IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

CHRISTOPHER BOWLER and the, )
HUDSON HIGH SCHOOL )
CONSERVATIVE CLUB, an )
unincorporated association, )
    *Plaintiffs*, )
                               )    05-11007 PBS
v.                             )    Case No.
                               )
JOHN STAPELFELD, in his )
individual and official capacities as )
principal of Hudson High School, )
DAVID CHAMPIGNY, in his individual )
and official capacities as assistant )
principal of Hudson High School, and )
DR. SHELDON BERMAN, in his )
individual and official capacities as )
Superintendent of Hudson Public )
School District, )
                               )
    *Defendants*. )

**MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

The Plaintiffs, Christopher Bowler and the Hudson High School Conservative Club, have moved pursuant to Fed. R. Civ. P. 65(a) for entry of a preliminary injunction prohibiting and restraining the Defendants from interfering with expressive and communicative activities of the Plaintiffs. A preliminary injunction is immediately required because the Defendants have prevented the Plaintiffs from engaging in expressive activity protected by the First Amendment to the United States Constitution, federal law, and the Constitution and laws of the Commonwealth of Massachusetts. The restraints imposed upon the speech of the Plaintiffs by the Defendants are plainly irreparable harm, which must be stopped through the issuance of the preliminary injunction sought

here.

## STATEMENT OF FACTS

Plaintiff Christopher Bowler (hereafter "Bowler") is an 18-year-old student enrolled at Hudson High School in Hudson, Massachusetts (Bowler Aff. ¶ 2). While a student at Hudson High School, Bowler observed an anti-American, anti-conservative attitude among most students and faculty at Hudson High School. Bowler holds conservative views and was criticized and derided for his ideology (Bowler Aff. ¶¶ 3, 6-7). Bowler complained about the anti-conservative bias he experienced at the school and was told that some corrective action would be taken. However, nothing was ever done (Bowler Aff. ¶¶ 4-5).

Because of the bias he observed, Bowler and another student decided to form a club to serve as a forum for pro-American and pro-conservative dialogue and speech. The two chose to be associated with a national organization, the High School Conservative Clubs of America (hereafter "HSCCA") and formed the Hudson High School Conservative Club (hereafter "the Club") (Bowler Aff. ¶¶ 8-9). HSCCA maintains a website with information about its activities, current events, opinion pieces, and other information of political and general interest (Bowler Aff. ¶ 10). Bowler and the other student obtained a faculty sponsor for the Club, and the Club was granted formal recognition as a Hudson High School student club in the Fall of 2004 (Bowler Aff. ¶ 12). The Club is not related to the curriculum of Hudson High School (Comp. ¶ 2.2.

As a recognized student club, the Club has the right and privilege to post posters in designated areas of the school publicizing the Club, its purpose, and other relevant information. On Friday, November 12, 2004, Bowler posted posters on behalf of the Club which contained the website address for HSCCA, www.hscca.org (Bowler Aff. ¶ 14). The following Monday, November 15,

2004, Bowler was called to the office of the Assistant Principal, Defendant David Champigny. When he arrived there, Bowler found most of the posters. In response to his query about why the posters were removed, Champigny told him that the HSCCA website promotes violence and is anti-gay (Bowler Aff. ¶¶ 15-16). Bowler requested clarification from the Principal, Defendant John Stapelfeld, who told Bowler that because the HSCCA website contained references to visual depictions of hostage beheadings in Iraq, the posters promoted violence and were inappropriate (Bowler Aff. ¶ 17).

At the next meeting of the Club, the faculty sponsor informed Bowler and other Club members that the posters could be put back up and that they could contain the HSCCA website address (Bowler Aff. ¶ 20). On January 7, 2005, Bowler and others put Club posters back up in proper places throughout the school, but only one contained the HSCCA web address (Bowler Aff. ¶ 21). However, that same day Bowler was again called to Defendant Champigny's office and found that the single poster with the web address had been removed (Bowler Aff. ¶ 22). Champigny gave Bowler a letter reasserting that, per Defendant Stapelfeld's orders, Club posters in the school could not contain the HSCCA website address (Comp. Exh. A). Eventually, Bowler and other Club members met with the Hudson Public School District Superintendent, Defendant Sheldon Berman. Defendant Berman defended the decision not to allow the website address on the posters, stating that the tone of some of the content on the HSCCA website was strident and problematic (Bowler Aff. ¶ 25).

## ARGUMENT

### I. PRELIMINARY INJUNCTION STANDARD

The criteria for the issuance of a preliminary injunction under Fed. R. Civ. P. 65(a) are well-established. As set forth in *McGuire v. Reilly*, 260 F.3d 36, 42 (1st Cir. 2001):

3

> A party who seeks a preliminary injunction must show: (1) that she has a substantial likelihood of success on the merits; (2) that she faces a significant potential for irreparable harm in the absence of immediate relief; (3) that the ebb and flow of possible hardships are in favorable juxtaposition; and (4) that the granting of prompt injunctive relief will promote the public interest.

*Accord Demarest v. Athol/Orange Community Television, Inc.*, 188 F. Supp. 2d 82, 89 (D. Mass. 2002). The third criteria simply means that the issuance of the requested preliminary injunction will burden the defendants less than denying an injunction would burden the plaintiffs. *Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98, 108 (D. Mass. 2003).

## II.   IRREPARABLE HARM

As a threshold matter, it is clear that the harm alleged in the Plaintiffs' Complaint, the suppression of communications, and expression protected under constitutional and statutory provisions is the kind of irreparable harm which justifies issuance of a preliminary injunction. "[T]he loss of First Amendment freedoms, for even minimum periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, when First Amendment interests are threatened or in fact being impaired at the time relief is sought, a preliminary injunction is proper. *Demarest*, 188 F. Supp. 2d at 89. The same principle has been applied to rights of free expression arising under Mass. Const. Art. XVI. *Jaykay-Boston, Inc. v. City of Boston*, 99 Mass. Super. LEXIS 41, at *11 (Mass. Super. Ct. Feb. 3, 1999) (citing *T&D Video, Inc. v. Revere*, 423 Mass. 577, 582, 670 N.E.2d 162 (1996)).

Because the Equal Access Act, 20 U.S.C. § 4071, protects the liberty to expression, the infringement of rights arising under that Act also constitutes irreparable harm for purposes of an application for a preliminary injunction. *Hsu v. Roslyn Union Free School Dist. No. 3*, 85 F.3d 839, 872 (2d Cir.), *cert. denied*, 519 U.S. 1040 (1996); *Colin ex rel. Colin v. Orange Unified Sch. Dist.*,

4

83 F. Supp. 2d 1135, 1149 (C.D. Cal. 2000). Actual and threatened violations of the Massachusetts statute protecting the right of students to free expression, Mass. Gen. Laws ch. 71, § 82, also has been found to be irreparable harm. *Westfield High School L.I.F.E. Club*, 249 F. Supp. 2d at 127-28. Violations of a plaintiff's right to equal protection of the law also constitute irreparable harm. *Westenfelder v. Ferguson*, 998 F. Supp. 146 (D.R.I. 1998) (citing *Maldonado v. Houston*, 177 F.R.D. 311 (E.D. Pa. 1997)). Thus, the Plaintiffs satisfy the irreparable harm criteria as to each of the claims set forth in the Complaint.

### III. THE PLAINTIFFS ARE LIKELY TO PREVAIL ON EACH OF THE CLAIMS SET FORTH IN THE COMPLAINT.

#### A. The Censorship of the Club's Posters Violates Massachusetts Students' Freedom of Expression Law.

Massachusetts Students' Freedom of Expression Law provides as follows:

> The right of students to freedom of expression in the public schools of the commonwealth shall not be abridged, provided that such right shall not cause any disruption or disorder within the school. Freedom of expression shall include without limitation, the rights and responsibilities of students, collectively and individually, (a) to express their views through speech and symbols, (b) to write, publish and disseminate their views, (c) to assemble peaceably on school property for the purpose of expressing their opinions. Any assembly planned by students during regularly scheduled school hours shall be held only at a time and place approved in advance by the school principal or his designee.
>
> No expression made by students in the exercise of such rights shall be deemed to be an expression of school policy and no school officials shall be held responsible in any civil or criminal action for any expression made or published by the students.
>
> For the purposes of this section and sections eighty-three to eighty-five, inclusive, the word student shall mean any person attending a public secondary school in the commonwealth. The word school official shall mean any member or employee of the local school committee.

Mass. Gen. Laws ch. 71, § 82. Plaintiffs are clearly students protected by this law, and the Defendants are clearly school officials subject to its strictures. Moreover, the Club has standing to

assert a claim under this law because the law protects the right of student expression both "collectively and individually." *Id.* *See also Westfield High School L.I.F.E. Club*, 249 F. Supp. 2d at 108-09 (student club had standing to bring claim under state student expression law).

The posters and the website information the Defendants have forbidden also are expressions protected by the Massachusetts statute. "The clear and unambiguous language protects the rights of the students limited only by the requirement that any expression be non-disruptive within the school. The language is mandatory. The students' rights include expression of views through speech and symbols, 'without limitation.'" *Pyle v. School Comm.*, 423 Mass. 283, 286, 667 N.E.2d 869, 872 (Mass. 1996). The freedom of speech protected under constitutional provisions has been construed to extend not only to expression that sets forth a particular idea or viewpoint, but also to information. The publication of truthful information on a matter of public interest or importance is expression that lies at the heart of the protection afforded by the First Amendment. *Butterworth v. Smith*, 494 U.S. 624, 632 (1990). Information regarding the HSCCA website is the means by which the Plaintiffs make known their views to others at the school and so is within the broad protection intended by the Massachusetts statute.

The only qualification upon the right granted by M.G.L.A. ch. 71, § 82, is that protection does not extend to speech that causes "any disruption or disorder" in the school. Construing this limitation, the court in *Westfield High School L.I.F.E. Club*, 249 F. Supp. 2d at 111, wrote that "[t]he obvious purpose of the statute, to protect student speech, would be completely undermined, . . ., if 'any disruption or disorder' extended to include trivial or merely negative reactions to an unpopular viewpoint." The court went on to hold that a school administrator can censor student expression if the administrator, considering all the circumstances known at the time of his or her decision, reasonably forecasts that any disruption or disorder will ensue within the school because of the

expression. *Id.*

It is clear that the censorship of the Plaintiffs' posters was not based upon any actual disruption of Hudson High School that was caused by the content of the posters. Plaintiff Bowler's affidavit attests to the fact that the first time the posters were removed, Defendant Champigny told Bowler it was because the HSCCA website promotes violence and is anti-gay (Bowler Aff. ¶ 16). When Bowler sought a more detailed explanation from Defendant Stapelfeld, he was told by Stapelfeld that the reason was the website's reference to hostage beheadings in Iraq and that access to visual depictions of beheadings was possible through the website, making the website "inappropriate" (Bowler Aff. ¶ 17). The posters were removed a second time after Bowler was told they could be replaced (Bowler Aff. ¶ 19). In a letter handed to Bowler by Defendant Champigny, no specific reason was given for the decision to require removal other than the fact that the posters contained the website address for HSCCA (Comp. Exh. A). In a later meeting involving Bowler, other Club members and Defendant Berman, Berman stated that the reason for the decision to forbid posting the HSCCA website address was that the "tone of some of the content on the HSCCA website was strident and problematic" (Bowler Aff. ¶ 25). Thus, at no time did any Defendant rely upon or refer to some actual disruption of the school as the basis for censoring the posters, and no incident of disruption was ever cited to Bowler.

Nor is this a case where the Defendants were aware of circumstances upon which they could reasonably forecast that there would be disruption of the school functions if the HSCCA website address were allowed to remain on the Club posters. Again, the specific reasons offered to the Club members and Bowler were not based upon a fear on the part of the Defendants that there would be problems at the school if the website address remained; the Defendants believed that content which could be accessed by a person visiting the HSCCA website was inappropriate for high school

students.[1] However, there is no indication either that students would be able to access this allegedly inappropriate material at school, much less that the viewing of the material to which the website referred would interfere with the operation of the school.

In the context of a claim that suppression of student speech violates the First Amendment, the courts have held that school officials have the burden of producing evidence that they "reasonably forecasted" disruption of the school. In *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 508 (1969), the Supreme Court held that a school's "undifferentiated fear or apprehension of disturbance [is] not enough to overcome the right to freedom of expression. Instead, school officials must present facts that might reasonably have led them to forecast interference with school activities. *Id.* at 514. *See also Griggs v. Fort Wayne School Board*, 359 F. Supp. 2d 731 (N.D. Ind. 2005) (school's decision to forbid student from wearing shirt bearing the Marine Corps motto because of the fear that it would incite violence did not satisfy the test of *Tinker*; officials could not point to any evidence supporting the fear that the shirt would incite violent acts).

There is simply no evidence here from which the Defendants could have forecast that any "inappropriate" material available through the HSCCA website would have interfered with the activities at Hudson High School. *See Westfield High School L.I.F.E. Club*, 249 F. Supp. 2d at 111-12 (no showing that school officials had evidence indicating to them that school would have been

---

[1]This even assumes the facts in a light most favorable to the Defendants. For instance, Defendants Champigny and Berman told Bowler that the website address was banned because the website promoted violence, was anti-gay and contained "strident content" (Bowler Aff. ¶¶ 16, 25). The first of these reasons is simply untrue because the website deplored the beheadings and cited the incidents as a reason to support the actions of the United States Government in Iraq. If the website reference had been banned because it was "anti-gay" or contained "strident" content, the reason for the censorship was content- or viewpoint-based and was a clear violation of the First Amendment. *Good News Club v. Milford Central Schools*, 533 U.S. 98, 106-07 (2001). Moreover, to the extent the censorship was based upon a fear of the reaction to the viewpoints expressed at the HSCCA website, this still was not a valid justification under M.G.L.A. ch. 71, § 82. "The obvious purpose of the statute, to protect student speech, would be completely undermined, however, if 'any disruption or disorder' extended to include . . . merely negative reactions to an unpopular viewpoint." *Westfield High School L.I.F.E Club*, 249 F. Supp. 2d at 111.

disrupted by religious students' distribution of candy canes with a religious message). Indeed, any claim to this effect is undercut by the fact that school officials allowed the Hudson High School student newspaper to print the HSCCA website address in a news story and allowed the showing of the film *Fahrenheit 9-11*, which depicts a beheading, at the school (Bowler Aff. ¶¶ 7, 26).

The Defendants' censorship of the Plaintiffs' posters also is not consistent with the Massachusetts student speech statute on the basis of any concerns that the hostage beheading depictions accessible through the HSCCA website were content from which students should be shielded. Although school officials are in certain circumstances allowed to censor and punish student expression that is vulgar or lewd, *cf. School Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986), that justification is insufficient under the protection afforded student speech by M.G.L.A. ch. 71, § 82. In *Pyle, supra*, the court considered the following certified question from the Court of Appeals for the First Circuit: "Do high school students in public schools have the freedom under G. L. c. 71, §§ 82 to engage in non-school-sponsored expression that may reasonably be considered vulgar, but causes no disruption or disorder?" The Massachusetts Supreme Court answered the question in the affirmative, holding that the language of the statute was clear:

> The statute is unambiguous and must be construed as written. . . . "The rights of students to freedom of expression in the public schools of the commonwealth shall not be abridged, provided that such right shall not cause any disruption or disorder within the school." G. L. c. 71, §§ 82. The clear and unambiguous language protects the rights of the students limited only by the requirement that any expression be non-disruptive within the school. The language is mandatory. The students' rights include expression of views through speech and symbols, "without limitation." There is no room in the statute to construe an exception for arguably vulgar, lewd, or offensive language absent a showing of disruption within the school.

*Pyle*, 423 Mass. at 286, 667 N.E.2d at 872. Without a showing of disruption or a reasonable forecast of disruption, *Westfield High School L.I.F.E. Club*, 249 F. Supp. 2d at 111, suppression of student speech is not justified even if school officials believe the speech is offensive. While it is clear that the Plaintiffs' speech was neither lewd, vulgar, or offensive because neither the website address nor the

website itself depicted, condoned, or glorified violence, even if the Defendants reasonably believed this to be the case, they were not entitled to censor the speech on this ground under Massachusetts' student speech statute.

### B. The Defendants' Censorship of the Plaintiffs' Posters Violates the Equal Access Act.

The Equal Access Act, 20 U.S.C. §§ 4071 et seq., provides in relevant parts as follows:

> It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

*Id.*, § 4071(a). In *Board of Ed. of Westside Community Schools v. Mergens*, 496 U.S. 226, 235 (1990), the Supreme Court determined that the purpose of the EAA was to extend the reasoning of *Widmar v. Vincent*, 454 U.S. 263 (1981), to public secondary schools, thereby requiring that such schools which receive federal funding not discriminate against non-curriculum related student groups on the basis of the religious, political, or philosophical views of the group. The EAA provides a private cause of action on behalf of persons or entities who are aggrieved by a secondary school's failure to comply with the equal access provisions of the Act. *Student Coalition for Peace v. Lower Merion School Dist. Bd. of School Dirs.*, 776 F.2d 431, 442 (3d Cir. 1985).

The EAA applies to schools that receive federal funding and have created a "limited public forum." 20 U.S.C. § 4071(a). Each of these criteria apply to Hudson High School; the school receives federal funding and it allows noncurriculum related student groups to meet on school property during noninstructional time (Comp. ¶¶ 3.9, 6.2). *See* 20 U.S.C. § 4071(b). Furthermore, the Club is a "noncurriculum related student group" for the purposes of the EAA. In *Mergens*, 496 U.S. at 239, the Supreme Court held that this phrase is to be interpreted broadly to mean any student group that does not directly relate to the body of course offered by the school. The Club was formed to serve as a forum for pro-American and pro-conservative dialogue and speech (Bowler Aff. ¶ 8). The

10

Club does not relate to a subject matter actually taught at Hudson High School, does not concern the body of courses taught at the high school, is not required as part of a particular course, and does not result in academic credit. As such, it is not directly related to the curriculum and is entitled to the equal treatment mandated by the EAA. *Mergens*, 496 U.S. at 239.

Although 20 U.S.C. § 4071(a) requires equal opportunity to conduct "meetings," the EAA requires more of schools than just equal treatment of noncurriculum related clubs with respect to the ability to hold group encounters. "Meeting" is defined in the EAA as "those activities of student groups which are permitted under a school's limited open forum and are not directly related to the school curriculum." 20 U.S.C. § 4072(3). Thus, "equal access" includes not simply the right to use meeting rooms, but to have access to school newspapers, bulletin boards, public address systems, and school events that are generally made available to noncurriculum related student groups. *Mergens*, 496 U.S. at 247. Thus, in *Prince v. Jacoby*, 303 F.3d 1074, 1086 (9th Cir. 2002), *cert. denied*, 540 U.S. 813 (2003), the court held that discrimination in the terms of use of school bulletin boards for publicizing student club events violates the EAA. There is no qualification in the EAA or *Mergens* that would allow unequal treatment with respect to access to bulletin boards. "Access to such space must be 'equal'." *Id.* at 1086.

In the instant case, the Plaintiffs' rights under the EAA have been violated because the Defendants have not treated Bowler or the Club equally with respect to posting of information regarding the Club and its national organization. The Club has been singled out for censorship of its information. It cannot be doubted that the HSCCA website is a valuable source of information concerning the viewpoint of the Club and the current issues of importance to the Club, Bowler and other Club members. The HSCCA website clearly would be a helpful source of information for other students at Hudson High School who may be considering joining the Club. However, the actions of the Defendants have prevented the Plaintiffs from effectively promoting and communicating the views of the Club to other students. The holding in *Mergens* and other cases applying the EAA require that the Club be allowed an equal opportunity to publicize itself and the views of the Club. *Prince*, 303 F.3d at 1087.

The Defendants cannot claim here that the information the Plaintiffs desired to post would have compromised the order or discipline of the school. Although 20 U.S.C. § 4071(f) provides that the EAA is not intended to limit the authority of school officials to maintain discipline and protect the well-being of students, courts have held that this provision was meant to incorporate the "material disruption" standard established in *Tinker*. *Hsu*, 85 F.3d at 868, n. 28; *Boyd County High School Gay Straight Alliance v. Board of Education of Boyd County*, 258 F. Supp. 2d 667, 689 (E.D. Ky. 2003). As pointed out in part III(B), *supra*, there has never been any indication that posting of the website address interfered with the operation of the school, nor is there any reasonable basis for the Defendants to have forecast that the information available at the website would materially disrupt the order or learning environment of Hudson High School. Therefore, the unequal treatment of the Plaintiffs by the Defendants is not covered by 20 U.S.C. § 4071(f), and the censorship of the Club posters violated the EAA.

### C. The Defendants' Censorship of the Plaintiffs' Posters Violates the Plaintiffs' Constitutional Right to Free Speech and Expression.

The Plaintiffs also are likely to prevail on the First and Second Claims set forth in the Complaint, which allege that the Defendants have violated the Plaintiffs' rights under the First Amendment to the United States Constitution and Article XVI of the Massachusetts Declaration of Rights.[2] It is by now well-established that public school students do not shed their constitutional rights at the schoolhouse gate. *Tinker*, 393 U.S. at 506. Admittedly, students in public schools do not enjoy First Amendment rights to free expression that are coextensive with the rights of adults in other settings. *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). In *Demers v. Leominster School Department*, 263 F. Supp. 2d 195, 201 (D. Mass. 2003), the court identified the limits on the protection of student speech as follows:

---

[2] These claims will be treated together because the Massachusetts courts have held that the analysis of free speech rights under Article XVI of the Declaration of Rights is guided by the analysis under the First Amendment. *Hosford v. School Committee of Sandwich*, 421 Mass. 708, 712, 659 N.E.2d 1178, 1180, n. 5 (1996).

> School officials have the authority to limit, restrict or punish: (1) speech that causes a substantial and material disruption of the school's operation, or which impinges upon the rights of other students, *Tinker*, 393 U.S. at 508 (upholding high school students' right to wear black armbands in protest against the Vietnam War); (2) vulgar or lewd speech, *Bethel*, 478 U.S. at 683 (holding school could punish students for making lewd remarks at school assembly); and (3) school-sponsored speech that is limited to legitimate educational concerns, *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (holding that school principal could censor student newspaper).

The analysis and degree of protection applicable depends upon what type of student speech is at issue. In this case, the *Tinker* analysis applies because the speech and expression that the Defendants censored and suppressed is neither vulgar, lewd, nor school-sponsored.

The *Hazelwood* decision is clearly inapplicable because this was not school-sponsored speech. The *Hazelwood* decision defined school-sponsored expressive activities as activities that "may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, *so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.*" *Hazelwood*, 484 U.S. at 271 (emphasis added). In that case, the Supreme Court held that school officials did not violate the First Amendment by editing articles composed in connection with the publication of a high school newspaper because the school paper was a school-sponsored activity designed to teach skills to student participants. The court distinguished speech that may fairly be characterized as part of the school curriculum from "personal expression that happens to occur on school premises." *Id.*

There is little doubt that the Plaintiffs' posters were not "school-sponsored expression" and that the *Hazelwood* analysis is inapplicable here. The posters were created and posted to publicize a non-curriculum related school club. While the Club had a faculty sponsor as required of any school club, the sponsor did not engage in instruction at the Club meetings. Indeed, the purpose of the Club was not to impart any particular knowledge or skills on behalf of the school, but to act as a forum for the exchange of ideas among students (Bowler Aff. ¶ 8). That school-sponsored speech is not involved here is confirmed by the decision in *Westfield High School L.I.F.E. Club*, 249 F. Supp. 2d at 117-18, where the court rejected a school's argument that a religious club's expression on school premises was school-sponsored speech, writing as follows:

13

> The mere facts that the school opened its channels of communication (i.e., daily bulletin, bulletin boards, student yearbook), provided an adult sponsor who acts merely as a monitor and does not actively or substantively participate in any of the Club's activities, and opened its facilities for use before school for morning prayer at the flagpole and after school for Club meetings, does not mean that the LIFE Club can "fairly be characterized as part of the school curriculum." . . . *Hazelwood*, 484 U.S. at 271. To adopt the defendants' definition of "school-sponsored" would devoid that term of any helpful meaning, as nearly every student group activity happening to occur on school grounds can, in some tenuous sense, be described as using school facilities and as designed to impart some sort of knowledge upon its members. Rather, for expressive activity to be school-sponsored, the school needs to take affirmative steps in promoting the particular speech.

The same reasoning controls in this case.

Censorship of the Plaintiffs' posters also was not justified under the holding in *Bethel* that school officials may restrict vulgar or lewd speech. *Bethel* upheld a school's decision to punish a student for a speech given at a school assembly that was sexually suggestive, writing as follows:

> Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse. Indeed, the "fundamental values necessary to the maintenance of a democratic political system" disfavor the use of terms of debate highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the "work of the schools." . . . The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board.

*Bethel*, 478 U.S. at 683. Thus, the Supreme Court authorized school restriction upon the manner of student speech and allows schools to forbid or punish speech that is lewd, vulgar, or offensive. *See Castorina v. Madison County Sch. Bd.*, 246 F.3d 536, 542 (6th Cir. 2001) (*Bethel* allows school regulation of the "manner of speech," not the content of the speech) and *Barber v. Dearborn Pub. Schs.*, 286 F. Supp. 2d 847, (E.D. Mich. 2003) (*Bethel* decision "merely was delineating certain forms of speech–sexually explicit or vulgar and offensive language–that in particular can be said to be 'wholly inconsistent with the "fundamental values" of public school education.'").

In the instant case, there was nothing vulgar, lewd, or offensive in the manner of speech employed by the Plaintiffs on the Club posters. The expression and information that was censored by the Defendants was simply a website address; there was nothing inherent in the symbols used, www.hscca.org, that was offensive, lewd, or vulgar. Because the manner of the Plaintiffs' speech was

14

not even remotely lewd, vulgar, or offensive, the decision in *Bethel* is not applicable here.

To the extent the Defendants suggest that *Bethel* applies here because material accessible via the HSCCA website, i.e., Iraqi hostage beheading, was excessively violent and offensive, the argument must be rejected as it has been in other cases. Thus, in *Emmett v. Kent Sch. Dist. No. 415*, 92 F. Supp. 2d 1088 (W.D. Wash. 2000), the court granted a student's request for a preliminary injunction preventing school officials from suspending him for creating a mock "homepage" for his high school that contained references to the death of certain students and gave persons the opportunity to vote on who would "die next." Rejecting the applicability of *Bethel*, the court pointed out that Justice Brennan's concurrence in *Bethel*, 478 U.S. at 688 (Brennan, J., concurring), disavowed any suggestion that the decision would allow punishment of a student for speech that occurs off school grounds. The court also noted that student distribution of non-school-sponsored material cannot be forbidden on the basis of undifferentiated fears of disturbance or embarrassment. *Emmett*, 98 F. Supp. 2d at 1090 (citing *Burch v. Barker*, 861 F.2d 1149 (9th Cir. 1988). Because the school officials had not shown actual or potential disruption of the school as a result of the website, the court found that the student would likely succeed on his First Amendment claim.

Similarly, in *Coy v. Bd. of Ed. of North Canton City Schs.*, 205 F. Supp. 2d 791 (N.D. Ohio 2002), the court rejected the claim of school officials that punishment imposed upon a student for vulgar and offensive content posted on a website created by the student, and accessed by that student at school, was justified under the *Bethel* decision. "The concerns raised in *Fraser* and *Hazelwood* are not present in this case," the court held. "Jon Coy was not speaking or attempting to speak in front of a captive audience. . . . His expressive activity was not sanctioned by the school nor did the school knowingly provide any materials to support the expression." *Id.* at 799-800. The court proceeded to hold that the "material disruption" test of *Tinker* would control in the case. *Accord Beussink by and through Beussink v. Woodland R-IV Sch. Dist.*, 30 F. Supp. 2d 1175 (E.D. Mo. 1998) (*Tinker* applied to validity of discipline imposed upon student for vulgar and offensive content on website created by student off school premises; student was entitled to preliminary injunction).

Even assuming material accessible through the HSCCA website was vulgar or offensive for

purposes of the *Bethel* decision, that decision is not controlling here because the expression did not occur on school premises. That decision extends only to in-school speech, the manner of which is lewd, vulgar, or offensive. Neither of those factors applies to the information set forth on the Plaintiffs' posters that was censored by the Defendants.

Therefore, the controlling standard in this case is that set forth in the *Tinker* decision. Under that decision, school officials may forbid student expression in the schools if the expression "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Tinker*, 393 U.S. at 509. As pointed out *supra*, there is no evidence of any actual disruption caused by the presence of the HSCCA website address on the Club's posters. Teachers were not prevented from instructing students, and no altercations between students occurred as a result of the website address on the posters. *See Killion v. Franklin Regional School District*, 136 F. Supp. 2d 446, 455 (W.D. Pa. 2001) (student's suspension for writing and e-mailing insulting and lewd list regarding school administrator violated the First Amendment because the school could not show any disruption resulting from the student's expression).

Furthermore, any fears of disruption on the part of the Defendants were unwarranted and the possibility of disruption too remote to justify censorship of the Plaintiffs' posters. *Tinker* ruled that a school's unsubstantiated apprehension of disruption is insufficient justification for suppressing students' rights to free speech in schools:

> In our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Tinker*, 393 U.S. at 508-09; *accord Westfield High School L.I.F.E. Club*, 249 F. Supp. 2d at 116-17. This is not a case where the student speech at issue raised a possibility of violence occurring on the school campus; in such cases, courts have given school administrators more leeway in predicting

disruption. *See Demers*, 263 F. Supp. 2d at 202-03 (citing *LaVine v. Blaine School Dist.*, 257 F.3d 981, 988 (9th Cir. 2001). Here, the only justification for the Defendants' censorship of the posters is the possibility that some students would follow links shown on the HSCCA website to video of hostage beheadings. Even if this were possible, it is wholly implausible to believe it would cause some disruption of the school.

Thus, any forecast of disruption arising from the information put on the Plaintiffs' poster was and is wholly unreasonable and entirely speculative. The possibility of disruption is clearly outweighed by the rights of the Plaintiffs to communicate information and their views to students and by the rights of students to know where they can find information about the HSCCA and conservative viewpoints in general. The Defendants, without any substantial basis for believing school disruption would occur, have prevented this exchange of information and political ideas and views among students. It is highly likely that the Defendants' actions will be found to have violated the First Amendment and the comparable provision of the Massachusetts Declaration of Rights, warranting preliminary relief in favor of the Plaintiffs.

### D. The Defendants' Censorship of the Plaintiffs' Posters Violates the Constitutional Guarantee to Equal Protection and Equal Rights.

As alleged in the Fifth and Sixth Claims set forth in the Complaint, the Plaintiffs also have been singled out for different and unequal treatment in violation of the Equal Protection Clause, U.S. Const. Amend. XIV, and the comparable provision of Mass. Const. part 1, Art. I.[3] The guarantee to equal protection of the law forbids those acting under color of state law from treating particular persons less favorably because of the views or content expressed in the speech of those persons. *Police Department of Chicago v. Mosely*, 408 U.S. 92, 96-97 (1972). The Supreme Court has condemned discrimination among users of the same medium of expression, *id.*, and when the government intentionally singles out persons for different treatment because of those persons' exercise of rights

---

[3] The protection afforded by the state and federal constitutional provisions are equivalent and will be treated together. *Commonwealth v. Arment*, 412 Mass. 55, 63, 587 N.E.2d 223, 228 (1992).

to free speech protected by the First Amendment, the government violates the Equal Protection Clause. *Wayte v. United States*, 470 U.S. 598, 608 (1985).

Indeed, the guarantee to equal protection forbids any and all arbitrary and irrational discrimination against individuals. Thus, the Supreme Court has held as follows:

> Our cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. *See Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441 (1923); *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.*, 488 U.S. 336 (1989). In so doing, we have explained that "'the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" *Sioux City Bridge Co., supra*, at 445 (quoting *Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 352 (1918)).

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564-565 (2000).

The facts of this case evince invidious and irrational discrimination against the Plaintiffs by the Defendants. The Defendants have targeted the Plaintiffs for unequal treatment, censoring only the Club's posters. That only the Club posters were targeted because of the political viewpoint of the Club and its affiliation with the HSCCA is supported by incidents detailed in Bowler's affidavit, including statements indicating teachers thought the Club would spread hate (Bowler Aff. ¶ 13), Defendant Berman's statement that the content at the HSCCA's website was "strident and problematic" (Bowler Aff. ¶ 25), and the interruption of a Club meeting by certain faculty members who were hostile to the views of the speaker the Club had invited (Bowler Aff. ¶¶ 30-31). Otherwise, the Defendants had no rational basis for censoring the Plaintiffs' posters. Again, there was no actual disruption caused by the posters, and the Defendants had no reason to fear any such disruption. To the extent the Defendants were concerned about students viewing the hostage beheadings, this justification is minimized, if not eliminated, by the fact that the existence of these videos was well known and any student desiring to view the videos could have accessed them through other internet sites. By singling out the Plaintiffs and the expression they desired to engage in for disparate treatment, the Defendants violated the Plaintiffs' right to equal protection and equal rights.

### IV. THE DEFENDANTS WOULD SUFFER NO HARM IF A PRELIMINARY INJUNCTION IS GRANTED, AND THE PUBLIC INTEREST WOULD BE FURTHERED BY GRANTING THE REQUESTED RELIEF.

The circumstances here also show that the "ebb and flow of possible hardships" favors the Plaintiffs. Against the harm to the Plaintiffs' rights of free speech and expression, which is unquestionably irreparable and substantial, must be weighed the possible harm to the Defendants. Because the Defendants cannot show any disruption of Hudson High School that might occur should the censorship of the Plaintiffs' posters be lifted, the balance unquestionably favors the Plaintiffs. Moreover, the public interest would be served by granting the preliminary injunction. As noted in *Westfield High School L.I.F.E. Club*, 249 F. Supp. 2d at 128, "[p]rotecting rights to free speech is *ipso facto* in the interest of the general public. *Machesky v. Bizzell*, 414 F.2d 283, 289 (5th Cir. 1969) ('First Amendment rights are not private rights . . . so much as they are rights of the general public.')."

### V. THE REQUIREMENT THAT SECURITY BE POSTED SHOULD BE WAIVED.

Although Fed. R. Civ. P. 65(c) generally requires that the party seeking a preliminary injunction post a security bond, that requirement should be waived in this case. As Plaintiff Bowler's affidavit indicates, he is a student and does not have sufficient financial means to post a security bond (Bowler Aff. ¶ *). Moreover, there is no indication that the Defendants or the Hudson Public School District would suffer any harm, much less some financial harm, from the issuance of an injunction preventing censorship of the Plaintiffs' posters. This action is one to enforce important state and federal rights, and "the public interest is served when public high school students seek to preserve their right[] to free expression[.]" *Westfield High School L.I.F.E. Club*, 249 F. Supp. 2d at 129 (citing *Crowley v. Local No. 82, Furniture & Piano Movers*, 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grds.*, 467 U.S. 526 (1984)). Therefore, this is an appropriate case for waiver of the security bond requirement of Fed. R. Civ. P. 65(c).

## CONCLUSION

For the reasons set forth above, the Plaintiffs respectfully request that this Court enter a preliminary injunction forbidding the Defendants and their officers and agents from forbidding, preventing, or otherwise interfering with the Plaintiffs' communication with others, either orally or by way of posters, flyers, and other written materials regarding the HSCCA, the HSCCA internet website, or other information regarding the HSCCA. It is further requested that this Court waive any requirement that the Plaintiffs post security in connection with that injunction.

Dated this 16 th day of May, 2005.

Respectfully submitted,

_____
Gregory A. Hession, Esq.
LAW OFFICES OF GREGORY A. HESSION
99 Forest Park Ave.
Springfield, MA 01108
(413) 746-3333
Fax: (413) 746-6161
Participating Attorney for
The Rutherford Institute

John W. Whitehead, Esq.
Douglas R. McKusick, Esq.
THE RUTHERFORD INSTITUTE
1440 Sachem Place
Charlottesville, Virginia 22901
(434) 978-3888
Fax: (434) 978-1789
OF COUNSEL

COUNSEL FOR THE PLAINTIFF