UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CHRISTOPHER BOWLER and HUDSON HIGH SCHOOL CONSERVATIVE CLUB,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN STAPELFELD, DAVID CHAMPIGNY and SHELDON BERMAN,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>) CASE NO. 05-CV-11007-PBS<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' OPPOSITION TO
## MOTION FOR PRELIMINARY INJUNCTION

The Defendants, John Stapelfeld, David Champigny and Sheldon Berman – the Principal

of Hudson High School, the Assistant Principal of Hudson High School and the Superintendent

of the Hudson Public Schools respectively – hereby oppose the Plaintiffs' motion for a

preliminary injunction.

## I.      BACKGROUND FACTS

Approximately 1,000 students attend Hudson High School, which includes grades 8

through 12.  Affidavit of John Stapelfeld ("Stapelfeld Aff.") at ¶ 2.  Grade 8, which is comprised

of approximately 220 students, is the biggest class on the High School campus.  Id.  There are

children in Hudson's 8th Grade who are as young as 12 years old.  Id.

During the Fall of 2005, a group of students sought permission to form a school-

recognized student club, the Hudson High School Conservative Club ("Club"), which would

discuss and support issues relating to a conservative political agenda.  Complaint at ¶¶ 3.7-3.9;

Stapelfeld Aff. at ¶ 3.  The High School administration viewed the formation of the Club

extremely positively, as it would only add to and encourage the High School's multiplicity of viewpoints and perspectives. Id.

School-recognized clubs are afforded the opportunity to place posters in designated High School hallways for purposes of publicizing the days, times and places in which they meet. Stapelfeld Aff. at ¶ 4. However, Hudson High does not allow student clubs to display additional detailed information, such the clubs' history, membership, or purposes, nor does it allow clubs or others to advertise the products, services and the like of outside entities in the school. Id.

In the Fall of 2004, Principal Stapelfeld granted the Conservative Club full status as a school-recognized student club. Stapelfeld Aff. at ¶ 5; Complaint at ¶ 3.9. The Club has continued to meet ever since. Id. At no time has Principal Stapelfeld or any other school administrator attempted to limit in any way the topics of discussion of the Club. Id.

In November 2004, the Club had hung posters which not only publicized its meetings, but also displayed a website address: www.hscca.org. Stapelfeld Aff. at ¶ 7. Prior to this, there was not a single instance in which any club advertised a website address in the High School's hallways. Id. Had any club ever done so, the school administration would have required that it be removed, as the school simply cannot be held responsible for content on sites over which it has no control. Id.

Here, however, it soon became apparent that the website at issue, that of the High School Conservative Clubs of America ("HSCCA"), appeared to contain direct links to no less than five videos of terrorists in Iraq beheading hostages. Stapelfeld Aff. at ¶ 8. The High School's Director of Technology, Ellen Shuck, further investigated the content of these links and discovered that the links in fact showed actual video footage of beheadings of hostages by

terrorists in Iraq. Id. Indeed, these videos depicted in graphic detail the literal sawing off of hostages' heads, sometimes lasting over several minutes. Id.

Based on this, Principal Stapelfeld concluded that the website should not be posted in the school's hallways. Stapelfeld Aff. at ¶ 9. The Superintendent of the Hudson Public Schools, Dr. Sheldon H. Berman, later affirmed this decision. Complaint at ¶¶ 3.21 and 3.23. While true that the administration could have prohibited the website based solely on the High School's policy against outside advertising on club posters, its main concern in prohibiting the Club's poster was that it promoted a website allowing students access to truly horrific, grisly and violent videos of murder by beheading. Stapelfeld Aff. at ¶ 10.

Based on his 25 years as a high school principal, Principal Stapelfeld had and continues to have no doubt that viewing this material would have an extremely negative impact on students – particularly the younger students in the school, some of whom are as young as 12 years old. Stapelfeld Aff. at ¶ 10. In Principal Stapelfeld's opinion, promoting this website, which directed students to these images, would likely cause extensive educational disruption and disorder to both their emotional sense of well-being as well as their ability to concentrate on their studies in school and at home. Id. The impact of viewing this material on any individual child could therefore be enormous and significantly disruptive of that child's education and, indeed, his or her ability to live peaceably. Id. Quite simply, this result was a risk that the Hudson Public Schools was and remains unwilling to take. Id.

The Hudson High School administration has had past experience with beheading videos on the internet. In Spring, 2004, students had accessed websites showing Iraqi beheadings on school computers. Stapelfeld Aff. at ¶ 11. At that time, Principal Stapelfeld immediately had student access to those sites blocked. Id. Principal Stapelfeld made this decision for the exact

same reason that he decided to prohibit the Club from displaying the HSCCA website – to protect students from lasting emotional damage the gruesome depictions of murder by beheading would engender.  Id.

Based on all this, the Club was informed that they could no longer display the website address on their posters.  Stapelfeld Aff. at ¶ 12.  Because the website address was the one and only issue with which the High School administration had any problem, it allowed the Club to re-hang their posters with the website address covered.  Id.  Although school administrators have discussed with Club members some of the other content of the HSCCA website, the links to the beheadings were and continue to be their sole objection thereto.  Id.  No Hudson High School official has ever indicated to Club members that the website's other content was the reason for the decision to prohibit the display of the website address.  Id.

## II.   ARGUMENT

Injunctive relief is considered an extraordinary remedy and courts should use it cautiously and sparingly.  Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 S. Ct. 1798, 72 L. Ed. 2d 91 (1982).  See also Charlesbank Equity Fund II, Ltd. Partnership v. Blinds to Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004) ("A preliminary injunction is a potent weapon that should be used only when necessary to safeguard a litigant's legitimate interests"); 13 Moore's Federal Practice, § 65.20 (Matthew Bender 3d ed.) ("a preliminary injunction is an extraordinary remedy that may be granted only by a clear demonstration by a plaintiff of the merits of such a request") (internal citations omitted).  Such extraordinary relief is not justified in this case.

**A.    The Motion For Preliminary Injunction Should Be Denied Because It Impermissibly Seeks To Alter The Long-Standing Status Quo.**

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Texas v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981). See also CMM Cable Rep. v. Ocean Coast Properties, 48 F.3d 618, 620 (1st Cir. 1995) ("The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs"); Bell Atl. Business Sys. Servs. v. Hitachi Data Sys. Corp., 856 F. Supp. 524, 525 (N.D. Cal. 1993) (denying preliminary injunction because "Plaintiff does not seek to maintain the status quo, but instead seeks to drastically alter the status quo").

Here, the Plaintiffs were first prohibited from displaying the HSCCA internet website address on Club posters on November 15, 2004. See Complaint at ¶ 3.12. That prohibition has lasted to this day. See Stapelfeld Aff. at ¶ 12; Complaint at ¶¶ 3.12-3.21. Thus, the current situation between the parties, which has existed as the status quo for over *six months*, is that the Plaintiffs remain prohibited from displaying the website address.[1]

Rather than attempting to freeze the existing situation, the Plaintiffs' motion for preliminary injunction instead seeks to completely reverse the long-standing status quo prior to a trial on the case's merits. The Plaintiffs' motion is therefore contrary to the plain purpose of a Rule 65 preliminary injunction and should be denied.

---

[1] Their six month delay in seeking preliminary injunctive relief also defeats the Plaintiffs' claim of irreparable harm, a prerequisite for obtaining a preliminary injunction. See Argument section B.1. *infra*.

**B.    The Motion Should Be Denied Because The Plaintiffs Cannot Meet The Requisite Elements For Obtaining A Preliminary Injunction.**

The Court may order a preliminary injunction if the plaintiffs can demonstrate that (1) they have a substantial likelihood of prevailing on the merits, (2) they face a significant potential of suffering irreparable harm in the absence of immediate relief, (3) issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs, and (4) issuing an injunction will promote or, at least not impair, the public interest.

Westfield High Sch. L.I.F.E. Club v. City of Westfield, 249 F. Supp. 2d 98, 108 (D. Mass. 2003)

(citing McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001)).

No preliminary injunction should issue here because the Plaintiffs do not – and cannot –

show that they will experience irreparable harm in the absence of immediate relief, that they are

likely to succeed on the merits of their claims, or that the issuance of an injunction would

promote the public interest.

**1.    The Plaintiffs Cannot Show That They Will Suffer Irreparable Harm in the Absence of Immediate Relief.**

Most clearly, the Plaintiffs cannot meet their burden of showing that they will be

irreparably harmed if they are denied the immediate relief of an injunction.  See Blinds to Go,

Inc., 370 F.3d at 162 (citing Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18

(1st Cir. 1996) ("The burden of demonstrating that a denial of interim relief is likely to cause

irreparable harm rests squarely on the movant")).

> [P]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least reduced need for such drastic, speedy action . . . . Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction."

Citibank N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985).  Accord Blinds to Go, Inc., 370

F.3d at 163 (delay in "filing of a motion for preliminary injunction, not attributable to

intervening events, detracts from the movant's claim of irreparable harm.  The longer the delay, the more pervasive the doubt") (internal citations omitted)).

As noted, the Plaintiffs have been continually prohibited from displaying the website address since November 15, 2004.[2]  See Complaint at ¶ 3.12.  There is therefore no rational argument that the Plaintiffs – six months after the fact – will be irreparably harmed without the immediate, emergency relief a preliminary injunction provides.[3]

Furthermore, the Plaintiffs initiated their lawsuit a mere month before the end of Hudson's 2004-05 school year on June 20, 2005.  Given the long-standing website address prohibition, an additional few weeks thereof before the school year ends completely undermines any claim of irreparable harm.  See, e.g., Doe v. Winchendon Sch. Comm., 18 Mass. L. Rep. 53, 2004 Mass. Super. LEXIS 221 at *11 (Agnes, *J.*) (June 28, 2004) (denying preliminary injunction motion of student claiming his expulsion violated his free speech rights because, *inter alia*, "Adam had already been out of school for approximately 6 weeks; thus it would be difficult to argue that missing the last 5 days [of the school year] in addition would cause 'irreparable harm'").  The Plaintiffs cannot show irreparable harm and the preliminary injunction should be denied.

---

[2] To the extent that the Plaintiffs try to claim that there was some doubt whether the initial November 2004 decision to prohibit the website address would remain in force, the Plaintiffs admittedly knew in January 2005 that Superintendent Berman "affirmed, ratified and adopted the decisions of Defendants Stapelfeld and Champigny that the club could not include the website address of HSCCA on its posters and signs."  See Complaint at ¶¶ 3.23.  Thus, in their most favorable light, the Plaintiffs waited over four months before filing the instant preliminary injunction motion – much too long a time to now claim irreparable harm.

[3] It is worth noting that the Club's faculty advisor, Donald Martin, reports that the Club never voted on or discussed in any meeting whether to institute this lawsuit.  See Stapelfeld Aff. at ¶ 13.  As such, there is significant doubt as to whether this suit is properly brought under the Club's auspices at all and/or whether it is truly the cause of a single student, Christopher Bowler, a senior who is graduating in mere days.

### 2.    The Plaintiffs Cannot Show a Likelihood of Success on the Merits of Their Claims.

Despite all their bluster about an alleged anti-conservative bias permeating Hudson High School (see, e.g., Affidavit of Christopher Bowler at ¶¶ 3-7; 13; 19; 28-31), the motion for preliminary injunction – indeed, the Plaintiffs' entire case – is solely about whether they should be allowed to display the HSCCA website address on Club posters hanging in the hallways of Hudson High School. See, e.g., Motion at 1 (seeking injunction directed solely at prohibiting Defendants from interfering with Plaintiffs' dissemination of information about HSCCA and its website). The Defendants' one and only reason for prohibiting the display of the HSCCA's website address was to shield children as young as twelve years old from accessing links provided on that site to truly horrific and gruesome videos of Iraqi insurgents beheading hostages. See Stapelfeld Aff. at ¶¶ 9-12, 14. Under these circumstances, common sense dictates a finding that the Defendants' actions were not only lawful but laudable, and that the Plaintiffs' motion for preliminary injunction should be denied.

### a.    The Plaintiffs cannot succeed on their claims under the Equal Access Act or M.G.L. c. 72, § 81 because they have not brought suit against entities that can be held liable thereunder.

As an initial matter, the Plaintiffs claims under the Equal Access Act, 20 U.S.C. § 4071 *et seq.* ("EAA")[4] and M.G.L. c. 71, § 82,[5] must fail because they have not sued the entities that can be held liable under those statutes. Having brought suit only against Hudson High School's

---

[4]In relevant part, the EAA states "It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a).

[5]M.G.L. c. 71, § 82 provides: "The right of students to freedom of expression in the public schools of the commonwealth shall not be abridged, provided that such right shall not cause any disruption or disorder in the school."

Assistant Principal and Principal and against the Superintendent of the Hudson Public Schools, the Plaintiffs have plainly failed to sue a "public secondary school which receives Federal financial assistance," the only entity over which the EAA extends coverage.

With regard to M.G.L. c. 71, § 82, that statute simply does not give a right of action against the named individuals (as opposed to a school committee or town).  Although § 82 provides certain free speech protections to public secondary school students, it does not contain an explicit private right of action.  Thus, in order to determine who is the responsible party for an alleged violation of § 82, one needs to examine the language of § 82 in the context of the fact that § 82 was passed by the legislature as part of series of interrelated laws on student behavior – that is, M.G.L. c. 71, §§ 82-86.  See Pyle v. Sch. Comm. of South Hadley, 423 Mass. 283, 285 (1996) (stating § 82 "is one of a series of statues outlining students' rights and responsibilities")..

When § 82 was passed, it was only applicable to the cities and towns that voted to accept its terms, and the local school committees in the municipalities that accepted its terms were to adopt "rules and regulations" for the statute's enforcement.  See M.G.L. c. 71, §§ 85-86; Pyle, 423 Mass. at 285.  Thus, § 82 was passed as a statute that mandated actions (and thereby arguably liabilities for any failures to act) to a city, town or school committee only when that public entity voluntarily chose to assume these § 82 responsibilities.

There is nothing in § 82 (or indeed in §§ 83-86) that makes an individual school employee potentially liable for a violation of § 82.  In fact, § 82 expressly provides that "school officials" (who are defined as "any member or employee of the local school committee") *cannot* be held civilly or criminally liable "for any expression made or published by the students."  As this action at its core seeks to hold the defendant "school officials," liable for their actions concerning "any expression made or published by the students" the Court cannot base any relief

(including preliminary equitable) against the defendants based on § 82. That § 82 was in 1988 made applicable to all cities and towns (through an amendment to § 86) does not change this analysis, as the Supreme Judicial Court has specifically held that this amendment did not "evince a legislative intent either to broaden or restrict the content of § 82." Pyle, 423 Mass. at 287.

Further, Chapter 71 is entitled "Public Schools" and concerns the rights and obligations of municipalities with regard to public education. Thus, the legislative scheme of Chapter 71 broadly indicates that its prohibitions are aimed at municipalities and not at individual school officials. In short, because the Plaintiffs have sued individual school employees, and not the entities which can be held liable under either the EAA or c. 71, § 82, they cannot show a likelihood of success on those claims and their preliminary injunction motion should be denied.

     **b.**     **The Plaintiffs' display of the website address at issue is not protected speech.**

Moreover, despite their assumptions to the contrary, the Plaintiffs' mere display of the HSCCA website address is not protected speech. Website "[d]omain names . . . *per se* are neither automatically entitled to nor excluded from the protections of the First Amendment, and the appropriate inquiry is one that fully addresses the particular circumstances presented with respect to each domain name." Name.Space, Inc. Network Solutions, Inc., 202 F.3d 573, 586 (2d Cir. 2000). "Whether a particular domain name is entitled to protection under the First Amendment depends on the extent of its communicative message."[6] OBH, Inc. v. Spotlight Magazine, Inc., 86 F. Supp. 2d 176, 197 (W.D.N.Y. 2000) (citing Name.Space, Inc., 202 F.3d at

_____

[6]For a thorough discussion of internet navigation, domain names, see National A-1 Advertising, Inc. v. Halberstroh, 121 F. Supp. 2d 156 (D.N.H. 2000).

586).

Consequently, where a domain name merely identifies a website's sponsor but contains no other message, it is merely a "source identifier" and not protected speech. See, e.g., OBH, Inc., 86 F. Supp. 2d. at 197-98 (holding domain name "thebuffalonews.com" contained no communicative message but was merely a source identifier directing internet users to defendant's website critical of The Buffalo News newspaper); Jews for Jesus v. Brodsky, 993 F. Supp. 282, 286-87 n.1 (D.N.J. 1998) (concluding domain names "JewsForJesus.org" and "Jews-for-Jesus.com" did not implicate First Amendment rights), aff'd, 159 F.3d 1351 (3rd Cir. 1998) (unpublished decision); Planned Parenthood Federation of America, Inc. v. Bucci, 1997 U.S. Dist. LEXIS 3338 (S.D.N.Y. March 24, 1997) (holding domain name "plannedparenthood.com" not communicative but merely a source identifier by which defendant directed users to his anti-abortion website), aff'd, 152 F.3d 920 (2d Cir.) (unpublished decision), cert. denied, 525 U.S. 834, 119 S. Ct. 90, 142 L. Ed. 2d 71 (1998).

Conversely, where a domain name contains a communicative message, it will be considered protected speech. See, e.g., National A-1 Advertising, Inc., 121 F. Supp. 2d at 170 (opining "Had the defendant in Planned Parenthood used a domain name such as 'chooselife.com' or 'stopabortion.com' he might have had a stronger claim that his domain name was meant to communicate an arguably protected message or idea"); Bally Total Fitness Holding Corp. v. Faber, 29 F. Supp. 2d 1161 (C.D. Cal. 1998) (holding web address "www.compupix.com/ballysucks" for site on which defendant criticized Bally's business practices contained communicative message protected by the First Amendment).

Here, the Plaintiffs' displaying "www.hscca.org" on their posters is not a communicative message of any sort and is therefore not protected expression. Devoid of any meaningful

content, the address is rather, at best, a source identifier.  Indeed, given the improbability that

many students would know that "hscca" is an acronym for "High School Conservative Clubs of

America," the Plaintiffs' website display is likely not even a source identifier, but instead merely

a string of letters with no more meaning than the generic word "website."

Because the display of the website address at issue is not speech protected by federal or

state law, the Plaintiffs cannot show a substantial likelihood that they will succeed on the merits

of any of their claims.  The motion for preliminary injunction should therefore be denied.

> **c.     Having created a limited public forum with respect to club
> posters, the Defendants have not violated the Plaintiffs' free
> speech rights by limiting the subject matter of those posters.**

A school that allows student clubs to display posters in its hallways has created a "limited

public forum."  See Board of Educ. of Westside Cmty. Schs. v. Mergens, 496 U.S. 226, 242-43,

110 S. Ct. 2356, 110 L. Ed. 2d 191 (1990).  A limited public forum allows a school to limit the

subject-matter topics that will be discussed in the forum, but not the individual viewpoints on the

allowed subject matter.  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-49,

103 S. Ct. 948, 74 L. Ed. 2d 794 (1983).

Here, the Defendants allow student clubs to publicize on posters in designated hallways

of Hudson High School the days, times and places in which the clubs meet.  Stapelfeld Aff. at ¶

4.  However, Hudson High does not allow student clubs to display additional information on

these posters, such as the clubs' history, membership, or purposes, nor does it allow clubs to

otherwise advertise the products, services and the like of entities outside the school.[7]  Id.

---

[7]It is undisputed that school officials in no way attempt to limit the topics of discussion of Club members
during meetings, including information presented on the HSCCA website.  See Stapelfeld Aff. at ¶ 5.

Thus, in prohibiting the Plaintiffs from advertising the website address, but continuing to allow them to post information about the Club's meeting days, times and places, the Defendants have acted consistently and evenhandedly vis-à-vis the Plaintiffs within the confines of the very limited public forum it created. See Perry Educ. Ass'n, 460 U.S. at 45-49. As such, and especially at this extremely early juncture in the proceedings, the Plaintiffs cannot show a substantial likelihood of success on the merits of their claims and the motion for preliminary injunction should be denied.

> **d.** **The prohibition on displaying the website address is lawful because the Defendants properly concluded that the display risked student safety and well-being, and that conclusion is entitled to deference.**

Even assuming that the Plaintiffs' display of the website address is protected expression, the Defendants' decision to prohibit the website address does not violate the Plaintiffs' free speech rights. "[W]hile children assuredly do not shed their constitutional rights . . . at the schoolhouse gate, the nature of those rights is what is appropriate for children in school." Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 656, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995) (internal quotations and citations omitted).

An overarching principle of litigation involving the schools – and student safety in particular – is one of court deference to the decisions of school administrators:

> Although public school students' First Amendment rights are not forfeited at the school door, those rights should not interfere with a school administrator's professional observation that certain expressions have led to, and therefore could lead to, an unhealthy and potentially unsafe learning environment for the children they serve. Short of a constitutional violation based on a school administrator's unsubstantiated infringement on a student's speech or other expressions, this Court will not interfere with the administration of a school.

Scott v. School Bd. of Alachua Cty., 324 F.3d 1246, 1247 (11th Cir. 2003).  See also, Lavine v. Blaine Sch. Dist., 257 F.3d 981, 992 (9th Cir. 2001) ("We review, however, with deference, school's decisions in connection with the safety of their students even when freedom of expression is involved . . . School officials have a difficult task in balancing safety concerns against chilling free expression").

Against this backdrop, "a school need not tolerate student speech that is inconsistent with its basic educational mission even though the government could not censor similar speech outside the school." Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 685, 106 S. Ct. 3159, 92 L. Ed. 2d 549 (1986) (internal quotations and citations omitted).  Indeed, "[n]othing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions."  Id. at 683 (quoting Tinker, 393 U.S. at 508).  Even in the absence of "disruption" to the school's operations,[8] school officials are charged with the duty to inculcate the habits and manners of civility as values conducive to both happiness and to the practice of self-government.  Bethel, 478 U.S. at 681 (internal quotations and citations omitted).  "To do so, they must have the flexibility to control the tenor and contours of student speech within school walls or on school property, even if such speech does not result in a reasonable fear of immediate disruption."  Scott, 324 F.3d at 1248 (citing Denno v. School Bd. of Volusia Cty., 218 F.3d 1267, 1271 (11th Cir. 2000)).

Here, school administrators determined that advertising the website posed a significant

---

[8]The Plaintiffs argue that Bethel is not the governing standard and that the Defendants may not limit the Club's display of the website address absent "disruption" in the school.  See Tinker v. Des Moines Independent Community Sch. Dist., 393 U.S. 503, 509, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969) and M.G.L. c. 71, § 82.  As set out in this section, "disruption" is not the relevant standard, but as discussed below, even if it were, the Defendants' prohibition on the website address was nevertheless lawful.  See, Argument section II.B.2.e. infra.

risk to student safety and well-being – especially to the high school's younger students who could access videos of beheadings through links contained on the site. This result was plainly contrary to the school's educational mission of providing a safe learning environment for children in furtherance of their well-being. See, e.g., Bethel, 478 U.S. at 684 (noting that for many purposes "school authorities act[] *in loco parentis*"); Bellotti v. Baird, 443 U.S. 622, 639, 99 S. Ct. 3035, 61 L. Ed. 2d 797 (1979) ("under the Constitution, the State can properly conclude that parents, and others, teachers, for example, who have the primary responsibility for children's well-being are entitled to the support of the laws designed to aid the discharge of that responsibility"). Surely, there can be no more proper function of school administrators than protecting children as young as twelve from the horrific scenes of murder accessible from the HSCCA website.

Taking an overly narrow view of the case, the Plaintiffs claim that Bethel does not apply because it only allows schools to prohibit of "lewd, vulgar or offensive" speech – that is, speech of a sexual nature – which is not at issue in this case. See Memorandum at 14-15. Completely aside from the fact that the beheading videos are plainly "offensive" and therefore within Bethel's broad purview, courts have refused to adopt this narrow view and have applied Bethel to uphold school decisions prohibiting non-sexual speech such as displaying the Confederate flag (Scott, 324 F.3d at 1247), and wearing a Marilyn Manson tee shirt (Boroff v. Van Wert City Bd. of Educ., 220 F.3d 465 (6th Cir. 2000)).

Moreover, at least one court has rejected the Plaintiffs' claim that Bethel only applies to "in-school speech," which, they argue, the beheading website links are not. See Memorandum at 15-16. In Caudillo v. Lubbock Indep. Sch. Dist., 311 F. Supp 2d 561 (N.D. Tex. 2004), the court upheld a school administration's decision to deny a gay-lesbian student group club status

because, *inter alia*, its website contained links to other sites with lewd, indecent and obscene content. In rejecting the group's argument that the offending material was merely linked to its website, the court concluded that:

> The purpose of linking one site to another is to provide access to that site . . . [The group] intended to establish connection to those sites by which other students could readily view the information contained on those sites . . . The only distinction is that the entity extending to the user the option of reading and viewing the sexually explicit material is the transferee site rather than [the group]. The Court finds such a distinction too tenuous to make a difference with regard to Plaintiffs' argument

Id. at 550.

Furthermore, the EAA specifically exempts from its prohibitions school action based on students' well-being: "Nothing in the subchapter shall be construe to limit the authority of the school, its agents or employees . . . to protect the well-being of students . . . ." 20 U.S.C. § 4071(f). In short, school administrators are charged with protecting the well-being of students and their decisions made with regard to students' well-being are entitled to great deference. The Plaintiffs, therefore, cannot show a likelihood of success on the merits of any of their claims and the Plaintiffs' motion should be denied.

> **e.    The prohibition on displaying the website address does not violate the Plaintiffs' free speech rights because the Defendants reasonably forecast that educational disruption or disorder would ensue.**

Even if the Plaintiffs' are ultimately correct and the "educational disruption" standard of Tinker and M.G.L. c. 71, § 82 applies to this case, the motion for preliminary injunction should still be denied. This Court has interpreted the educational disruption standard under § 82 as follows:

> A school administrator may, under the Act, deny a student permission to distribute literature before such distribution occurs, but only if the administrator, considering all

circumstances known at the time of his or her decision, reasonably forecasts that "any disruption or disorder" will ensue within the school because of the distribution.

Westfield High Sch. L.I.F.E. Club, 249 F. Supp. at 111.

Assuming that the posting of the website address is akin to distributing literature – and is, therefore, protected speech – the issue here is whether the Defendants, knowing that the website contained links to hostage beheadings, had "reasonably forecast" that "any disruption or disorder"[9] in the education of its students would occur in the school. The answer must be in the affirmative.

It is undisputed that the beheading videos are extraordinarily gory, offensive and potentially damaging to student-viewers. It is equally indisputable that it is reasonably foreseeable that children viewing the overtly violent, grisly videos of real-life beheadings could potentially be extremely traumatized thereby. See Stapelfeld Aff. at ¶ 10. Indeed, it is "reasonably foreseeable" that such an event could cause the real potential to interfere not only with students' class work, but with their well-being generally. Id.

Under these circumstances, and giving the Hudson's school administrators the deference to which they are entitled, it was and is plainly reasonable for them to believe that promoting access to beheadings would likely lead to the educational "disruption" contemplated by Tinker and M.G.L. c. 72, § 81. See, e.g., J.S. v. Bethlehem Area Sch. Dist., 807 A.2d 847 (Pa. 2002) (upholding student's expulsion because teacher featured in student's website was so upset by his

---

[9]The Court in Westfield High Sch. L.I.F.E. Club assumed without deciding that the "any disruption or disorder" standard of M.G.L. c. 71, § 82 was easier for school administrators to show than the "material and substantial disruption" standard set out in Tinker. See 249 F. Supp. at 111 n. 11. The Defendants' concerns about the website's potential impact on students easily meet either of these standards.

solicitation for money to hire hit-man to kill her that she was unable to continue teaching for a period of time, which constituted an on-campus disruption).

In any event, these issues are sufficiently close and exceedingly difficult such that a preliminary decision about the merits of the case prior to their full and fair development during discovery and at trial would be unjustified and contrary the standards of deference decisions of school administrators command. For all these reasons, the Plaintiffs' motion for preliminary injunction should be denied.

### 3.    The Public Interest Weighs Strongly In Favor of Denying the Preliminary Injunction.

Finally, and closely related to the preceding "success on the merits" discussion is the public's interest, which weighs strongly in favor of allowing school officials the authority to protect minors from the gruesome, potentially dangerous content contained on the website. See, e.g., Bethel, 478 U.S. at 684; Bellotti, 443 U.S. at 639; Scott, 324 F.3d at 1247. Indeed, despite the relative furor within Hudson High School generated by this case, the Defendants have no doubt that a decision allowing the Club to post the website address would cause a much greater and more vociferous uproar amongst the parents of Hudson High School students.

As one court noted, "School officials have a difficult task in balancing safety concerns against chilling free expression. This case demonstrates how difficult that task can be." Lavine, 257 F.3d 992. Like in Lavine, the circumstances presented here fully illustrate the difficulties of this balancing act. At the very least, at this very preliminary stage of the case, the public interest in protecting the well-being of Hudson public school children weighs in favor of giving the Defendants the benefit of the doubt.

## III.    <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should deny the Plaintiffs' motion for preliminary injunction.

Respectfully submitted,

JOHN STAPELFELD, DAVID CHAMPIGNY and SHELDON BERMAN

By their attorneys,


s/John M Simon
Kay H. Hodge (BBO# 236560)
John M. Simon (BBO# 645557)
Stoneman, Chandler & Miller LLP
99 High Street
Boston, MA 02110
(617) 542-6789

Dated: June 3, 2005

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER BOWLER and HUDSON HIGH SCHOOL CONSERVATIVE CLUB, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN STAPELFELD, DAVID CHAMPIGNY and SHELDON BERMAN, <br><br> Defendants, | ) <br> ) <br> ) <br> ) <br> ) <br> ) CASE NO. 05-CV-11007-PBS <br> ) <br> ) <br> ) <br> ) <br> ) |

## AFFIDAVIT OF JOHN STAPELFELD

I, John Stapelfeld, hereby state as follows:

1.      I am the Principal of Hudson High School, a position which I have held for over 25 years.

2.      Approximately 1,000 students attend Hudson High School, which includes grades 8 through 12.  Grade 8, which is comprised of approximately 220 students, is the biggest class on the High School campus.  There are children in Hudson's 8th Grade who are as young as 12 years old.

3.      It came to my attention during the Fall of 2005, that a group of students sought permission to form a school-recognized student club, the Hudson High School Conservative Club ("Club"), which would discuss and support issues relating to a conservative political agenda.  I viewed the formation of the Club extremely positively, as it would only add to and encourage the High School's multiplicity of viewpoints and perspectives.

4.      School-recognized clubs are afforded the opportunity  to place posters in designated High School hallways for purposes of publicizing the days, times and places in which

they meet. However, Hudson High does not allow student clubs to display additional detailed information, such the clubs' history, membership, or purposes, nor does it allow clubs to advertise outside products, services and the like in the school.

5.     In the Fall of 2004, I granted the Conservative Club full status as a school-recognized student club. The Club has continued to meet ever since. At no time have I or any other school administrator attempted to limit in any way the topics of discussion of the Club.

6.     All school-recognized student clubs must have faculty advisors, who generally advise and assist club members with all aspects of their clubs, including attending club meetings and setting club agendas.

7.     In December 2004, it came to my attention that the Club had hung posters which not only publicized its meetings, but also displayed a website address: "www.hscca.org." Prior to this, I cannot remember a single instance in which any club advertised a website address in the school's hallways. Had any club ever done so, I would have required that it be removed, as school administrators simply cannot be held responsible for content on sites over which it has no control.

8.     In this case, however, I soon learned that the website at issue, that of the High School Conservative Clubs of America ("HSCCA"), appeared to contain direct links to no less than five videos of terrorists in Iraq beheading hostages. I asked the High School's Director of Technology, Ellen Shuck, to further investigate the content of these links. Ms. Shuck in informed me that the links in fact showed actual video footage of beheadings of hostages by terrorists in Iraq. Indeed, these videos depicted in graphic detail the literal sawing off of hostages' heads, sometimes lasting over several minutes.

9.     Based on this, I concluded that the website should not be posted in the school's hallways. While true that I could have prohibited the website based solely on the High School's policy against outside advertising on club posters, my main concern in prohibiting the Club's poster was that it promoted a website allowing students access to truly horrific, grisly and violent videos of murder by beheading.

10.     Based on my 25 years as a high school principal, I had and continue to have no doubt that viewing this material would have an extremely negative impact on students – particularly the younger students in the school, some of whom are as young as 12 years old. I believe that allowing students access to these images would likely cause extensive disruption and disorder to both their emotional sense of well-being, as well as their ability to concentrate on their studies in school and at home. Indeed, Ms. Shuck herself has repeated the extremely upsetting and lasting emotional effects that viewing the beheading videos has had on her. The impact of viewing this material on any individual child could therefore be enormous and significantly disruptive of that child's education and, indeed, his or her ability to live peaceably. Quite simply, this result was a risk I was and remain unwilling to take.

11.     The High School administration has had past experience with beheading videos in the internet. It came to my attention in the Spring, 2004 that students had accessed websites showing Iraqi beheadings on school computers. At that time, I immediately had student access to those sites blocked. I took this action for the exact same reason that decided to prohibit the Club from displaying the HSCCA website – to protect students from lasting emotional damage the gruesome depictions of murder by beheading would engender.

12.     Based on all this, I informed the Club that they could no longer display the website address on their posters. Because the website address was the one and only issue with

which I had any problem, I allowed the Club to re-hang their posters with tape over the website address.

13.     I have learned from the Club's faculty advisor, Donald Martin, who has attended all Club meetings, that the Club never discussed or voted on whether to institute the instant lawsuit.

14.     Although Assistant Principal David Champigny and I have discussed with Club members some of the other content of the HSCCA website, the links to the beheadings were and continue to be my sole objection thereto.  I have never indicated to Club members that the website's other content was the reason for my decision.

Signed under the pains and penalties of perjury this 3rd day of June 2005.


s/John Stapelfeld
John Stapelfeld