UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

DOCKET NO.: 05-11007 PBS

| | |
|---|---|
| CHRISTOPHER BOWLER, HUDSON HIGH SCHOOL CONSERVATIVE CLUB, an unincorporated association, JOSEPH T. BOWLER, and KIMBERLY A. BOWLER, by and through her father and next friend, STEVEN BOWLER, Plaintiffs, | ) ) ) ) ) ) ) |
| vs. | ) ) |
| JOHN STAPELFELD, DAVID CHAMPIGNY, DR. SHELDON BERMAN, TOWN OF HUDSON, MASSACHUSETTS and HUDSON HIGH SCHOOL, Defendants. | ) ) ) ) ) ) |

**DEFENDANTS' MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**FACTS**[1]

This civil rights action arises out of a decision by Hudson High School (hereinafter "HHS") administrators to prohibit a non-curriculum related student group from listing a website address on its posters – posters displayed on hallway walls and bulletin boards throughout HHS – containing links to five realtime, gruesome videos, in color and with sound, of terrorists beheading hostages (hereinafter "the beheading videos").

HHS grants non-curriculum related student groups the right to meet on school property outside of school hours, and also grants such groups access to school facilities for their activities.

---

[1] The facts contained in this Memorandum are set forth and supported in the Defendants' Concise Statement of Material Facts submitted together with Defendants' Motion for Summary Judgment pursuant to L.R. 56.1.

During the 2004-2005 academic school year, the plaintiff, Christopher Bowler (hereinafter "Christopher") formed the Hudson High School Conservative Club (hereinafter "the Club"). Christopher chose to affiliate the Club with a national organization called the High School Conservative Clubs of America (hereinafter "the HSCCA").  On Friday, December 3, 2004, Christopher and another Club member displayed 10 posters on the walls and bulletin boards of HHS advertising an upcoming meeting of the Club.  The posters also listed, *inter alia*, the website address of the HSCCA, http://www.hscca.org.  The 10 posters were displayed in areas that were accessible to all HHS students, including 8th and 9th grade students.  At the time Christopher hung the Club posters, the HSCCA website prominently listed direct links to the beheading videos.

On Monday, December 6, 2004, Hudson Public Schools Technology Director Ellen Schuck (hereinafter "Ms. Schuck") visited the HSCCA website using an HHS computer to access and watch one of the beheading videos.  The video left Ms. Schuck trembling, crying, shocked, horrified, angry, helpless and sad due to the gruesome and frightful violence contained in the video.  Ms. Schuck immediately blocked access to the HSCCA website from all Hudson Public School computers.  She then went to the office of the defendant, HHS Assistant Principal David Champigny (hereinafter "Mr. Champigny,") to inform him of the graphic nature of the beheading video.  Based on Ms. Schuck's description and reaction, the defendant, HHS Principal John Stapelfeld (hereinafter "Mr. Stapelfeld,") and Mr. Champigny determined that the beheading videos, if viewed by HHS students, were likely to cause a substantial and material disruption at HHS and could impinge upon the rights of other HHS students to be free from disturbing violent images.  Thus, on Tuesday, December 7, 2004, Mr. Champigny removed the Club posters from

the HHS walls, then advised Christopher and James Melillo (co-founder of the Club) that the posters could not list the HSCCA website because of the violent content of the beheadings videos. On or about January 7, 2005, the Club posted new posters on the walls of HHS, at least some of which again contained the HSCCA website address. On that same day, Christopher was again called to Mr. Champigny's office and told that the HSCCA website could not be shown on the Club's posters because of the violent beheadings videos.

Throughout the 2004-2005 academic year, the Club was given the same access to school facilities as all other non-curriculum related student groups. The Club was not told when it could meet nor how many meetings it could hold. The Club was provided with space to hold as many meetings as it wished and was allowed to host outside speakers at its meetings. Further, Mr. Stapelfeld and Mr. Champigny allowed the Club to post posters within HHS with the HSCCA website address blacked out and the word "censored" written over the HSCCA website address. Mr. Stapelfeld and Mr. Champigny also allowed the Club, during Club meetings, to display a large Club banner listing the HSCCA website in the classroom or library wherever Club meetings were held.

The Club's last meeting was held two years ago, on April 13, 2005. The Club remained inactive throughout the 2005-2006 and 2006-2007 academic school years, and continues to remain inactive today. No former or present member of the Club – including but not limited to Christopher, James Melillo, Kimberly or Joseph – ever attempted to reactivate the Club at any time during the 2005-2006 and 2006-2007 academic school years. Neither Christopher, James Melillo, Kimberly, Joseph, nor any other Club member was ever disciplined in any way for posting the HSCCA website on Club posters or for any other matter related to the activities of the

-3-

Club.

On October 23, 2006, the plaintiffs filed their Second Amended Complaint seeking

damages and injunctive relief for the defendants' alleged censorship of the HSCCA website

address from the Club's posters and for the Hudson School Committee's allegedly unlawful

policies regulating student posting of materials within HHS.  Specifically, the plaintiffs allege

five counts:[2]

| | |
|---|---|
| **Count I** | Section 1983 (based on defendants' alleged violation of plaintiffs' rights of free speech as guaranteed under the First Amendment to the United States Constitution); |
| **Count III** | Section 1983 (seeking injunctive relief only) (based on defendants' alleged violations of plaintiffs' rights to equal access and a fair opportunity to use a limited public forum as protected under the Equal Access Act, 20 U.S.C. § 4071); |
| **Count IV** | G.L. c. 71, § 82 (seeking injunctive relief only) (based on defendants' alleged violations of plaintiffs' rights of free expression as protected under the Massachusetts Education Reform Act, M.G.L. c. 71, § 82); |
| **Count V** | Section 1983 (seeking injunctive relief only) (based on defendants' alleged violation of plaintiffs' rights to equal protection as guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution); and |
| **Count VI** | Massachusetts Constitution, Amendment CVI (seeking unspecified relief) (based on defendants' alleged violation of plaintiffs' rights to equal protection as guaranteed under the Massachusetts Constitution). |

The defendants now move for summary judgment on plaintiffs' remaining claims (Counts

I, III, IV, V & VI) on the grounds that no material issue of fact remains in dispute with respect to

such claims and, as set forth further below, the defendants are entitled to judgment on such

---

[2]  On March 21, 2007, the parties filed a Stipulation of Dismissal as to Count II only, plaintiffs' claim under
the Massachusetts Civil Rights Act. M.G.L. c. 12, § 111.

claims as a matter of law. The defendants submit this Memorandum of Law in Support of their

Motion for Summary Judgment.

## ARGUMENT

## I.    SUMMARY JUDGMENT STANDARD.

Federal Rule of Civil Procedure 56 provides that judgment shall be rendered if there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

law. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004). The moving party must demonstrate an

absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S.

317, 325 (1986). Once the moving party does so, the nonmoving party cannot rely on "mere

allegations or evidence that is less than significantly probative" to defeat the motion.

Maldonado-Denis v. Costillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994); Matsushita Electrical

Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Rather, it must "produce

specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."

Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (citations omitted);

Maldonado-Denis, 22 F.3d at 581.

## II.    DEFENDANTS DID NOT VIOLATE PLAINTIFFS' FIRST AMENDMENT RIGHTS TO FREE SPEECH (COUNT I).

A.    Controlling Law: The Tinker-Bethel-Hazelwood Framework.

The plaintiffs allege, in Count I of their Second Amended Complaint, that the defendants'

conduct in prohibiting the Club from listing the HSCCA website address on its posters violated

their First Amendment rights to free speech and freedom of expression. Admittedly, public

school students do not shed their First Amendment rights at the school house door. Tinker v.

Des Moines Ind. Community School Dist., 393 U.S. 503, 506 (1969). Yet, the United States

Supreme Court has made clear that protection for the speech of public school students is not

unlimited, and that student rights to free speech are not coextensive with those of adults. Bethel

School District No. 403 v. Fraser, 478 U.S. 675, 682 (1986). Indeed, the Supreme Court has

"repeatedly emphasized the need for affirming the comprehensive authority of the States and of

school officials, consistent with fundamental constitutional safeguards, to prescribe and control

conduct in the schools." Tinker, 393 U.S. at 507 (upholding students' right to wear black

armbands to school as symbol of opposition to the United States' involvement in the Vietnam

War), citing Epperson v. Arkansas, 393 U.S. 97, 104 (1968), and Meyer v. Nebraska, 262 U.S.

390, 402 (1923).  Thus, student First Amendment rights are to be applied "in light of the special

characteristics of the school environment." Tinker, 393 U.S. at 506.

Public educators are charged with the arduous task of preparing students for their adult

lives by teaching the "'habits and manners of civility' essential to a democratic society", which

"must . . . take into account consideration of the sensibilities of others, and, in the case of a

school, the sensibilities of fellow students." Bethel, 478 U.S. at 681.  School officials must,

therefore, strike a balance between the protection of students' constitutional freedoms and the

compelling interest in preserving the educational process. Lavine v. Blaine School District, 257

F.3d 981, 988 (9th Cir. 2001), citing Karp v. Becken, 477 F.2d 171, 174 (9th Cir. 1973).

Within the Constitutional framework – frequently defined by the trilogy of Tinker, Bethel

and Hazelwood School Dist. v. Kuhlmeier, 484 U.S. 260 (1968) – public school officials have

the authority to limit, restrict or punish three types of speech without violating a student's First

Amendment rights. First, a school may restrict non-school sponsored speech which causes a

substantial disruption of or material interference with the requirements of appropriate discipline

in the operation of the school, or impinges on the rights of other students. Tinker, 393 U.S. at

513; Burnside v. Byars, 363 F.2d 744, 749 (5th Cir. 1966). Second, school officials have broad

leeway to limit student speech that is vulgar, lewd, obscene or plainly offensive, as schools have

an interest in teaching students the boundaries of socially appropriate behavior. Bethel, 478 U.S.

at 683. Third, officials may also limit school-sponsored speech so long as the limitations are

reasonably related to a legitimate educational concern. Hazelwood, 484 U.S. at 271 (1998)

(upholding school principal's decision to excise two pages of student newspaper designed as a

learning experience for journalist students).

Plaintiffs' posting of posters within HHS listing the HSCCA website address falls within

the first two categories of unprotected student speech. Therefore, the defendants did not violate

plaintiffs' First Amendment rights by requiring plaintiffs to delete the website address from Club

posters.[3]

    B.    The Beheading Videos Impinged on The Rights of Other Students to be Left
        Alone.

In Tinker, the Supreme Court upheld the authority of school officials to regulate student

speech that impinges upon – or may impinge upon – the rights of other students. 393 U.S. at 513.

The right to be left alone is one of the most important rights valued in our society. Hill v.

Colorado, 530 U.S. 703, 716-717 (2000), quoting Olmstead v. United States, 277 U.S. 438, 478

(1928). "Because minors are subject to mandatory attendance requirements, the Court has

emphasized 'the obvious concern on the part of parents, and school authorities acting *in loco*

*parentis*, to protect children.'" Harper v. Poway Unified School District, 445 F.3d 1166, 1178 (9th

_____

[3] As neither party contends that posting of the HSCCA website was sponsored by HHS, the Hazelwood
analysis is inapplicable here.

Cir. 2006), *cert. granted, vacated by* 2007 WL 632768 (U.S.) (quotations omitted) (school did

not abuse its discretion by banning student from wearing a t-shirt expressing religious

condemnation of homosexuals where school reasonably forecast that shirt would psychologically

injure gay students).  Encompassed in the <u>Tinker</u> "right to be left alone" is not only the right to be

free from direct physical confrontation, but also the right to be free from psychological injury.

<u>Harper</u>, 445 F.3d at 1177-1178; <u>see also</u> <u>West v. Derby Unified School District</u>, 206 F.3d 1358,

1366 (10th Cir. 2000) (holding that display of Confederate flag may interfere with rights of other

students even where there was no indication that any student was physically accosted).

The exact scope of the <u>Tinker</u> "right to be left alone" protection remains unclear. <u>Saxe v.</u>

<u>State College Area School Dist.</u>, 240 F.3d 200, 217 (3rd Cir. 2000).  The 9th Circuit has held,

however, that school officials may ban certain school speech, even where there is no material and

substantial disruption, where they reasonably forecast that the rights of other students' may be

infringed upon. <u>Harper</u>, 445 F.3d at 1179-1180.  In <u>Harper</u>, a student wore a t-shirt to school

stating, *inter alia*, "HOMOSEXUALITY IS SHAMEFUL" and "BE ASHAMED, OUR

SCHOOL EMBRACED WHAT GOD HAS CONDEMNED" on a day designated as a "Day of

Silence" to teach tolerance of homosexuals. <u>Id.</u> at 1171.  The 9th Circuit, affirming the District

Court's denial of the student's motion for preliminary injunction, ruled that school officials were

within their rights to ban school speech where such speech might cause psychological harm to

other students. <u>See</u> <u>Harper</u>, 445 F.3d at 1179-1180. Although there was no evidence that

homosexual students were in fact psychologically injured by plaintiff's t-shirt, the Court

concluded that such evidence was unnecessary because:

> It is simply not a novel concept . . . that such attacks on young minority students
> can be harmful . . . to their ability to learn . . .. If a school permitted its student to

wear shirts reading, "Negroes: Go Back To Africa," no one would doubt that the message would be harmful to young black students . . . . "[Y]ou don't need an expert witness to figure out" the self-evident effect of certain policies or messages. . . .. [W]e can certainly take notice that it is harmful to gay teenagers to be publicly degraded and called immoral and shameful.

Id., 445 F.3d at 1180 (citations omitted).

Just as it is self-evident that derogatory statements about homosexuality may be harmful to gay teenagers, it is equally clear that the viewing of even a portion of one of the beheading videos could cause psychological injury to HHS students.  By requiring removal of the HSCCA website from the Club posters, the defendants favored the protection of HHS students from the exposure to lengthy, graphic and horrifying sounds and images of brutal murders – sounds and images defendants reasonably concluded could cause psychological harm to students, particularly those as young as twelve to thirteen years old.[4]  None of the Bowlers (Christopher, Kimberly or Joseph) ever viewed the beheading videos; therefore, plaintiffs cannot dispute the videos' extremely graphic or potentially harmful content.  The defendant, Mr. Stapelfeld, Ms. Schuck and Club co-founder James Melillo, all viewed at least one of the beheading videos.  All three agree that the videos they watched were gruesome, graphic, disturbing, upsetting, frightful, shocking and horrifying.[5]  Further, Ms. Schuck became "extremely upset" by the video.  She began to tremble and cry.  According to Ms. Schuck:

Most alarming to me were the manner in which the victim was killed; the anonymity and cold-bloodedness of the hooded executioners; the sounds of the victim as he was killed;

---

[4] Three of the beheading videos that appeared on the HSCCA website are contained on a CD attached as Exhibit"A" to the Affidavit of John J. Davis ("Davis Affidavit.") For brief descriptions of the videos, see Davis Affidavit, ¶¶ 6 - 10.

[5] Although the plaintiff, Christopher Bowler, never watched any of the beheading videos on the HSCCA website, he admits he watched a similar beheading video on the internet approximately one year before the Club posted its posters.  The video Christopher watched was likewise "graphic," "gruesome" and "disturbing." (Christopher's Deposition, at 57-58).

the amount of blood shown; the close-up images of the fatal wound, the severed head and the lifeless body; and the length of the video. It seemed to go on and on. When the video was finally over, I felt angry, helpless and sad. I was still crying and trembling.

(Affidavit of Ellen Schuck, ¶¶10 & 11)

Thus, because any reasonable school official could have determined that the beheading videos were likely to cause psychological injury to HHS students, thereby impinging upon their rights to be left alone, Count I of the Second Amended Complaint must be dismissed.

C.     Defendants Reasonably Believed The Beheading Videos Would Substantially Disrupt or Materially Interfere With HHS Operations.

The Tinker Court reaffirmed that school authorities cannot ban students from expressing political viewpoints simply because they believe "schools are no place for demonstrations." 393 U.S. at 509. But, if such expression would cause a substantial disruption of or a material interference with the school's operations, then school authorities may restrict it. Id.; see also Harper, 445 F.3d at 1184-1185.

School administrators need not wait until *after* incidents of disruption occur before taking appropriate action; in fact, they are obligated to take reasonable measures to prevent incidents and diffuse existing tensions whenever possible. Governor Wentworth Regional School Dist. v. Hendrickson, 421 F.Supp.2d 410, 421 (D.N.H. 2006) (school ban on wearing "No Nazis" patch upheld based on school's reasonable concern that speech presented confrontational challenge to, and provocation of, group of "redneck" students); see also West Derby Unified School Dist. No. 260, 206 F.3d 1358, 1366 (10th Cir. 2000) (upholding school's decision to prohibit display of a Confederate flag in school where it might cause a material and substantial disruption based on past events). The decisions of school officials charged with maintaining order and a viable educational environment regarding the potential disruption of certain speech will be considered

reasonable when the officials can point to specific facts "which might reasonably have led [them] to forecast substantial disruption or material interference with school activities." Governor Wentworth, 421 F.Supp.2d at 420-421. Further, "the First Amendment does not deprive school administrators of the ability to rely upon their own considerable experience, expertise, and judgment in recognizing and diffusing the potential for disruption . . . in public schools." Id., 421 F.Supp.2d at 423.

Based on Ms. Schuck's review and description of one of the beheading videos, and Mr. Champigny's observations of Ms. Schuck's physical and emotional reaction to the same, the defendants used their educational experience and familiarity with the HHS environment to reasonably determine that the beheading videos (if watched by HHS students) could cause a substantial disruption of or material interference with HHS operations. The defendants thought it likely that word of the videos would spread, and that many students would watch the videos, either intentionally or unintentionally, and thereby suffer a negative reaction. The defendant, Mr. Stapelfeld, believed those students who viewed the videos might reasonably request and/or require counseling to cope with their subsequent feelings of helplessness and despair. The defendants also predicted that HHS classrooms could be disrupted by the videos such that teachers might be compelled or persuaded to interrupt their planned lessons or curricula, and turn classroom discussions into conversations about the videos. The defendants' reasonable forecast of substantial disruption and material interference serves as a second ground to dismiss Count I of plaintiffs' Second Amended Complaint.

D.    The Beheading Videos Are Plainly Offensive.

As set forth above, the second category of unprotected student speech is that which is "plainly offensive" under the Bethel standard. "Surely it is a highly appropriate function of

public school education to prohibit the use of vulgar and offensive terms in public discourse." Bethel, 478 U.S. at 683. Schools are entitled to prohibit offensive speech even where there is no substantial disruption or material inference in the school's operations. Pyle v. South Hadley School Comm., 861 F.Supp. 157, 168 (D. Mass. 1994) (upholding school's authority to ban vulgar t-shirts). The primary consideration under Bethel is not the actual content of student speech but the plainly offensive manner in which it is conveyed. Nixon v. Northern Local School Dist. Bd. of Ed., 383 F.Supp.2d 965, 971 (S.D. Ohio 2005), citing Castorina v. Madison County School Bd., 246 F.3d 536, 542 (6th Cir. 2001).

While Bethel involved student speech laden with sexual content, courts have applied the "plainly offensive" rationale to school decisions regarding other types of student speech, including messages pertaining to drugs, alcohol, murder and suicide. See Boroff v. Van Wert City Bd. of Ed., 220 F.3d 465, 470 (6th Cir. 2000) ("Marilyn Manson" t-shirt containing symbols and words promoting suicide, murder and drugs, found plainly offensive and contrary to school's education mission); Nixon, 383 F.Supp.2d at 971 (student speech promoting suicide, drugs, alcohol or murder can be restricted under Bethel); Barber v. Dearborn Pub. Schools, 286 F. Supp.2d 847, 856 (E.D. Mich. 2003) (Bethel can be applied to restrict student speech regarding alcohol, drugs or sex); Broussard v. School Bd. of City of Norfolk, 801 F.Supp. 1526, 1536 (E.D. Va. 1992) (non-sexual student speech held "offensive"); Gano v. School Dist. No. 411 of Twin Falls County, State of Id., 674 F.Supp. 796, 798-799 (D. Id. 1987) (ban of student t-shirts depicting intoxicated school administrators upheld as "offensive"); see also Scott v. School Bd. of Alachua County, 324 F.3d 1246, 1249 (11th Cir. 2003) (suspension of student for displaying Confederate flag upheld under Bethel).

Defendants' decision to ban the HSCCA website from plaintiffs' posters, much like the

-12-

school decisions in Pyle and the other cases cited above, was not related to the content of the

plaintiffs' speech. Rather, defendants reasonably determined that the *manner* in which the Club

sought to convey a political message – i.e., through gruesome beheading videos – was plainly

offensive. In fact, by their very shock value, it was clear to defendants that the videos were

intended to be offensive. Thus, defendants' reasonable conclusion that videos containing live

beheadings constituted an offensive form of political expression subject to restriction serves as a

third grounds to dismiss Count I of plaintiffs' Second Amended Complaint.

## III.    DEFENDANTS DID NOT VIOLATE PLAINTIFFS' RIGHTS TO EQUAL PROTECTION (COUNTS V & VI).

In Count V of their Second Amended Complaint, the plaintiffs allege defendants violated

their rights to equal protection under the Fourteenth Amendment of the United States

Constitution. To establish an equal protection violation, a plaintiff must prove that, "compared

with others similarly situated, [he] was selectively treated . . . based on impermissible

considerations such as race, religion, intent to inhibit or punish the exercise of constitutional

rights, or malicious or bad intent to injure a person." See Barrington Cove Ltd. Partnership v. R.I.

Hous. & Mortgage Fin. Corp., 246 F.3d 1, 7 (1st Cir. 2001). The test to determine whether a

plaintiff was singled out from other similarly situated individuals for unfair treatment is "whether

a prudent person, looking objectively at the incidents, would think them roughly equivalent and

the protagonists similarly situated . . .. Exact correlation is neither likely nor necessary, but the

cases must be fair congeners. In other words, apples should be compared to apples." Dartmouth

Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989). In analyzing any equal protection

claim, a court must determine what standard of review to apply. Courts will evaluate defendant's

conduct under a strict scrutiny test if the plaintiff was treated differently because of his

membership in a suspect class, such as race or religion, or if the plaintiff was exercising a fundamental right. <u>United States v. Williams</u>, 124 F.3d 411, 422 (3rd Cir. 1997). Courts will apply only a rational basis test if the plaintiff was treated differently for more general reasons, such as social or economic considerations. <u>Id</u>.

The plaintiffs point to no other non-curriculum related student group at HHS that ever listed a website on posters posted at HHS, or displayed images of graphic violence (or links to images of graphic violence) on the walls of HHS. Thus, the plaintiffs cannot satisfy their burden of proving that they were singled out by the defendants for unfair treatment, because they can identify no similarly situated group that was treated differently. Further, any disparate treatment plaintiffs received at the hands of the defendants (which defendants deny) was not based on a suspect classification or on plaintiffs' exercise of their First Amendment rights. As stated above, plaintiffs' use of the HSCCA website address was not protected speech. Without a suspect classification or infringement of a fundamental right, defendants' conduct is tested under a rational relationship test. And, since defendants had legitimate reasons for banning the HSCCA website – <u>i.e.</u>, to protect the psychological well-being of HHS students and to prevent a substantial disruption or material interference at HHS – plaintiffs cannot establish an equal protection violation as a matter of law. Count V of plaintiffs' Second Amended Complaint must likewise fail.

In Count VI of the Second Amended Complaint, the plaintiffs seek unspecified relief under the Massachusetts Constitution, Amendment CVI, for defendants' alleged equal protection violations. This Amendment, captioned "Equal rights," was adopted in 1976 merely to amend Article I of the First Part of the Massachusetts Constitution which, in turn, is captioned "Equality

of people, natural rights."[6]  Count VI adds nothing to the plaintiffs' Federal equal protection

claim.  As the Massachusetts SJC has stated, "[f]or purposes of equal protection analysis, our

standard of review under the cognate provisions of the Massachusetts Declaration of Rights is the

same as under the Fourteenth Amendment to the Federal Constitution." Dickerson v. Attorney

General, 396 Mass. 740, 743 (1986); Commonwealth v. Franklin Fruit Co., 388 Mass. 228, 235

(1983); Commissioner of Pub. Health v. Bessie M. Burke Memorial Hosp., 366 Mass. 734, 744

n.18 (1975).  Therefore, Count VI of plaintiff's Second Amended Complaint is duplicative of

Count V and, for the reasons stated above, must also fail.

**IV.    DEFENDANTS DID NOT VIOLATE PLAINTIFFS' RIGHTS UNDER THE
        EQUAL ACCESS ACT – 20 U.S.C. § 4071 (COUNT III).**

A.    Statutory Language.

In Count III of their Second Amended Complaint, the plaintiffs allege the defendants'

conduct in banning the HSCCA website from the Club's posters amounted to a violation of the

Equal Access Act, 20 U.S.C. § 4071 (hereinafter "the EAA.")  In pertinent part, the EAA states:

> It shall be unlawful for any public secondary school which receives federal
> financial assistance and which has a limited open forum to deny equal access or a
> fair opportunity to, or discriminate against, any students who wish to conduct a
> meeting within that limited open forum on the basis of religious, political,
> philosophical, or other content of the speech at such meetings.

20 U.S.C. § 4071(a).  In other words, "schools that allow student groups whose purpose is not

directly related to the curriculum to meet on school grounds during lunch or after school cannot

---

[6]  The 1976 amendment substituted "people" for "men" in the first line, and added the final sentence.
Article I, Part I (as amended), now states as follows:

> All people are born free and equal and have certain natural, essential and unalienable rights;
> among which may be reckoned the right of enjoying and defending their lives and liberties, that of
> acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety
> and happiness.  Equality under the law shall not be denied or abridged because of sex, race, color,
> creed or national origin.

deny other student groups access to the school due to the content of the students' proposed

discussions." Colin v. Orange Unified School Dist., 83 F. Supp. 2d 1135, 1142 (C.D. Cal. 2000).

A "limited public forum" is defined as any public secondary school that "grants an offering to or

opportunity for one or more noncurriculum related student groups to meet on school premises

during noninstructional time." 20 U.S.C. § 4071(b). Neither party disputes application of the

EAA. But, for the reasons stated below, the plaintiffs cannot prove a violation of the EAA by the

defendants as a matter of law.

      B.     Posting Posters Was Not Protected Conduct Under The EAA.

      Congress passed the EAA to ensure students groups' equal "access" to school facilities

for a specific purpose – i.e., to hold "meetings." See Student Coalition for Peace v. Lower

Merion School Dist. Bd., 633 F.Supp. 1040, 1043 (E.D. Pa. 1986) ("Congress sought . . . to

prohibit the denial of noncurricular related student groups' meetings on the basis of subject

matter, namely as to religious, political, philosophical, or other content of the speech"). It is

undisputed that plaintiffs were given the same access as other non-curriculum related student

groups to hold meetings at HHS. Plaintiffs' only complaint is that defendants banned the listing

of the HSCCA website on their posters. The unfettered posting of postings free from school

censorship, however, is not the type of activity protected by the EAA.

      Several courts have held that the distribution of literature relating to a student club is not

protected by the EAA because such activity does not relate to the holding of a "meeting" under

20 U.S.C. § 4071(a).[7] See Clark v. Dallas Ind. School Dist., 806 F.Supp. 116, 120 (N.D. Tex.

1992) (distribution of religious tracts by high school students on high school campus held not

_____

      [7] "Meeting" is defined to include "those activities of student groups which are permitted under a school's limited open forum and are not directly related to the school curriculum." 20 U.S.C. § 4072(3).

protected by EAA); <u>Thompson v. Waynesboro Area School Dist.</u>, 673 F.Supp. 1379, 1383 (M.D.

Pa. 1987) (gathering of plaintiffs to distribute religious newspapers did not possess

characteristics of a "meeting" and, therefore, held not protected under the EAA). In <u>Thompson</u>,

the Court emphasized that, based on the Senate Judiciary Committee report on the EAA, the

major characteristic of a "meeting" under the EAA is *voluntariness*:

> ...[M]eetings would be voluntary in the truest sense of the word.  In order for any
> student to attend, it first would be necessary for at least one student to take the
> initiative and arrange the meeting.  Any other student desiring to participate would
> then have to reject the various other secular activities available to him and go to
> the room where those few other students who have a common interest would be
> meeting... the individual students would be selecting on an individual basis the
> activities in which they wished to participate.

<u>Id.</u>, 673 F.Supp. at 1383 (quoting S. Rep. No. 357, 98th Cong. 2d Sess., *reprinted in* 1984

U.S.Code Cong. & Admin. News 2348, 2374 (footnote omitted)).  Thus, the EAA was intended

to protect the voluntariness of each meeting by ensuring that such meetings would be held in a

separate place "set aside where it would be necessary for the student to go." <u>Id</u>.

　　Plaintiffs' conduct in displaying the posters in HHS hallways does not qualify as a

"meeting" within the meaning of the EAA because their posters – and the display of information

on those posters – did not allow students to make a voluntary choice regarding their exposure to

plaintiffs' message.[8]  Like the distribution of newspapers or other literature, the Club's posters

confronted students, even those who may have wished not to be so confronted, with its content.

Hence, the EAA does not apply to plaintiffs' posting activity.

　　C.　　<u>Plaintiffs Were Not Denied Equal Access or a Fair Opportunity, Nor Were They
Discriminated Against Because of The Content of Their Speech at Meetings.</u>

---

[8] The posters were hung "in places where the most amount of people would see them, so there were a bunch of areas in the hallways, which are unavoidable for every student in the whole school, and we hung them up in those areas." Melillo Deposition, at 70.

Consistent with its protection of the right of non-curriculum related student groups to

hold meetings in any public secondary school with a "limited public forum," the EAA ensures

such groups shall not be denied equal access or a fair opportunity, or be discriminated against,

because of the "content of the speech *at such meetings*." 20 U.S.C. § 4071.  Plaintiffs admit they

were afforded a "fair opportunity" to conduct their meetings.  They held as many meetings as

they wished on HHS premises, during which they were permitted to display a large Club banner

listing the HSCCA website. (Christopher's Deposition, at 92-95, Stapelfeld Affidavit, ¶¶ 13 &

29).  School officials made no attempt to restrict, dictate or control the content of plaintiffs'

speech at Club meetings. (Christopher's Deposition, at 92-95, Melillo Deposition, at 80).

Moreover, even if the posting of posters qualifies as protected speech under the EAA (which

defendants deny), the Club was given "equal access" to the walls of HHS to advertise their

meetings so long as the posters did not list the HSCCA website.[9]  Under such circumstances, it is

undisputed that the plaintiffs were not discriminated against in their access to the "limited public

forum" because of the content of their speech at meetings.

20 U.S.C. § 4071(c) defines what is meant by a "fair opportunity to students" by setting

forth five criteria.  Adopting the lessons of Tinker, these criteria state, in part, that:

> Schools shall be deemed to offer a fair opportunity to students who wish to conduct a meeting within its limited open forum if such school uniformly provides that –
> . . .
> (4) the meeting does not materially and substantially interfere with the orderly conduct of educational activities within the school . . ..

Just as the Supreme Court in Tinker ruled that a public school may (without violating the First

---

[9] The plaintiffs do not allege that any other non-curriculum related student group displayed posters listing a website.

Amendment) restrict non-school sponsored speech that causes a substantial disruption of or material interference with the requirements of appropriate discipline in the operation of the school, it similarly construed Section 4071(c) to mean that a school likewise retains its authority to prohibit student meetings that may cause such interference. Board of Ed. of Westside Community Schools v. Mergens, 496 U.S. 226, 241 (1990); Hsu v. Roslyn Union Free School Dist. No. 3, 85 F.3d 839, 870 (2nd Cir. 1996). Thus, equal access need not be granted under 20 U.S.C. § 4071(c)(4) if such access "creates a genuine safety concern or interrupts or interferes with the teaching of curriculum . . .." Caudillo v. Lubbock Ind. School Dist., 311 F.Supp.2d 550, 568 (N.D. Tex. 2004).

In Caudillo, the Court considered the defendant high school's denial of a request by a student gay-straight alliance to post and distribute fliers throughout the high school that listed websites with direct links to other websites containing explicit materials on sexual activity. Id., 311 F. Supp. 2d at 556-557. Noting that it was "highly inappropriate to be directing the attention of young students towards such material by way of promotion of the website on the school campus" where the school "contain[ed] students as young as twelve years of age," the Caudillo Court held that, because the websites contradicted the high school's abstinence-only curriculum, the gay-straight alliances' posting of the website caused a "material and substantial interference" with the school's education goals. Id., 311 F. Supp. 2d at 561, 563, 568. [10]

_____

[10] Interestingly, the Court rejected plaintiffs' argument that the offending material was not contained on the banned website, but was merely contained in direct links listed on the banned website, because the plaintiff's intent was for visitors to the offending website to be directed to the offending material:

> The purpose of linking one site to another is to provide access to the site. In this case [the plaintiff], by specifically creating the direct button links as part of the [banned] website to [the websites containing the offending material], intended to establish connection to those sites by which other students could readily view the information contained on those sites.

If defendants' censorship of Club posters somehow restricted plaintiffs' fair opportunity to conduct meetings (which defendants deny), then such censorship was permitted under Section 4071(c)(4) and, therefore, not in violation of the EAA. As a result, plaintiffs cannot recover under Count III of their Second Amended Complaint.

      D.    <u>Barring The HSCCA Website From Plaintiffs' Posters Falls Within The "Order And Discipline" And "Well-Being" Exceptions to The EAA.</u>

Absent the showing of a "material and substantial" interference, 20 U.S.C. § 4071(f) contains three exceptions to the requirement that a school must provide equal access to all non-curriculum related student groups. Thus, Section 4071(f) provides:

> Nothing in this subchapter shall be construed to limit the authority of the school, its agents or employees, to maintain order and discipline on school premises, to protect the well-being of students and faculty, and to assure that attendance of students at meetings is voluntary.

Two of those exceptions – maintaining "order and discipline" and protecting the "well- being" of students – are at issue here. HHS school officials were concerned that the extreme violence of the beheading videos would not only disrupt classroom procedure and routine (Stapelfeld Affidavit, ¶¶ 19 & 20; Champigny Affidavit, ¶¶ 5 & 6), but might so upset students – particularly twelve and thirteen-year olds – that they could suffer psychological harm and even require counseling as a result. (Stapelfeld Affidavit, ¶¶ 19 & 21; Champigny Affidavit, ¶¶ 5 & 7; Schuck Affidavit, ¶¶ 15-17). In adopting the "well-being" exception, it was Congress's intent "to try to prevent the interference with the psychological welfare or the well-being of the kids." <u>Caudillo</u>, <u>supra</u>, 311 F.Supp.2d at 571, citing 130 Cong. Rec. 19, 229 (1984) (statement of Sen. Danforth). In light of the graphic and shocking nature of the beheading videos, the defendants cannot be

---

<u>Caudillo</u>, 311 F.Supp.2d at 561.

held liable under the EAA for attempting to protect the well-being of HHS students.  Section 4071(f) protects the defendants from liability under Count III of plaintiffs' Second Amended Complaint.

## V.     THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY AS AGAINST PLAINTIFFS' CIVIL RIGHTS CLAIMS.

Even if they deprived plaintiffs of their constitutional rights (which they deny), the individual defendants, Mr. Stapelfeld, Mr. Champigny and Dr. Berman, remain protected from liability for damages under the defense of qualified immunity.  Qualified immunity shields government officials performing discretionary functions from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1992); Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 91 (1st Cir. 1994) ("the relevant question is whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct").  Qualified immunity "gives ample room for mistake in judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  Lowinger v. Broderick, 50 F.3d 61, 65 (1st Cir. 1995), quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991) (*per curiam*).  "A reasonable although mistaken conclusion about the lawfulness of one's conduct does not subject a government official to personal liability."  Id.  In using their discretion to ban the HSCCA website from Club posters, the individual defendants were operating in the realm of discretion.  Thus their decisions, even if unconstitutional (which the defendants deny), are protected from both suit and liability.

-21-

After first determining whether plaintiffs' allegations establish a constitutional violation, the Court must next determine whether the constitutional right was clearly established at the time of the violation. Mihos v. Swift, 358 F.3d 91, 102 (1st Cir. 2004). If so, the Court must further decide "whether a similarly situated reasonable official would have understood that the challenged action violated the constitutional right at issue." Id.

"The inquiry into the nature of a constitutional right for the purpose of ascertaining clear establishment seeks to discover whether the right was reasonably well settled at the time of the challenged conduct . . .." Martinez v. Colon, 54 F.3d 980, 988 (1st Cir. 1995). Further, such inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Suboh v. District Attorney's Office of Suffolk Dist., 298 F.3d 81, 93 (1st Cir. 2002). "If the operative legal principles are clearly established only at a level of generality so high that officials cannot fairly anticipate the legal consequences of specific actions, then the requisite notice is lacking." Savard v. Rhode Island, 338 F.3d 23, 28 (1st Cir. 2003), cert. den., 540 U.S. 1109 (2004). Here, plaintiffs' alleged right to display the HSCCA website on Club posters at HHS without restriction was by no means "reasonably well settled" during the 2004-2005 academic school year. On the contrary, under the rationales of Tinker and Bethel, and in accordance with the provisions of the EAA, the defendants enjoyed significant discretion to protect the rights of other students, to prevent disruption and disorder within the school, and to restrict speech that was "plainly offensive." In the event the individual defendants were unable to fairly anticipate the legal consequences of their conduct, it is only because the law regarding plaintiffs' rights was not "clearly established" at the time defendants acted.

To determine the next step – the understanding of an objectively reasonable official – it is

necessary to consider the alleged misconduct from the perspective of the individual defendants. Thus, even if the individual defendants erred – i.e., if they violated plaintiffs' clearly-established constitutional rights – the defendants are still immune if their mistake as to what the law required was reasonable. Saucier v. Katz, 533 U.S. 194, 205 (2001). Here, given the pronouncement in Tinker that students' First Amendment rights must be applied based on the special characteristics of each school environment, and the balance that school officials must strike between students' free speech rights and the preservation of the education process, it cannot be said that no reasonable official in the position of the defendants could have believed that his or her actions were lawful. Nor, in the face of the extremely violent and upsetting videos, can it be said that reasonable officials in the place of the individual defendants would have known that they were violating any "clearly established" rights by taking the measures they took. As a result, the individual defendants cannot be held liable under 42 U.S.C. § 1983, and Counts I, III and V must be dismissed as against the individual defendants.

## VI. NEITHER THE TOWN OF HUDSON NOR HHS CAN BE HELD VICARIOUSLY LIABLE FOR THE CIVIL RIGHTS VIOLATIONS OF ITS AGENTS OR EMPLOYEES.

A municipality cannot be held vicariously liable for the civil rights violations of its agents or employees. Monell v. Dep't of Social Services of the City of New York, 436 U.S. 658, 665 (1978). It can, nevertheless, be held liable under 42 U.S.C. § 1983 for constitutional wrongs caused through "a policy statement, ordinance, regulation or decision officially adopted or promulgated" by the municipality. Id. And, even in the absence of a formal government policy, liability may still be imposed if a plaintiff is deprived of his or her constitutional rights by the existence of a widespread practice that, although not authorized by law or express government

-23-

policy, is "so permanent and well established as to constitute a 'custom or usage' with the force of law." St. Louis v. Praprotnick, 485 U.S. 112, 127 (1988).

The United States Supreme Court cautioned that where a 42 U.S.C. § 1983 plaintiff claims that a municipality has not directly inflicted an injury but instead has caused its employee to do so, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Board of County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 405 (1997). This is particularly so where the plaintiff makes no allegation that the municipality itself violated federal law or directed or authorized the deprivation of his civil rights. "That a plaintiff suffered a deprivation of federal rights at the hands of a municipal employee will not alone permit an inference of municipal culpability and causation . . . ." Id., 520 U.S. at 406.

The plaintiffs seek to impose municipal liability upon the Town of Hudson and HHS. Yet, at the time of defendants' actions – December 7, 2004 and January 7, 2005 – it is undisputed that no policy, either within the Town of Hudson, HHS, or the Hudson School Committee, dictated defendants' conduct in banning the HSCCA website from Club posters. Moreover, as such a novel issue had never before arisen at HHS, neither the Town, HHS, nor the Hudson School Committee, can be said to have had any usual practice banning such websites. Without proof of a municipal policy or practice, Counts I, III and V must be dismissed as against the Town of Hudson and HHS.

## VII.    PLAINTIFFS LACK STANDING TO CHALLENGE THE HUDSON SCHOOL COMMITTEE POLICIES.

The plaintiffs claim in their Second Amended Complaint that Hudson School Committee

policies 1700 and 1701 (hereinafter "the policies") are unconstitutional. Yet, because the

policies were not adopted by the Hudson School Committee until February 8, 2005 and July 12,

2005, *after the defendants' banned the Club from listing the HSCCA website*, the plaintiffs lack

standing to challenge the constitutionality of these policies.

Standing, as well as mootness, are jurisdictional issues deriving from the "case or

controversy" requirement of Article III of the United States Constitution. Cole v. Oroville Union

High School Dist., 228 F.3d 1092, 1098 (9th Cir. 2000), citing Friends of the Earth, Inc. v.

Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180 (2000). To maintain an action, a plaintiff

must demonstrate a personal stake in the outcome of a lawsuit, and must show that he or she

"'has sustained or is immediately in danger of sustaining some direct injury' as the result of the

challenged official conduct and the injury or threat of injury must be both 'real and immediate,'

not 'conjectural' or 'hypothetical.'" City of Los Angeles v. Lyons, 461 U.S. 95, 101-102 (1983).

Past exposure to harm will not, by itself, confer standing upon a plaintiff "[a]bsent a sufficient

likelihood that he will again be wronged in a similar way." Brown v. Hot, Sexy and Safer

Productions, Inc., 68 F.3d 525, 539 (1st Cir. 1995), citing City of Los Angeles v. Lyons, 461 U.S.

95, 104-106 (1983).

As stated above, the claims in plaintiffs' Second Amended Complaint are centered on

actions taken by the defendants' *prior* to enactment of the 2005 policies. Thus, plaintiffs

suffered no harm from the existence or enforcement of said policies. Further, it is undisputed

that the Club has ceased to exist since its last meeting held on April 13, 2005, almost two years

ago. Any injury or threat of injury plaintiffs allege they may suffer from future enforcement of

the policies is hypothetical only, since the policies were never applied to preclude the Club from

any conduct or action whatsoever.  Thus, the plaintiffs lack standing to challenge the

constitutionality of the policies.  This portion of their claim must be dismissed.[11]

## VIII.   DEFENDANTS DID NOT VIOLATE PLAINTIFFS' RIGHTS TO FREE EXPRESSION UNDER M.G.L. c. 71, § 82 (COUNT IV).

In Count IV of their Second Amended Complaint, the plaintiffs allege that defendants

violated their free speech rights under M.G.L. c. 71, § 82, the Massachusetts statute that protects

a student's right to freedom of expression.  The statute states, in pertinent part, that:

> The rights of students to freedom of expression in the public schools of the
> commonwealth shall not be abridged, provided that such right shall not cause *any
> disruption or disorder within the school*.  Freedom of expression shall include without
> limitation, the rights and responsibilities of students, collectively and individually, (a) to
> express their views through speech and symbols, (b) to write, publish and disseminate
> their views, and (c) to assemble peaceably on school property for the purpose of
> expressing their opinions.

M.G.L. c. 71, § 82 (emphasis added).  The Massachusetts SJC has held that the "clear" and

"unambiguous" language of Chapter 71, Section 82, "protects the rights of secondary school

students limited only by the requirement that any expression be non-disruptive within the

school." Pyle v. School Comm.of South Hadley, 423 Mass. 283, 286 (1996) (answering certified

question from Pyle v. School Comm. of South Hadley, 55 F.3d 20 (1st Cir. 1995)).

The Legislature intended M.G.L. c. 71, § 82, to codify the holding in Tinker. Westfield

High School L.I.F.E. Club v. City of Westfield, 249 F.Supp.2d 98, 111 (D. Mass. 2003) (holding

Bible club had right to distribute candy canes with religious messages to the student body absent

---

[11] Typically, student claims regarding a school policy become moot when that student graduates from the school. See Cole, supra, 228 F.3d at 1098 ("[i]t is well-settled that once a student graduates, he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy"); see also Bd. of School Comm'rs of Indianapolis v. Jacobs, 420 U.S. 128, 129 (per curiam) ("[once] all of the named plaintiffs in the action [have] graduated ... a case or controversy no longer exists"); see also Mellen v. Bunting, 327 F.3d 355, 364 (4th Cir. 2003) ("[student] claims for declaratory and injunctive relief generally become moot when they graduate").

Case 1:05-cv-11007-PBS    Document 41    Filed 04/11/2007    Page 27 of 28

evidence of any disruption or interference). But with one major difference. While Tinker

requires school officials to demonstrate a "*substantial* disruption or *material* interference" in

order to restrict student speech, Section 82, by its terms, permits restriction upon a showing of

"*any*" disruption or disorder. Id. (stating that "the Court will assume . . . that the [state statute's]

'any disruption or disorder' standard is easier for the defendants to show than Tinker's

'substantial disruption or material interference' standard"). While no Massachusetts or federal

court has yet explored what constitutes "*any* disruption or disorder," the Westfield Court stated

that a reasonable construction of the statute would interpret "any" to include prospective

disruption or disorder. Id.

    As explained more fully above, the defendants reasonably forecast that student viewing of

the beheading videos would cause a "substantial and material disruption" with the operations of

HHS. (Stapelfeld Affidavit, ¶ 18). Even assuming, *arguendo*, this Court should conclude that

the defendants did not satisfy the Tinker requirement, Count IV of plaintiffs' Second Amended

Complaint still fails because, under M.G.L. c. 71, § 82, the defendants could reasonably

determine that the beheading videos would cause at least some disruption or disorder within

HHS. Indeed, Ms. Schuck (an adult) was herself was extremely upset and disturbed by the

viewing of just one video. Thus, defendants are entitled to judgment on Count IV.

**CONCLUSION**

    For the reasons set forth above, this Court should allow defendants' Motion for Summary

Judgment by entering summary judgment in favor of the defendants and against the plaintiffs on

Counts I, III, IV, V and VI of their Second Amended Complaint.

-27-

Respectfully submitted,

The Defendants,

JOHN STAPELFELD, in his individual and official
capacities as Principal of Hudson High School,
DAVID CHAMPIGNY, in his individual and
official capacities as Assistant Principal of Hudson
High School, Dr. SHELDON BERMAN, in his
individual and official capacities as Superintendent
of Hudson Public School District, TOWN OF
HUDSON, MASSACHUSETTS, and HUDSON
HIGH SCHOOL,

By their attorneys,

**PIERCE, DAVIS & PERRITANO, LLP**

_____
John J. Davis, Esq., BBO # 115890
Mia Baron, Esq., BBO # 663826
Ten Winthrop Square
Boston, MA 02110
(617) 350-0950

Dated:  April 11, 2007

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing, filed through the Electronic Case Filing System, will
be sent electronically to the registered participants as identified on the Notice of Electronic Filing
and that a paper copy shall be served upon those indicated as non-registered participants on April
11, 2007.

_____
John J. Davis, Esq.