UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

DOCKET NO.: 05-11007 PBS

)
CHRISTOPHER BOWLER, HUDSON HIGH    )
SCHOOL CONSERVATIVE CLUB, an    )
unincorporated association, JOSEPH T. BOWLER, )
and KIMBERLY A. BOWLER, by and through    )
her father and next friend, STEVEN BOWLER,    )
    Plaintiffs,    )
    )
vs.    )
    )
JOHN STAPELFELD, DAVID CHAMPIGNY,    )
DR. SHELDON BERMAN, TOWN OF HUDSON, )
MASSACHUSETTS and HUDSON HIGH    )
SCHOOL,    )
    Defendants.    )
)

**DEFENDANTS' CONCISE STATEMENT OF MATERIAL FACTS IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**I. The Parties.**

1.    The plaintiff, Christopher Bowler (hereinafter "Christopher"), is a resident of Hudson,

Massachusetts and a 2005 graduate of Hudson High School (hereinafter "HHS").

(Plaintiffs' Second Amended Complaint (hereinafter "Complaint") & Defendants'

Answer to Second Amended Complaint (hereinafter "Answer"), ¶ 2.1).

2.    The plaintiff, Joseph T. Bowler (hereinafter "Joseph"), is a resident of Hudson,

Massachusetts, and currently enrolled in the twelfth grade at HHS. Joseph expects to

graduate from HHS in the Spring of 2007. (Complaint & Answer, ¶ 2.2; Deposition of

Joseph, at 6-7).

3.    The plaintiff, Kimberly A. Bowler, by and through her father and next friend, Steven

Bowler (hereinafter "Kimberly"), is a resident of Hudson, Massachusetts, and currently enrolled in the eleventh grade at HHS.  Kimberly expects to graduate from HHS in the Spring of 2008. (Complaint & Answer, ¶ 2.3; Deposition of Kimberly, at 8).

4.    The defendant, John Stapelfeld (hereinafter "Mr. Stapelfeld"), is currently and was at all relevant times the Principal of HHS. (Complaint & Answer, ¶ 2.4).

5.    The defendant, David Champigny (hereinafter "Mr. Champigny"), is currently and was at all relevant times the Assistant Principal of HHS. (Complaint & Answer, ¶ 2.5).

6.    The defendant, Dr. Sheldon Berman (hereinafter "Dr. Berman"), is currently and was at all relevant times the Superintendent of Schools for Hudson Public Schools. (Complaint & Answer, ¶ 2.6).

7.    The defendant, Town of Hudson (hereinafter "the Town"), is a duly constituted municipality located in Middlesex County, Massachusetts. (Complaint & Answer, ¶ 2.7).

8.    The defendant, HHS, is a public high school located in and owned by the Town.  HHS is part of the Hudson Public Schools. (Complaint & Answer, ¶ 2.8).

## II.  HHS and Formation of the Hudson High School Conservative Club.

9.    Total enrollment at HHS for the 2006-2007 academic year is approximately 1100 students, comprised at the beginning of the year of eight twelve-year old students, 197 thirteen-year old students, 213 fourteen-year old students, 229 fifteen-year old students, 230 sixteen-year old students, 187 seventeen-year old students, and 34 eighteen-year old students. (Affidavit of Mr. Stapelfeld (hereinafter "Stapelfeld"), ¶ 2).

10.   HHS was one of 11 pilot schools in the country selected to participate in the "First Amendment Schools" program, a national initiative designed to transform the way in

which schools teach the rights and responsibilities of democratic citizenship. (Stapelfeld, ¶ 3).

11.   HHS serves as a community center and, as such, hosts several conferences, concerts and theater events every year. (Stapelfeld, ¶ 4).

12.   For example, in December 2004, 60 first-grade students visited HHS and walked through its halls in order to attend a holiday concert. (Stapelfeld, ¶ 5).

13.   Middle school students are routinely brought into HHS to tour the facility and to familiarize themselves with their future high school. (Stapelfeld, ¶ 6).

14.   Senior citizens also walk the halls of HHS to attend events. (Stapelfeld, ¶ 7).

15.   HHS grants non-curriculum related student groups the right to meet on school property outside of school hours, and also grants such groups access to school facilities for activities. (Stapelfeld, ¶ 8).

16.   All school-recognized student groups must have a faculty advisor to advise and assist club members with various aspects of their clubs, and to attend club meetings. (Stapelfeld, ¶ 9).

17.   In the Fall of 2004, Christopher and James Melillo (hereinafter "Melillo"), a fellow HHS student, formed the Hudson High School Conservative Club (hereinafter "the Club"). (Complaint & Answer, ¶ 3.10 & Stapelfeld, ¶ 10).

18.   While Christopher and Melillo were still organizing the Club, Mr. Stapelfeld expressed his support for the Club to Christopher:

Q:      So before you formed the club, did Mr. Stapelfeld encourage you in any
        way to form the club?

A:      ... he expressed his opinions stating that he was glad that we were getting

involved politically.

(Christopher's Deposition, at 91; Stapelfeld, ¶ 11).

19. Mr. Stapelfeld also helped the Club obtain an advisor. (Stapelfeld, ¶ 12; Christopher's Deposition, at 89-90).

20. Christopher and Melillo did not begin organizing the Club until late October or early November 2004, approximately two months into the school year. (Melillo Deposition, at 55-56). By that time, many teachers had already made other extra-curricular commitments. (Stapelfeld, ¶ 12).

21. After the Club gained full status as a school-recognized organization in November 2004, it held from six to seven meetings during the 2004-2005 academic year. (Christopher's Deposition, at 93). The Club's last meeting was held on April 13, 2005. (Id., at 184). The Club held no further meetings after April 13, 2005 "because students stopped showing up." (Id.). Only five people attended each of the last three Club meetings, including the plaintiffs Christopher, Joseph and Kimberly Bowler, and Melillo. (Id., at 184-185).

22. Throughout the 2004-2005 academic year, the Club was given the same access to school facilities as all other non-curriculum related student groups. (Stapelfeld, ¶ 13). The Club was not told when it could meet or how many meetings it could hold. (Stapelfeld, ¶ 13; Christopher's Deposition, at 92-95). The Club was provided with space to hold as many meetings as it wished. (Id.). Moreover, the Club invited speakers to HHS. (Christopher's Deposition, at 92-95). HHS did not bar any Club-invited speakers from the school, but instead provided the Club with facilities to hold their speaking engagements. (Id.).

School officials made no attempt to restrict, dictate or control the content of plaintiffs' speech at Club meetings. (Christopher's Deposition, at 92-95; Melillo Deposition, at 80).

**III. Posting of the National Website.**

23. Christopher and Melillo chose to affiliate the Club with a national organization called the High School Conservative Club of America (hereinafter "HSCCA"). (Complaint & Answer, ¶ 3.9).

24. The HSCCA has its own website, http://www.hscca.org. (Complaint & Answer, ¶ 3.9).

25. Members of the Club prepared ten (10) posters advertising the Club. (Stapelfeld, ¶ 14). On or about Friday, December 3, 2004, members of the Club posted the posters on hallway walls and bulletin boards throughout HHS. (Id.).

26. The areas where the Club posted its posters were accessible to all HHS students, including 8th and 9th grade students. (Christopher's Deposition, at 67; Melillo Deposition, at 70-71).

27. The posters publicized the existence, purpose and message of the Club, the names of the founders (Christopher and Melillo), as well as the details of the first Club meeting. (Complaint & Answers, ¶ 3.11; Christopher's Deposition, at 53).

28. The posters also displayed the HSCCA website address, http://www.hscca.org. (Christopher's Deposition, p. 53).

29. At the time Christopher and Kimberly hung the Club posters, a heading near the top of the HSCCA website's homepage read "Islam: A Religion of Peace?" (Affidavit of Ellen Schuck (hereinafter "Schuck"), ¶ 9; Melillo Deposition, at 40, & Exhibit 2, attached thereto).

30.  Below the heading was a still shot from one of five realtime videos of beheadings directly linked to the HSCCA website. (Melillo Deposition, at 40, & Exhibit 2, attached thereto).

31.  The still shot showed a blindfolded hostage kneeling in front of three masked and armed terrorists. (Melillo Deposition, at 40-41, & Exhibit 2, attached thereto).

32.  The heading, still shot and five beheading videos were accessible directly from the HSCCA website from at least December 6, 2004 until today. (Schuck, ¶ 9).

33.  True and accurate copies of three of the five beheading videos that appeared (and continue to appear) on the HSCCA website are contained on a CD attached as Exhibit "A" to the Affidavit of John J. Davis. A brief narrative description of each video is also set forth in the Affidavit, although not as evidence of their contents but, rather, as a warning to viewers.

34.  The plaintiffs, Christopher, Joseph and Kimberly, never viewed the beheading videos accessible on the HSCCA website. (Christopher's Deposition, at 55-56; Joseph's Deposition, at 92; Kimberly's Deposition, at 70).

35.  Christopher had seen a beheading video the year before and, therefore, "felt no need to see any more." (Christopher's Deposition, at 56). Christopher describes the beheading video he saw the year before as "graphic," "gruesome" and "disturbing." (Id., at 57-58).

36.  Melillo viewed "two or three" of the beheading videos accessible on the HSCCA website. (Melillo Deposition, at 39). One was approximately two minutes long; another was approximately five minutes long. (Id., at 43). The two-minute video showed terrorists using "an axe or something, maybe a dulled axe to cut through some person's neck." (Id.). The images were accompanied by sounds of "grunting" and "screaming." (Id.). It

was "gruesome," "disturbing" and "upsetting." (Id., at 43-44). The five-minute video "was roughly about the same . . ." as the two-minute video, "just a little more drawn out." (Id., at 45). The five-minute video was also accompanied by sounds of "grunting" and "screaming." (Id., at 45-46). It too was "gruesome," "graphic," "disturbing" and "upsetting." (Id., at 46).

## IV. Defendants' Actions Regarding The Website.

37.    Ellen Schuck (hereinafter "Ms. Schuck") is the Technology Director of the Hudson Public Schools. (Schuck, ¶ 1). As Technology Director, she is responsible for monitoring and filtering the web content on all of computers located within the Hudson Public School system.[1] (Id., ¶ 2). If Ms. Schuck should learn of a website or internet address containing pornographic, excessively violent or graphic images or material, she blocks access to such images or material from all Hudson Public School computers by means of filters on the computer servers. (Id., ¶ 4).

38.    Ms. Schuck became aware of the HSCCA website on Monday, December 6, 2004 through an email she received from a teacher at HHS. (Schuck, ¶ 5).

39.    The HHS teacher indicated in his email to Ms. Schuck that the Club's posters listed a website with, *inter alia*, several links to brutal beheadings. (Schuck, ¶ 6). The HHS teacher asked Ms. Schuck to look at the website in question, http://www.hscca.org, and determine whether access to it should be blocked since the Hudson Public Schools' filtering software had not automatically blocked access to the website on the Hudson

---

[1] In total, 435 computers are accessible to HHS students: (I) HHS has three instructional labs where any teacher can take their students to integrate technology into HHS' core curriculum; (ii) there are six additional computer labs where computer courses are conducted; (iii) there are 30 computers in the library available for student use at any time; and (iv) there are two to three computers in each HHS classroom. (Schuck, ¶ 3).

Public Schools' computers. (Id., ¶ 7-8).

40.    On Monday, December 6, 2004, Ms. Schuck visited the HSCCA website from a HHS

computer and accessed one of the five beheading videos listed under the "Islam: A

Religion of Peace?" heading. (Schuck, ¶ 9).  Because the heading "Islam: A Religion of

Peace?" was prominently featured at the top of the HSCCA homepage, Ms. Schuck easily

found the beheading videos within moments after clicking to the website. (Id.).

41.    As Ms. Schuck watched and listened to the beheading video, she began to tremble and

cry. (Schuck, ¶ 10).  She had never seen such genuine, gruesome or frightful violence on

the internet or, indeed, anywhere else. (Id.).  Because she understood the video to be a

recording of an actual execution, Ms. Schuck found it both shocking and horrifying. (Id.).

42.    Ms. Schuck became extremely upset due to the high level of violence contained in the

beheading video. (Schuck, ¶ 11).  Most alarming to Ms. Shuck were the manner in which

the victim was killed; the anonymity and cold-bloodedness of the hooded executioners;

the sounds of the victim as he was killed; the amount of blood shown; the close-up

images of the fatal wound, the severed head and the lifeless body; and the length of the

video. (Id.).  It seemed to go on and on. (Id.).  When the video was finally over, Ms.

Schuck felt angry, helpless and sad.  She was still crying and trembling. (Id.).

43.    On December 6, 2004, immediately after watching the beheading video, Ms. Schuck

blocked access to the HSCCA website from all Hudson Public School computers.

(Schuck, ¶ 12).

44.    On either December 6, 2004 or December 7, 2004, Ms. Schuck went to Mr. Champigny's

office to inform him of the graphic nature of the beheading video. (Affidavit of Mr.

Champigny (hereinafter "Champigny"), ¶ 2; Schuck, ¶ 13).

45.  Still shaking and upset, Ms. Schuck told Mr. Champigny that the video she had just watched on the HSCCA website was extremely violent and wholly inappropriate in a school setting. (Champigny, ¶ 3; Schuck, ¶ 14).

46.  Ms. Schuck believed that students, if they viewed even a portion of one of the beheading videos, would likely be profoundly affected by the level of violence, and could experience psychological injury or trauma as a result. (Schuck, ¶ 15).

47.  Ms. Schuck further believed that students who viewed even a portion of one of the beheading videos while in school would be so disturbed or traumatized by the violent images and sounds that they would likely be distracted from their studies and other scheduled activities, thereby disrupting the normal flow of learning at HHS. (Schuck, ¶ 16).  Ms. Schuck also believed that, as disturbing as the beheading video was for an adult, it would likely be even more shocking and potentially harmful for students, particularly those as young as twelve, thirteen and fourteen years of age.  (Id., ¶ 17).

48.  Based on Ms. Schuck's description and reaction, Mr. Stapelfeld and Mr. Champigny determined, on Monday, December 7, 2004, that the beheading videos, if viewed by HHS students, were reasonably likely to cause a substantial and material disruption at HHS. (Stapelfeld, ¶ 18; Champigny, ¶ 4).

49.  Specifically, Mr. Stapelfeld and Mr. Champigny believed that, as soon as one student watched one of the videos and word of their graphic and violent nature spread, many more students would likely watch the videos or at least talk about their contents. (Stapelfeld, ¶ 19; Champigny, ¶ 5).  Mr. Stapelfeld and Mr. Champigny believed that

those students who viewed the videos might reasonably request and/or require counseling in order to cope with subsequent feelings of helplessness or despair. (Id.).

50. Mr. Stapelfeld and Mr. Champigny reasonably forecast that the reactions of HHS students and teachers viewing the extremely violent videos on the HSCCA website would be strong enough to distract students from their school work. (Stapelfeld, ¶ 20; Champigny, ¶ 6). This belief was based, at least in part, on Mr. Champigny's communications with Ms. Schuck, and observations of how upset she sounded and appeared after viewing just one of the beheading videos. (Champigny, ¶ 6).

51. Mr. Stapelfeld and Mr. Champigny also reasonably forecast that HHS teachers would be compelled or persuaded to interrupt their planned lessons or curricula, and turn classroom discussions into conversations regarding the videos, thereby disrupting normal classroom procedure and routine. (Stapelfeld, ¶ 20; Champigny, ¶ 6).

52. The violence on the videos was so shocking and graphic that Mr. Stapelfeld and Mr. Champigny also concluded that, should the HSCCA website remain on the Club posters, it would impinge upon the rights of other students – particularly younger students – to be free from the potential psychological injury that watching the videos could cause. (Stapelfeld, ¶ 21; Champigny, ¶ 7).

53. Mr. Champigny and Mr. Stapelfeld also reasonably forecast that at least some parents of HHS students would object to their children – particularly younger students – being exposed to the videos due to their extremely violent content. (Stapelfeld, ¶ 22; Champigny, ¶ 8).

54. Mr. Champigny met with Christopher and Melillo on Tuesday, December 7, 2004.

(Champigny, ¶ 9).

55.    During their December 7, 2004 meeting, Mr. Champigny informed Christopher and

Melillo that, because of the violent and gruesome content of the beheading videos, the

Club could not continue to list the HSCCA website on its posters.   (Champigny, ¶ 9);

Melillo Deposition, at 81-82).  Mr. Champigny informed Christopher and Melillo that

HHS considered it inappropriate and potentially harmful to expose other students to the

type of violence shown in the videos. (Champigny,  ¶ 10; Christopher's Deposition, at 57,

62-63).  Mr. Champigny did not tell Christopher and Melillo that their Club could not

meet, nor did he tell them that their Club had to sever all ties with the national HSCCA

organization.  (Champigny, ¶ 11).  According to Melillo, Mr. Champigny told him and

Christopher "we needed to remove the Web site from the posters and rehang them up or

create new posters without the Web site . . .."  (Melillo Deposition, at 82).

56.    The posters were taken down on December 7, 2004. (Champigny, ¶ 12).

57.    On or about January 7, 2005, the Club posted new posters on the walls of HHS, at least

some of which again listed the HSCCA website address. (Champigny, ¶ 13).

58.    On or about January 7, 2005, Mr. Stapelfeld viewed one of the beheading videos

accessible from the HSCCA website. (Stapelfeld, ¶ 26).  Mr. Stapelfeld found the video

shocking and disturbing, particularly its realtime graphic depiction of an actual murder

complete with the victim's screaming and moaning. (Id.).  Mr. Stapelfeld had never seen

such violent images on the internet. (Id.).

59.    Christopher was again called to Mr. Champigny's office on January 7, 2005, where Mr.

Champigny again advised him that the HSCCA website could not be posted on the Club's

posters because of the violent beheadings videos on the HSCCA website. (Champigny, ¶ 14).

60. Mr. Stapelfeld and Mr. Champigny allowed the Club to black out the HSCCA website address on the Club's posters and write the word "censored" over the HSCCA website address, which the Club did on several of its posters. (Champigny, ¶ 15; Stapelfeld, ¶ 28).

61. Mr. Stapelfeld and Mr. Champigny also allowed the Club, during Club meetings, to display in the classroom or library where the meetings were held, a large Club banner listing the HSCCA website. (Christopher's Deposition, at 96-97; Stapelfeld, ¶ 29).

62. On or about February 3, 2005, the Hudson High School newspaper, "Hawk Talk," ran an article that included the HSCCA website address. (Complaint & Answer, ¶ 3.23 & Stapelfeld, ¶ 30).

63. Neither Mr. Stapelfeld nor Mr. Champigny allowed or gave permission to any student or teacher associated with "Hawk Talk" to publish the HSCCA website address in the "Hawk Talk" article, nor did Mr. Stapelfeld or Mr. Champigny read or review the "Hawk Talk" article before it was published. (Stapelfeld, ¶ 31 & Champigny, ¶ 17).

64. Neither Christopher, Melillo, Kimberly, Joseph nor any other Club member was ever disciplined in any way for posting the HSCCA website on Club posters or for any other matter related to the activities of the Club. (Stapelfeld, ¶ 32).

65. The Club remained inactive throughout the 2005-2006 and 2006-2007 academic years, and continues to remain inactive today. (Kimberly's Deposition, at 43-46; Joseph's Deposition, at 60).

66. No former or present member of the Club – including but not limited to Christopher, Melillo, Kimberly or Joseph – ever attempted to secure an advisor, schedule meetings,

organize activities or otherwise reactivate the Club at any time during the 2005-2006 and 2006-2007 academic years. (Kimberly's Deposition, at 43-46; Joseph's Deposition, at 60).

## V.  Hudson School Committee Policies.

67.    Hudson School Committee Policies 1700 (Distribution and Posting of Written Materials For Students in Schools) and 1701 (Posters Announcing Meetings or Events Sponsored by Student Groups) were adopted by the Hudson School Committee on February 8, 2005 and July 12, 2005, respectively. (Complaint, ¶ 3.26, & Exhibits "B" and "C", attached thereto).

68.    On both December 7, 2004 and January 7, 2005, the dates on which Mr. Champigny informed Christopher that the HSCCA website could not appear on the Club's posters, no policy was in existence at HHS regarding non-curriculum related student groups posting posters at HHS. (Stapelfeld, ¶ 33).

Respectfully submitted,
The Defendants,

JOHN STAPELFELD, in his individual and official
capacities as Principal of Hudson High School,
DAVID CHAMPIGNY, in his individual and
official capacities as Assistant Principal of Hudson
High School, Dr. SHELDON BERMAN, in his
individual and official capacities as Superintendent
of Hudson Public School District, TOWN OF
HUDSON, MASSACHUSETTS, and HUDSON
HIGH SCHOOL,

By their attorneys,

PIERCE, DAVIS & PERRITANO, LLP

John J. Davis, Esq., BBO # 115890
Mia Baron, Esq., BBO # 663826
Ten Winthrop Square
Boston, MA 02110
(671) 350-0950

Dated:  April 11, 2007

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing, filed through the Electronic Case Filing System, will
be sent electronically to the registered participants as identified on the Notice of Electronic Filing
and that a paper copy shall be served upon those indicated as non-registered participants on April
11, 2007.

John J. Davis, Esq.

-14-