UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

DOCKET NO.: 05-11007 PBS

CHRISTOPHER BOWLER, HUDSON HIGH )
SCHOOL CONSERVATIVE CLUB, an )
unincorporated association, JOSEPH T. BOWLER, )
and KIMBERLY A. BOWLER, by and through )
her father and next friend, STEVEN BOWLER, )
    Plaintiffs, )
)
vs. )
)
JOHN STAPELFELD, DAVID CHAMPIGNY, )
DR. SHELDON BERMAN, TOWN OF HUDSON, )
MASSACHUSETTS and HUDSON HIGH )
SCHOOL, )
    Defendants. )

## AFFIDAVIT OF JOHN STAPELFELD

I, John Stapelfeld, hereby depose and aver as follows:

1. I am the Principal of Hudson High School (hereinafter "HHS"), a position I have held for over 25 years.

2. Total enrollment at HHS for the 2006-2007 academic year is approximately 1100 students, comprised at the beginning of the year of eight twelve-year old students, 197 thirteen-year old students, 213 fourteen-year old students, 229 fifteen-year old students, 230 sixteen-year old students, 187 seventeen-year old students, and 34 eighteen-year old students.

3. HHS was one of 11 pilot schools in the country selected to participate in the "First Amendment Schools" program, a national initiative designed to transform the way in

which schools teach the rights and responsibilities of democratic citizenship.

4. HHS serves as a community center and, as such, hosts several conferences, concerts and theater events every year.

5. For example, in December 2004, 60 first-grade students visited HHS and walked through its halls in order to attend a holiday concert.

6. Middle school students are routinely brought into HHS to tour the facility and to familiarize themselves with their future high school.

7. Senior citizens also walk the halls of HHS to attend events.

8. HHS grants non-curriculum related student groups the right to meet on school property outside of school hours, and also grants such groups access to school facilities for activities.

9. All school-recognized student groups must have a faculty advisor to advise and assist club members with various aspects of their clubs, and to attend club meetings.

10. In the Fall of 2004, Christopher Bowler (hereinafter "Christopher") and James Milello (hereinafter "James"), both twelfth grade HHS students at the time, formed the Hudson High School Conservative Club (hereinafter "the Club").

11. While Christopher and James were still organizing the Club, I expressed my support for the Club to Christopher by telling him that I was happy to see he was organizing an extra-curricular club and getting involved politically.

12. I also helped the Club obtain an advisor, as many teachers had already made other extra-curricular commitments by the time Christopher and James began to organize the Club in late October or early November 2004.

13. Throughout the 2004-2005 academic year, the Club was given the same access to school facilities as all other non-curriculum related student groups. The Club was not told when it could meet or how many meetings it could hold. The Club was provided with space to hold as many meetings as it wished.

14. Members of the Club prepared ten (10) posters advertising the Club and posted them on hallway walls and bulletin board throughout HHS on or about Friday, December 3, 2004.

15. The website address for the High School Conservative Club of America (hereinafter "HSCCA"), a national organization with which Christopher and James had decided to affiliate the Club, was listed on the posters. The HSCCA website address is http://www.hscca.org.

16. On Tuesday, December 7, 2004, Assistant Principal David Champigny (hereinafter "Mr. Champigny") and I were informed by Technology Director Ellen Schuck of extremely graphic videos of beheadings that were accessible directly from the HSCCA website.

17. Ms. Schuck told Mr. Champigny that he had watched one of the beheading videos and was extremely upset by its violent and graphic content. After watching the video, Ms. Schuck blocked access to the HSCCA website from all Hudson Public School computers.

18. Based on Ms. Schuck's description of and reaction to the video, Mr. Champigny and I determined, on December 7, 2004, that the beheading videos, if viewed by HHS students, were reasonably likely to cause a substantial and material disruption at HHS.

19. Specifically, I believed that, as soon as one student watched one of the videos and word of their graphic and violent nature spread, many more students would likely watch the videos or at least talk about their contents. I also believed that those students who viewed

the videos might reasonably request and/or require counseling in order to cope with subsequent feelings of helplessness or despair.

20. I reasonably forecast that the reactions of HHS students and teachers viewing the extremely violent videos on the HSCCA website would be strong enough to distract students from their school work. I also reasonably forecast that HHS teachers would be compelled or persuaded to interrupt their planned lessons or curricula, and turn classroom discussions into conversations regarding the videos, thereby disrupting normal classroom procedure and routine.

21. The violence in the videos was so shocking and graphic that I also concluded that, should the HSCCA website remain on the Club posters, it would impinge upon the rights of other students – particularly younger students – to be free from the potential psychological injury that watching the videos could cause.

22. Further, I reasonably forecast that at least some parents of HHS students would object to their children – particularly younger students – being exposed to the videos due to their extremely violent content.

23. At my direction, Mr. Champigny met with Christopher and James on Tuesday, December 7, 2004 and informed them that the HSCAA website could not remain on the Club posters because of the violent beheadings videos accessible from that website.

24. The Club posters were taken down on December 7, 2004.

25. On or about January 7, 2005, the Club posted new posters on the walls of HHS, at least some of which again listed the HSCCA website address.

26. On or about January 7, 2005, I viewed one of the beheading videos accessible from the

HSCCA website. I found the video shocking and disturbing, particularly its realtime graphic depiction of an actual murder complete with the victim's screaming and moaning. I had never seen such violent images on the internet.

27. Again at my direction, Christopher was called to Mr. Champigny's office on January 7, 2005, where Mr. Champigny again advised him that the HSCCA website could not be posted on the Club's posters because of the violent beheadings videos accessible from that website.

28. Mr. Champigny did, however, inform Christopher and James that the Club could black out the HSCCA website address on the Club's posters and write the word "censored" over the HSCCA website address, which the Club did on several of its posters.

29. Also, I allowed the Club to display in the classroom or library where the Club meetings were held a large Club banner listing the HSCCA website.

30. On or about February 3, 2005, the Hudson High School newspaper, "Hawk Talk," ran an article that included the HSCCA website address.

31. I did not allow or give permission to any student or teacher associated with "Hawk Talk" to publish the HSCCA website address in the "Hawk Talk" article, nor did I read or review the "Hawk Talk" article before it was published.

32. Neither Christopher, James, Kimberly nor Joseph, nor any other Club member, was ever disciplined in any way for posting the HSCCA website on Club posters or for any other matter related to the activities of the Club.

33. On both December 7, 2004 and January 7, 2005, the dates on which Mr. Champigny informed Christopher that the HSCCA website could not appear on the Club's posters, no

policy was in existence at HHS regarding non-curriculum related student groups posting posters at HHS.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS __7__ DAY OF APRIL, 2007.

_____
John Stapelfeld