**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **CHRISTOPHER BOWLER,** | ) | |
| **HUDSON HIGH SCHOOL CONSERVATIVE** | ) | |
| **CLUB, an unincorporated association,** | ) | |
| **JOSEPH T. BOWLER and** | ) | |
| **KIMBERLY A. BOWLER, by and through her** | ) | |
| **father and next friend, STEVEN BOWLER,** | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| **v.** | ) | **Docket No.: 05-11007 PBS** |
| | ) | |
| **JOHN STAPELFELD, DAVID CHAMPIGNY,** | ) | |
| **DR. SHELDON BERMAN, TOWN OF** | ) | |
| **HUDSON, MASSACHUSETTS and HUDSON** | ) | |
| **HIGH SCHOOL,** | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiffs in the above captioned cause of action hereby oppose the Defendants' motion

for summary judgment, as follows:

<u>**FACTS**</u>

**A.      <u>Facts in Defendants' Statement of Material Facts, ADOPTED by Plaintiffs</u>**

Plaintiffs adopt the following facts from Defendants' statement of material facts:

1-8, 10, 16-36, 43, 54-57, 59-62, 64-67.

**B.**     <u>**Facts in Defendants' Statement of Material Facts, UNKNOWN by Plaintiffs**</u>

Plaintiffs have insufficient knowledge to confirm or deny the following facts from the

Defendants' statement of material facts, and thus they do not adopt them:  9, 11-14, 37-

42, 44-53, 58, 63, 68.

**C.**     <u>**Additional Material Facts Asserted by Plaintiffs**</u>

1.     During his junior year at Hudson High School,  Christopher Bowler ("Christopher")

observed a steady stream of comments and actions on the part of the faculty,

administration, and students at Hudson High School which were critical of the policies of

the United States and of conservative political leaders.  [Christopher Depo, Ex. 1,

Christopher Answer to Ints., No. 4, 8]

2.     These teachers and administrators mocked and derided anyone who held conservative

political beliefs, including Plaintiff Christopher and many of his friends. [Christopher

Answer to Ints., No. 8]

3.     Hudson High School showed extremely violent films based on a liberal political

viewpoint such as *Fahrenheit 911*, a film by Michael Moore, which showed a beheading,

*Schindler's List*, which was graphically violent, and a film about the death of Emmett

Till, which showed close- ups of his violent beating with his face pulverized.

[Christopher Answer to Ints., No. 10]

4.     Because of the persistent bias against the conservative viewpoint at Hudson High School,

Christopher and another student, James Milello, decided to form a club that would serve

as a forum for pro-American, pro-conservative dialogue and speech and to advocate

respect and tolerance for their point of view at the school.  The club was named the

Hudson High School Conservative Club ( the "Club" or "Conservative Club").

[Christopher Answer to Ints., No. 4]

5.    Christopher and Milello chose to be affiliated with a national organization, High School
      Conservative Clubs of America ("HSCCA"). [Christopher Aff., ¶9]

6.    Christopher and co-founder James Mellilo found it difficult to obtain a sponsor because
      of fear of "backlash" from other teachers if they associated themselves with a club which
      had a conservative viewpoint. [Christopher Answer to Ints., No. 4]

7.    After the club started, teachers asked Christopher to disband it.  [Christopher Depo, Ex.
      10]

8.    Around December 3, 2004, the Plaintiffs, Milello, and other Conservative Club members
      prepared ten posters that were posted on walls and bulletin boards throughout Hudson
      High School for the purpose of publicizing the existence of the club, its purpose, its
      message, and its meetings. [Christopher Ans. to Ints., No. 3]

9.    The posters included information about the club and a reference to the website address of
      HSCCA.  There was nothing threatening or violent on the posters. [Christopher Depo., P.
      92]

10.   On December 7, 2004, the following Monday, Christopher was called to the office of
      Defendant Champigny, where seven of the ten club posters had been taken down and
      were in the office. [Christopher Aff., ¶15 (incorrect date), Champigny Aff., ¶9]

11.   When Christopher asked why the posters were removed, Defendant Champigny told him
      about a wide range of issues on the website that had offended teachers and others in the
      school.  He indicated that teachers were offended by references to taking down the
      rainbow [gay rights] flag and putting up the American flag, to advocacy of Second

Amendment rights, to a "12-step liberal recovery program," and to its position in favor of abolition of the National Education Association, a large teachers union. [Christopher Depo., P. 62-63]  The linked videos were only a small part of the reason why Defendant Champigny demanded that Plaintiffs had to remove reference to the HSCCA web site from their posters. [Christopher Depo., P. 56]

12. At least seven of the ten posters were thrown away by defendants or their agents, at the cost of about $2.00 each.  [Christopher Answer to Ints., No. 9]

13. Principal Stapelfeld revealed his overt bias against the content of  the plaintiffs' expression when he stated that the posters were removed because the club wasn't "neutral on issues" and when he told the *MetroWest Daily News*, "What started out as a great idea drifted from true conservative values to reactionary.  [Christopher Depo, Ex. 9]

14. After the club posters were posted, Christopher was confronted and challenged by teachers at Hudson High School regarding content on the HSCCA website, including the website's opinions supporting the Second Amendment, advocating disbanding the National Education Association, and protecting traditional marriage. [Christopher Answer to Ints., No. 3]

15. At the next meeting of the Club, the Club's teacher sponsor informed the Plaintiffs and other persons at the meeting that the Club's posters may be put back up and those posters could include the HSCCA web address. [Christopher Aff., ¶20]

16. The Plaintiffs and others then prepared new Club posters, one of which included a reference to the HSCCA website and web address, which were again posted in authorized places throughout Hudson High School on January 7, 2005.  [Champigny Aff., ¶13]

17. On January 7, 2005, Christopher  was again called to Defendant Champigny's office.

When Christopher arrived at the office, he was handed the new club poster which contained the HSCCA website address. [Christopher Aff., ¶22]

18. At meetings of the Conservative Club, teachers sometimes expressed their disdain and opposition in a disrespectful and intolerant manner. [Christopher Answer to Ints., No. 8]

19. At first, Defendant Stapelfeld stopped the Club from hanging a banner with the name of the Club and the website on it. Later, he changed his mind and allowed the banner to be displayed during meetings, but indicated that teachers would give him a "lot of flack." [Christopher Depo, P. 95-97]

20. Many outside news organizations with significant circulation published information about the controversy between the Conservative Club and Hudson High School, and published the HSCCA web site address. These include *The Boston Globe*, *Metrowest Daily News*, *USA Today*, *Christian Science Monitor*, and others. [Christopher Answer to Ints, No. 18]

21. The Hudson High School's own newspaper, "Hawk Talk," published the Conservative Club web site address after the Conservative Club itself was prohibited from doing so, ostensibly without permission from the school administration. [Stapelfeld Aff., ¶30-31]

22. No other school club has had its posters censored during the time the Plaintiffs attended Hudson High School, except for the HHSCC. [Christopher Answer to Ints., No. 14, 19]

23. No disturbance has ever been observed at Hudson High School related to the posting of the HHSCC posters. [Christopher Answer to Ints., No. 14]

24. On February 8, 2005, right after the suppression of the Plaintiffs' speech was exposed by the media, the Hudson School Committee adopted policy No. 1700, entitled "Distribution and Posting of Written Materials for Students in Schools." The policy was revised on July 12, 2005. [Exhibit B, Second Amended Complaint, affirmed by Defs. Material Facts

¶67, attached to Affidavit of Gregory A. Hession]

25.    On July 12, 2005,  the Hudson School Committee adopted policy No. 1701, entitled

"Posters Announcing Meetings or Events Sponsored by Student Groups." [Exhibit C,

Second Amended Complaint, affirmed by Defs. Material Facts ¶67, attached to Affidavit

of Gregory A. Hession]

26.    The plaintiffs Kimberly Bowler and Joseph Bowler decided not to have the HHSCC

meet during the 2005-2006 and 2006-2007 academic years because of the harassment by

faculty members and intolerance against persons holding political viewpoints different

than their own, pending the outcome of the instant case.  [Christopher Answer to Ints.,

No. 8,  Defs. Memo., P. 9]


## ARGUMENT

## I.    STANDARD OF REVIEW AND SUMMARY

The  Defendants  set  forth  the  well-known  standard  of  review  in  Fed.R.Civ.P.  56  with

reasonable clarity in their memorandum, citing *Santoni v. Potter*, 369 F.3d 594 (1st Cir. 2004).  The

Defendants, as the moving party, bear the burden of showing: 1) that there is no genuine dispute as

to the material facts in the case; and 2) that they are entitled to judgment as a matter of law.  *Hahn*

*v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975).

The Court must examine the record on summary judgment in the light most favorable to the

party opposing the motion which, in this case, is the Plaintiff.  See *Kennedy v. Josephthal & Co.,*

*Inc.*, 814 F.2d 798, 804 (1st Cir. 1987).  The Court must also draw all reasonable inferences in favor

of the party opposing the motion.  *Id.*

For the reasons set forth below, Plaintiffs assert that Defendants have not met their burden

of showing that there is no dispute of material fact and that they are entitled to judgment as a matter of law, and, thus, their motion should be denied.

First, the Plaintiffs have asserted a number of undisputed material facts in their motions concerning the origins of the Conservative Club and the presence of links on the national affiliate web site, which allow a viewer to click to other sites containing videos of beheadings by terrorists. However, Defendants have omitted a number of critical facts which show that their restriction of the Plaintiffs' free speech was based primarily on the viewpoint espoused by the Plaintiffs in the school and by the Conservative Club, which began long before the discovery of the website in question.

Further, the links to beheadings, which now form the core of the Defendant's objections, are linked from and to hundreds of places on the Internet or on secondary links, most of which are accessible to students from the Hudson High School computers. In summary, the linked videos appear to be a later-discovered pretext for restricting the protected speech of the Plaintiffs at an earlier time.

Second, as set forth in the arguments below, the Defendants have failed to show that they are entitled to judgment as a matter of law on any cause of action pleaded by the Plaintiffs. Rather, the statutory and case law show that the Defendants deprived the Plaintiffs of their protected federal and state free speech rights.

## II.    FIRST AMENDMENT CLAIM

### A.    The Censorship of the Club Posters Was Not Justified As Preventing an Intrusion on the Rights of Other Students.

The Defendants first seek to justify the censorship of the Conservative Club posters by asserting that school administrators were seeking to protect the rights of Hudson High pupils to "be

left alone." Admitting that this right of students is "unclear," Defendants resort to relying upon the decision in *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166 (9th Cir. 2006), *vacated*, 125 S. Ct. 1484 (2007), a decision and judgment the Supreme Court vacated on March 5, 2007. It is well-established that a Supreme Court decision vacating a judgment of a court of appeals deprives the appeals court's decision of any precedential value. *County of Los Angeles v. Davis*, 634 (1978); *Public Service Co. v. Consolidated Utilities & Communications, Inc.*, 846 F.2d 803, 811 (1st Cir. 1988).

Otherwise, the Defendants cite no authority supporting their claim that the censorship is justified under *Tinker v. Des Moines Ind. Comm. Sch. Dist.*, 393 U.S. 503 (1969), as vindicating a student right "to be left alone," and there are numerous problems with this legal theory in any event. First, *Tinker* never held that schools can censor student speech in order to preserve the privacy or solitude of other students. The Supreme Court there simply identified what was *not* at issue in the case, writing that "[t]here is here no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be left alone. Accordingly, this case does not concern speech or action that intrudes upon the work of the schools or the rights of other students." *Tinker*, 393 U.S. at 508. Since that time, the Supreme Court has not identified a "right to be left alone" as grounds for suppressing student speech, nor has any other case.

Second, the Defendants' censorship of the Conservative Club posters, which simply bore the web site address of the High School Conservative Clubs of America, is not justified even under the *Harper* decision. The Ninth Circuit in that case wrote that

> Engaging in controversial political speech, even when it is offensive to others, is an important right of all Americans and learning the value of such freedoms is an essential part of a public school education. Indeed, the inculcation of "the

fundamental values necessary to the maintenance of a democratic political system"
is "truly the 'work of the schools.'" . . . . Limitations on student speech must be
narrow, and applied with sensitivity and for reasons that are consistent with the
fundamental First Amendment mandate. *Accordingly, we limit our holding to
instances of derogatory and injurious remarks directed at students' minority status
such as race, religion, and sexual orientation.*

Harper, 445 F.3d at 1182-1183 (emphasis added; citations omitted). *See also Saxe v. State College
Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2000) (censorship on the basis of "interference with the
rights of others" under *Tinker* has be interpreted only to cover tortious speech, like libel, slander, and
intentional infliction of emotional distress; it is not enough that speech is offensive to others). The
website address clearly is not derogatory to any minority, nor is the video that was accessible at
www.hscca.org demeaning to any minority. Even under the invalid *Harper* case, the censorship
practiced by the Defendants is not justified.

## B.    The Censorship Practiced By the Defendants Was Not Justified By Any Disruption of the School.

Defendants go on to justify the prohibition on the posting of the website address as necessary
to prevent disruption of Hudson High School. Under *Tinker*, "[s]chool officials have the authority
to limit, restrict or punish . . . speech that causes a substantial and material disruption of the school's
operation[.]" *Demers v. Leominster School Department*, 263 F. Supp. 2d 195, 201 (D. Mass. 2003)
(citing *Tinker*, 393 U.S. at 508). However, the Defendants have presented no evidence of actual
disruption caused by the website address appearing on the poster. Instead, they rely upon the
principle that student speech may be censored when school officials believe the speech may cause
disruption.

In relying on a forecast of disruption as grounds for silencing expression protected by the
First Amendment, the Defendants assume a "substantial burden" that they simply have not carried.

*Governor Wentworth Regional Sch. Dist. v. Hendrickson*, 421 F. Supp. 2d 410, 421 (D.N.H. 2006).

As the Supreme Court noted in *Tinker*, 393 U.S. at 508-09 (emphasis added):

> In our system, *undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression*. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. *But our Constitution says we must take this risk . . .; and our history says that it is this sort of hazardous freedom -- this kind of openness -- that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society*.

To justify censorship of student speech, school officials must have "reason to anticipate that" the expression "would substantially interfere with the work of the school." *Id.* at 509. Subsequent cases make clear that Tinker requires a specific and significant fear of disruption, not just some remote apprehension of disturbance. *Saxe*, 240 F.3d at 211.

The cases the Defendants rely on are completely distinguishable from the instant case. In *Hendrickson*, 421 F. Supp. 2d at 418, the school acted upon specific evidence that the student expression in question constituted "a provocative characterization and condemnation of a discrete group of students with whom [the plaintiff] and his friends had ongoing disputes that manifested themselves in incidents of harassment, bullying, and threatened violence." The court there noted that censorship of student speech on the basis of a forecast of substantial disruption of the school must be based upon "specific facts." *Id.* at 421. "School authorities were aware of the history, tension, manifested hostility, and student personalities involved. That knowledge and familiarity with the school and its students, reasonably led them to forecast substantial disruption of or a material interference with school activities." *Id.* at 424.

Cases upholding school bans on apparel with the Confederate flag also rely upon a specific history of racial tension or violence in the school as justification for the ban. *See West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366 (10th Cir. 2000) (history of specific incidents of racial confrontations and violence justified school's belief that allowing Confederate flag would result in substantial disruption of the school) and *Sypniewski v. Warren Hills Reg'l Bd. of Ed.*, 307

F.3d 243, (3d Cir. 2002) (ban on Confederate flag in school justified where there is evidence of prior racial incidents and confrontations in the school).

By contrast, where there is no evidence of past disruption connected to the expression at issue, courts have held that school officials violated the First Amendment by censoring student speech. In *Westfield High School L.I.F.E. Club v. City of Westfield*, 249 F. Supp. 2d 98 (D. Mass. 2003), the court rejected a school's attempt to justify an order forbidding students from distributing candy canes with religious messages attached on the ground that students in the school had a right to be protected from "offensive" material. As to this reason, the court wrote that "the school's 'undifferentiated fear or apprehension of disturbance' is precisely what the Supreme Court held 'is not enough to overcome the right to freedom of expression.'" *Id.* at 123 (citing *Tinker*, 393 U.S. at 508). In *Bragg v. Swanson*, 371 F. Supp. 2d 814 (S.D. W.Va. 2005), the court held that discipline imposed against a student for wearing apparel with the Confederate flag violated the student's First Amendment rights. The school policy was not found to be justified as needed to prevent disruption of the school because the case did not involve a background of racial violence or tension at the high school. *Id.* at 827. *See also Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 259 (4th Cir. 2003) ("In the absence of past incidents, courts have concluded that school authorities have failed to establish a sufficient likelihood of disruption to support the ban on speech.") and *Griggs v. Fort Wayne School Board*, 359 F. Supp. 2d 731 (N.D. Ind. 2005) (school's decision to forbid student from wearing shirt bearing the Marine Corps motto because of the fear that it would incite violence did not satisfy the test of *Tinker*; officials could not point to any evidence supporting the fear that the shirt would incite violent acts).

The Defendants have not, and cannot, point to any prior incidents of disruption because of speech similar to that involved in this case, so their censorship must be deemed to rest on an undifferentiated fear. In his affidavit, Stapelfeld and Champigny assert that based on the report from Ms. Schuck that she "reasonably believed" the presence of the HSCCA website address on posters would cause "substantial disruption" because word of the beheading video would spread around the school and distract students and teachers. But their assertions in this respect are conclusory and not

based upon any supporting evidence. Neither Stapelfeld nor Champigny refer to any similar incident that had occurred or of which they are aware, much less an incident involving the posting of a web address in the school, where substantial disruption of the school occurred. Moreover, they each admit that the HSCCA web address was subsequently published in the school's newspaper, yet they do not refer to any disruption resulting from this publication. If disruption, offense, or disturbance of any kind had resulted from the student paper publication, the Defendants certainly would now raise that incident as a justification for their censorship. The fact that they cannot point to any disruption from student awareness of the web address is strong evidence that their belief of substantial disruption from the posters was not reasonable.

There are additional problems with the Defendants' argument that their censorship of the HSCCA web address was justified in the interest of maintaining school order and discipline. First, they do not argue that the web address itself, the only speech which appeared on school grounds, was disruptive. Indeed, there is nothing inherently disruptive about a web address of this kind, save the situation where the address spells out inappropriate or vulgar messages. In all the cases cited by the Defendants, the expression suppressed by school officials was itself directly offensive or provocative. Thus, the Confederate flag itself expresses (to some) a message of bigotry and racism, *Sypniewski*, while the term "Nazi" was found to have an immediate danger of provoking a violent response from some students in the school in *Hendrickson*.

By contrast, the Defendants in this case do not rely upon anything directly communicated by the HSCCA web address as disruptive, but upon information otherwise accessible due to knowledge of this web address. Not only is there no evidence of past disruption to support the Defendants' censorship, but the Defendants rely upon the supposition that students would access the beheading videos if they visited the HSCCA web address. Given this additional contingency, the justification for the Defendants' suppression of speech is even less supportable. None of the plaintiffs even watched one of the videos accessible from the HSCCA web site.

Another problem with the action of the Defendants is that even if it was aimed at the

beheading videos accessible through the HSCCA website, it prevented access to more information than just those videos. The beheading videos were only a small part of the content available at the HSCCA website, which otherwise contained extensive coverage of topics of great public importance and interest. The Defendants' actions also silenced this other wholly unobjectionable political speech. When a state seeks to restrict expression, "the First Amendment surely requires that the restriction be demonstrably supported by not only a legitimate state interest, but a compelling one, and that the restriction operate without unnecessarily circumscribing protected expression." *Brown v. Hartlage*, 456 U.S. 45, 53-54 (1982). Even where restrictions on speech are otherwise justified, they still must be "narrowly tailored" and eliminate no more than the exact source of the "evil" sought to be remedied. *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808-810 (1984). The ban on the HSCCA website imposed by the Defendants was not narrowly tailored because it impeded access to a substantial amount of speech that was unobjectionable, pure political speech.

In fact, the school took the action necessary to prevent any on-campus viewing of the beheading video. Technology Director Ellen Schuck has averred that after she saw that the beheading video was accessible at the website, she blocked access to the HSCCA website from all Hudson High School computers (Schuck Aff., ¶ 12). Total and full censorship of the HSCCA website address from club posters went well beyond any justifying circumstance, which was solely the on-campus viewing of the beheading video.

Moreover, there are strong reasons to doubt that censorship of the HSCCA website address could reasonably have been considered an effective means of shielding students from the beheading video. That video was widely available on the internet at sources other than the HSCCA website, and its existence was well known because of media coverage. If students wanted to view this video, knowledge of the HSCCA website was not a prerequisite, nor would suppression of the website address have prevented students from accessing the video. Preventing the display of the website address in the school was not a reasonable response to any concerns about disruption, and the Defendants should have realized that their actions would serve only to prevent students from

accessing the other, unobjectionable political speech available at the HSCCA website.

### C.    Censorship of the Posters Was Not Justified Under the *Bethel* Standard.

Censorship of the Plaintiffs' posters also was not justified under the holding in *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675 (1986), that school officials may restrict vulgar or lewd speech.  *Bethel* upheld a school's decision to punish a student for a speech given at a school assembly that was sexually suggestive, writing as follows:

> Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse. Indeed, the "fundamental values necessary to the maintenance of a democratic political system" disfavor the use of terms of debate highly offensive or highly threatening to others. Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions. The inculcation of these values is truly the "work of the schools." . . .  The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board.

*Bethel*, 478 U.S. at  683.  Thus, the Supreme Court authorized school restriction upon the manner of student speech and allowed schools to forbid or punish speech that is lewd, vulgar, or offensive. *See Castorina v. Madison County Sch. Bd.*, 246 F.3d 536, 542 (6th Cir. 2001)  (*Bethel* allows school regulation of the "manner of speech," not the content of the speech) and *Barber v. Dearborn Pub. Schs.*, 286 F. Supp. 2d 847, (E.D. Mich. 2003)  (*Bethel* decision "merely was delineating certain forms of speech – sexually explicit or vulgar and offensive language – that in particular can be said to be 'wholly inconsistent with the "fundamental values" of public school education.'").

In the instant case, there was nothing vulgar, lewd, or offensive in the manner of speech employed by the Plaintiffs on the Club posters.  The expression and information that was censored by the Defendants was simply a website address; there was nothing inherent in the symbols used, www.hscca.org, that was offensive, lewd, or vulgar.  Because the manner of the Plaintiffs' speech was not even remotely lewd, vulgar, or offensive, the decision in *Bethel* is not applicable here.

To the extent the Defendants suggest that *Bethel* applies here because material accessible via the HSCCA website, i.e., Iraqi hostage beheadings, was excessively violent and offensive, the

argument must be rejected as it has been in other cases.  Thus, in *Emmett v. Kent Sch. Dist. No. 415*, 92 F. Supp. 2d 1088 (W.D. Wash. 2000), the court granted a student's request for a preliminary injunction preventing school officials from suspending him for creating a mock "homepage" for his high school that contained references to the death of certain students and gave persons the opportunity to vote on who would "die next."  Rejecting the applicability of *Bethel*, the court pointed out that Justice Brennan's concurrence in *Bethel*, 478 U.S. at 688 (Brennan, J., concurring), disavowed any suggestion that the decision would allow punishment of a student for speech that occurs off school grounds.  The court also noted that student distribution of non-school-sponsored material cannot be forbidden on the basis of undifferentiated fears of disturbance or embarrassment. *Emmett*, 98 F. Supp. 2d at 1090 (citing *Burch v. Barker*, 861 F.2d 1149 (9th Cir. 1988).  Because the school officials had not shown actual or potential disruption of the school as a result of the website, the court found that the student would likely succeed on his First Amendment claim.

Similarly, in *Coy v. Bd. of Ed. of North Canton City Schs.*, 205 F. Supp. 2d 791 (N.D. Ohio 2002), the court rejected the claim of school officials that punishment imposed upon a student for vulgar and offensive content posted on a website created by the student, and accessed by that student at school, was justified under the *Bethel* decision.  "The concerns raised in *Fraser* and *Hazelwood* are not present in this case," the court held.  "Jon Coy was not speaking or attempting to speak in front of a captive audience. . . .  His expressive activity was not sanctioned by the school nor did the school knowingly provide any materials to support the expression."  *Id.* at 799-800.  The court proceeded to hold that the "material disruption" test of *Tinker* would control in the case.  *Accord Beussink by and through Beussink v. Woodland R-IV Sch. Dist.*, 30 F. Supp. 2d 1175 (E.D. Mo. 1998) (*Tinker* applied to validity of discipline imposed upon student for vulgar and offensive content on website created by student off school premises; student was entitled to preliminary injunction).

Even assuming material accessible through the HSCCA website was vulgar or offensive for purposes of the *Bethel* decision, that decision is not controlling here because the expression did not occur on school premises.  That decision extends only to in-school speech, the manner of which is lewd, vulgar, or offensive, and the cases cited by the Defendants in support of application of *Bethel*

here also involved in-school speech.  The Defendants concede that it is the "manner" of student speech that is important under *Bethel*, but do not explain how the words "www.hscca.org" is lewd, vulgar or offensive.  Additionally, as pointed out above, Schuck blocked access to the HSCCA website so any on-campus viewing of the beheading video was prevented.  The additional censorship of the website address was not justified under *Bethel*.

### III.    THERE ARE QUESTIONS OF FACT THAT PRECLUDE SUMMARY JUDGMENT ON THE PLAINTIFFS' EQUAL PROTECTION CLAIM.

The Defendants also seek summary judgment as to the Plaintiffs' claims that they have been discriminated against in violation of the Equal Protection Clause, U.S. Const. Amend. XIV, and the comparable provision of Mass. Const. Part 1, Art. I.[1]  The guarantee to equal protection of the law forbids those acting under color of state law from treating particular persons less favorably because of the views or content expressed in the speech of those persons.  *Police Department of Chicago v. Mosely*, 408 U.S. 92, 96-97 (1972).  The Supreme Court has condemned discrimination among users of the same medium of expression, *id.*, and when the government intentionally singles out persons for different treatment because of those persons' exercise of rights to free speech protected by the First Amendment, the government violates the Equal Protection Clause.  *Wayte v. United States*, 470 U.S. 598, 608 (1985).  When the government engages in viewpoint discrimination against speech, it violates the Constitution's guarantee to equal protection of the law.

Indeed, the guarantee to equal protection forbids any and all arbitrary and irrational discrimination against individuals.  Thus, the Supreme Court has held as follows:

> Our cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  *See Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441 (1923); *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.*, 488 U.S. 336 (1989). In so doing, we have explained that "'the purpose of the equal protection clause of

---

[1]The protection afforded by the state and federal constitutional provisions are equivalent and will be treated together.  *Commonwealth v. Arment*, 412 Mass. 55, 63, 587 N.E.2d 223, 228 (1992).

the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" *Sioux City Bridge Co.*, *supra*, at 445 (*quoting Sunday Lake Iron Co. v. Township of Wakefield*, 247 U.S. 350, 352 (1918)).

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564-565 (2000).

Although the Defendants assert that there has been no different treatment of student club posters, there is evidence disputing this. For example, when Chris Bowler was originally informed that the HSCCA website address could not be posted, he was told by Defendant Berman that the content at the HSCCA's website was "strident and problematic" and the interruption of a Club meeting by certain faculty members who were hostile to the views of the speaker the Club had invited (Bowler Aff. ¶¶ 30-31). No other club's posters were censored. (Ans. Christopher Ints, No. 14, 18).

It is by no means undisputed that the Plaintiffs and the Conservative Club were treated equally by Hudson High School administrators. Because there is a material factual dispute on this point, the Defendants are not entitled to summary judgment on the Plaintiffs' equal protection claims.

## IV. THE CENSORSHIP OF STUDENT CLUB POSTERS VIOLATES THE EQUAL ACCESS ACT.

The Defendants' opposition to the Plaintiffs' Equal Access Act, 20 U.S.C. §§ 4071 et seq., claims is based entirely upon the argument that the Act does not protect the right of non-curriculum student clubs, such as the Conservative Club formed by Chris Bowler, to post posters on the school walls. The Defendants argue that the EAA protects only the right of student clubs to hold "meetings."

Unfortunately for Defendants, this argument runs squarely counter to the seminal decision construing the EAA, *Bd. of Educ. of Westside Cmty. Schools v. Mergens*, 496 U.S. 226 (1990). In *Mergens*, a student religion club sought recognition by the school as a student club. Although the

school allowed the students to meet informally after school, the Court held that formal recognition was required by the EAA:

> Although the school apparently permits respondents to meet informally after school, . . ., respondents seek equal access in the form of official recognition by the school. Official recognition allows student clubs to be part of the student activities program and carries with it access to the school newspaper, bulletin boards, the public address system, and the annual Club Fair. . . . Given that the Act explicitly prohibits denial of "equal access . . . to . . . any students who wish to conduct a meeting within [the school's] limited open forum" on the basis of the religious content of the speech at such meetings, . . ., we hold that Westside's denial of respondents' request to form a Christian club denies them "equal access" under the Act.

*Mergens*, 496 U.S. at 247. The clear import of the *Mergens* decision is the "equal access" means more than just the ability of student groups to hold meetings. The Court found that the students at issue in the case were entitled to formal recognition by the school because it allowed them equal access to modes of communication to other students, i.e., bulletin boards and the public address system. Thus, the Supreme Court found that the school violated the EAA not because it was denying the students the right to meet, but because it was denying the students the right to use school facilities to communicate with other students.

The "equal access" protected by the EAA concerns all the terms and benefits afforded by secondary schools to student clubs, not simply the right to meet during non-curricular time. "Thus, the term 'equal access' means what the Supreme Court said in [*Widmar v. Vincent*, 454 U.S. 263, 267-71 (1981)]: religiously-oriented student activities must be allowed under the same terms and conditions as other extracurricular activities, once the secondary school has established a limited open forum." *Prince v. Jacoby*, 303 F.3d 1074, 1081 (9th Cir. 2002). The *Prince* case also made clear that under *Mergens* the EAA requires secondary schools to allow all student clubs to use school bulletin boards to post club information and announcements on equal terms. *Prince*, 303 F.3d at 1086-87. In any event, a "meeting" protected by the EAA include "those *activities* of student groups which are permitted under a school's limited open forum and are not directly related to the school curriculum." 20 U.S.C. § 4072(3) (emphasis added). To the extent the district court cases cited by the Defendants conflict with *Mergens*, they plainly have been overruled or are not controlling.

Defendants' claim that the Plaintiffs were given "equal access" for the purpose of posting Conservative Club posters must be rejected. The Conservative Club was the only student club whose posters were removed or censored by Hudson High School officials. (Christopher Answer to Ints., No. 14, 19) Only the Conservative Club had its message censored by school officials, which by definition is not equal access.

The Defendants' invocation of provisions of the EAA allowing schools to maintain order and discipline provide no additional support to their motion. This is simply a restatement of the argument, discussed *supra*, that posting of the HSCCA web address would have caused substantial disruption of the school. For the reasons set forth above, the Defendants cannot justify the censorship either on the basis of actual disruption or a reasonable forecast of substantial disruption.

For support, the Defendants cite *Caudillo v. Lubbock Ind. Sch. Dist.*, 311 F. Supp. 2d 550 (N.D. Tex. 2004), where a court upheld a school's refusal to recognize a gay and lesbian student club because the club promoted a website with links to other websites with strong sexual content. However, the court there made explicit findings that the material available on the website was legally obscene, and so was not protected speech. *Id.* at 561. Furthermore, the court there pointed out that, at the time period at issue, homosexuality constituted a criminal offense in Texas so the school was justified in refusing to recognize a club which would be encouraging violations of state law. *Id.* at 565-66. Even to the extent *Caudillo* was correctly decided, it is distinguishable because the content promoted by the school club at issue there was found to be unlawful speech. The same is clearly not true with respect to the HSCCA website. All the content of that website was lawful and protected by the First Amendment.

## V.  THE INDIVIDUAL DEFENDANTS ARE NOT PROTECTED BY QUALIFIED IMMUNITY.

In seeking the protection of qualified immunity, the individual Defendants[2] suggest that because they were operating in "the realm of discretion," qualified immunity precludes any claim against them.  However, the issue in determining whether individual defendants can claim qualified immunity is not whether their acts were "discretionary" but whether that conduct violated the clearly established constitutional rights of the plaintiffs of which a reasonable person would have known. *El Dia, Inc. v. Rosella*, 165 F.3d 106, (1st Cir. 1999) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The Defendants concede, for purposes of this aspect of their summary judgment motion, that their conduct violated the First Amendment but argue that this was not "clearly established."

The proper standard is that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful,. . .; but it is to say that in the light of pre-existing law, the unlawfulness must be apparent. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 535 n. 12 (1985)).  The First Circuit has recognized that the exact conduct need not have been found unconstitutional:

> Rather, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *United States v. Lanier*, 520 U.S. 259 . . . (1997) (alteration in original; internal quotation marks omitted). Thus, all that is needed is that, "in the light of the preexisting law[,] the unlawfulness must [have] been apparent." Anderson, 483 U.S. at 640.

---

[2]Qualified immunity only protects individuals from claims of damages brought under 42 U.S.C. § 1983.  It does not apply to claims for injunctive or declaratory relief against individuals nor is it a defense available to employing governmental entities, such as a school board or town. *Noreida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 705 (1st Cir. 1993).  Furthermore, there is no precedent holding that qualified immunity applies to state law causes of action.

*El Dia, Inc.*, 165 F.3d at 109 (footnote omitted).

Application of this standard here requires rejection of the Defendants' qualified immunity defense. It cannot be doubted that the First Amendment right of high school students to engage in non-disruptive speech in schools was at all relevant times clearly established. *Tinker*, *supra*. More specifically, the case law further establishes that where, as here, school officials assert that censorship of student speech was justified by a forecast of disruption, the officials must be able to point to some past incidents of disruption that would make their concerns more than "undifferentiated fears" of disruption of the school. *Saxe*, 240 F.3d at 212; *Westfield High School L.I.F.E. Club*, 249 F. Supp. 2d at 123; *Bragg*, 371 F. Supp. 2d at 827. *See also Castorina*, 246 F.3d at 544 (if student claims that there were no prior disruptive altercations as a result of Confederate flags are found credible, the court below would be required to strike down the students' suspension as a violation of their rights of free speech as set forth in *Tinker*). The precedent on this point is uniform, and the instant Defendants should have known that the censorship of the HSCCA posters was not allowed on the basis of their "undifferentiated fear" of disruption unsupported by prior incidents.

Furthermore, any reasonable school official would have known that *Bethel* did not support the censorship of the posters. The web address was not "lewd, vulgar or offensive," and no precedent would support a view that the web address falls within the category of speech *Bethel* allows school officials to regulate. And no case has extended the reach of the *Bethel* rationale to speech that occurs off-campus. *Emmett*, 92 F. Supp. 2d at 1088; *Coy*, 205 F. Supp. 2d 799-800. The individual Defendants' conduct did violate clearly established constitutional rights and is not shielded from liability by the doctrine of qualified immunity.

VI.    **THE DECISION TO FORBID POSTING OF THE WEBSITE ADDRESS WAS RATIFIED BY THE HUDSON SCHOOL COMMITTEE, AND SO THE TOWN IS LIABLE FOR CONSTITUTIONAL DEPRIVATION SUFFERED BY THE PLAINTIFFS.**

The Plaintiffs agree with the broad statement set forth in Section VI of the Defendants' summary judgment brief: a municipality is not vicariously liable under 42 U.S.C. § 1983 for the deprivation of constitutional and statutory rights inflicted by municipal employees.  Under *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658 (1975), municipal[3] liability under § 1983 must be based upon a municipal policy, custom or practice that has caused the deprivation of rights granted by federal law.

But the decision to censor the Conservative Club's poster was clearly policy in light of subsequent events showing that the Hudson School Committee ratified the decision.  On July 12, 2005, soon after the incidents at issue here, the Hudson School Committee adopted Policy 1701 concerning posters announcing meetings of student groups.  That policy provides in relevant parts that such posters "may not contain other material including website information."  (Hession Aff., Exhibit C).  Plainly, as a result of the incidents in question here and the decisions made by Defendants Stapelfeld and Champigny, the censorship of student club posters with respect to website addresses has become the official policy of the schools of the Town of Hudson.

The enactment of Policy 1701 effected a ratification and adoption of the decision to censor Conservative Club posters and constitutes a policy that is actionable under § 1983.  The Supreme Court has recognized that ratification and adoption of an employee's decision by the municipal policymaker is grounds for imposing liability on the municipality under *Monell*:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. *If the authorized policymakers approve a subordinate's decision and the basis for it, their*

---

[3]A Massachusetts town is clearly a "person" subject to liability under 42 U.S.C. § 1983. *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 142 (1st Cir. 2003).

*ratification would be chargeable to the municipality because their decision is final*.

*St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (emphasis added). *See also Christie v. Iopa*, 176 F.3d 1231, 1238 (9th Cir. 1999) (a municipality can be liable for an isolated constitutional violation if the final policymaker ratifies a subordinate's actions; ratification is ordinarily a jury question). The promulgation of Policy 1701 shows that the School Committee made a deliberate choice to embrace the decision of Defendants Stapelfeld and Champigny as its own and as its official policy. Therefore, the decision constitutes a policy of the Town for which it may be held liable under § 1983.

In any event, the Town is made a party here not only on the basis of the censorship of the posters that Plaintiff Christopher Bowler sought to post in January 2005, but also on the basis of specific policies the School Committee has adopted that restrict student speech in general and the posting of web addresses specifically. Policies 1700 and 1701 (Hession Aff., Exhibits B and C) are challenged as an infringement of the Plaintiffs' right to free speech (Second Amended Complaint, ¶¶ 4.5 and 5.4). A judgment declaring these policies to be unconstitutional is requested here. These claims clearly are based upon Town policy and are not improper attempts to hold the Town to respondeat superior liability.

## VII. PLAINTIFFS JOSEPH AND KIMBERLY BOWLER HAVE STANDING TO CHALLENGE EXISTING SCHOOL POLICIES BECAUSE THEY ARE CURRENTLY HUDSON HIGH SCHOOL STUDENTS SUBJECT TO THOSE POLICIES.

The Defendants' standing argument makes little sense and fails to appreciate that the existence of Policies 1700 and 1701 are currently inflicting injury upon Plaintiffs Joseph and Kimberly Bowler, who are presently enrolled at Hudson High School. Although the deprivation of constitutional rights arising from the censorship of Conservative Club posters occurred before the policies were adopted, the policies *currently* inhibit the speech of Joseph and Kimberly Bowler by forbidding the posting of any and all website addresses on student club posters. The challenged

policies formalized and ratified the deprivation of rights that was effected when Conservative Club posters were censored in January 2005. Contrary to the Defendants' arguments, the Plaintiffs are not asserting only "past exposure to harm" but a real and present injury to their constitutional rights arising from Policies 1700 and 1701. Club members, including Plaintiffs Kimberly and Joseph Bowler, have not re-started the Conservative Club yet because they observed that the issues of intolerance and censorship at Hudson High School have not been resolved. (Christopher Answer to Ints., No. 8)

## VIII. THE CENSORSHIP OF THE CLUB'S POSTERS VIOLATES MASSACHUSETTS STUDENTS' FREEDOM OF EXPRESSION LAW.

Massachusetts Students' Freedom of Expression Law provides as follows:

The right of students to freedom of expression in the public schools of the commonwealth shall not be abridged, provided that such right shall not cause any disruption or disorder within the school. Freedom of expression shall include without limitation, the rights and responsibilities of students, collectively and individually, (a) to express their views through speech and symbols, (b) to write, publish and disseminate their views, ©) to assemble peaceably on school property for the purpose of expressing their opinions. Any assembly planned by students during regularly scheduled school hours shall be held only at a time and place approved in advance by the school principal or his designee.

No expression made by students in the exercise of such rights shall be deemed to be an expression of school policy and no school officials shall be held responsible in any civil or criminal action for any expression made or published by the students.

For the purposes of this section and sections eighty-three to eighty-five, inclusive, the word student shall mean any person attending a public secondary school in the commonwealth. The word school official shall mean any member or employee of the local school committee.

Mass. Gen. Laws ch. 71, § 82. Plaintiffs are clearly students protected by this law, and the Defendants are clearly school officials subject to its strictures.

The posters and the website information which the Defendants have forbidden also are expressions protected by the Massachusetts statute. "The clear and unambiguous language protects the rights of the students limited only by the requirement that any expression be non-disruptive

within the school. The language is mandatory. The students' rights include expression of views through speech and symbols, 'without limitation.'" *Pyle v. School Comm.*, 423 Mass. 283, 286, 667 N.E.2d 869, 872 (Mass. 1996). The freedom of speech protected under constitutional provisions has been construed to extend not only to expression that sets forth a particular idea or viewpoint, but also to information. The publication of truthful information on a matter of public interest or importance is expression that lies at the heart of the protection afforded by the First Amendment. *Butterworth v. Smith*, 494 U.S. 624, 632 (1990). Information regarding the HSCCA website is the means by which the Plaintiffs make known their views to others at the school and so is within the broad protection intended by the Massachusetts statute.

The only qualification upon the right granted by M.G.L.A. ch. 71, § 82, is that protection does not extend to speech that causes "any disruption or disorder" in the school. As the Supreme Court of Massachusetts wrote in construing this limitation, the court in *Westfield High School L.I.F.E. Club*, 249 F. Supp. 2d at 111,[4] wrote that "[t]he obvious purpose of the statute, to protect student speech, would be completely undermined, . . ., if 'any disruption or disorder' extended to include trivial or merely negative reactions to an unpopular viewpoint." The court went on to hold that a school administrator can censor student expression if the administrator, considering all the circumstances known at the time of his or her decision, reasonably forecasts that any disruption or disorder will ensue within the school because of the expression. *Id.*

To the extent the *Tinker* standard applies under this Massachusetts statute, the Defendants' argument that they reasonably forecast disruption must be rejected. As discussed in section II(B), *supra*, school officials must be able to point to past incidents at the school to support a decision to censor student speech. The court in *Westfield*, 249 F. Supp. 2d at 112-13, also pointed to the lack of evidence of past disruptive incidents as grounds for finding that a school's prohibition on student

---

[4]Contrary to the statement in Defendants' summary judgment memo, the *Westfield* court did not hold that the Massachusetts law was meant to codify the *Tinker* decision. In fact, *Westfield* noted that this contention was not endorsed by the Massachusetts Supreme Judicial Court in *Pyle*. *Westfield*, 249 F. Supp. 2d at 111.

speech violated the Massachusetts student speech law. The Defendants' conclusory argument that they reasonably forecast disruption cannot justify their decision in light of the lack of any evidence to support that claim.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Defendants' Motion for Summary Judgment on all counts of the Plaintiffs' Second Amended Complaint.

Respectfully submitted,
The Plaintiffs, By Counsel,

/s/ Gregory A. Hession
Gregory A. Hession, J.D.
172 Thompson Street.
Springfield, MA  01109
(413) 746-3333
Fax:  (413) 746-6161

Participating Attorney for
The Rutherford Institute

### Certificate of Service

I, Gregory A. Hession, hereby certify that the foregoing document was filed through the Electronic Case Filing System on May 4, 2007, and that a paper copy will be served to any non-registered participants on the same date.

/s/Gregory A. Hession

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER BOWLER, and the HUDSON HIGH SCHOOL CONSERVATIVE CLUB, an unincorporated association,<br><br>*Plaintiff,*<br><br>v.<br><br>JOHN STAPELFELD, in his individual and official capacities as Principal of Hudson High School, DAVID CHAMPIGNY, in his individual and official capacities as Assistant Principal of Hudson High School, and DR. SHELDON BERMAN, in his individual and official capacities as Superintendent of Hudson Public School District,<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. |

## Affidavit of Christopher Bowler

1.    I am Christopher Bowler, Plaintiff in the above captioned action.  I make this affidavit from my own knowledge and experience, to support my motion for a preliminary injunction.

2.    I am currently a senior at Hudson High School in Hudson, Massachusetts.

3.    The faculty, administration, and students at Hudson High School have been, and continue to be, very critical of my political beliefs.  Classroom discussion involved talking points that were anti-American and anti-conservative, and continually derided the conservative point of view.

4.    When I reported this bias to the administration, including the Principal, Mr. Stapelfeld, administrators promised to take strong action.

5.    Despite the administrators' promise, biased comments and conduct by teachers at

1

Hudson High School continued.

6. On other occasions, I was told that I was "ignorant" and an idiot because I supported the policies of the United States and conservative politicians.

7. In the days leading up to the 2004 Presidential election, many teachers openly derided President Bush and openly supported Senator John Kerry. *Fahrenheit 9/11*, a film directed by Michael Moore which was overtly critical of President Bush and his administration, was shown in classrooms at Hudson High School. The film contained graphic violence, including videotaped footage of a beheading. One teacher requested that I view the film, and although I initially declined, the teacher persisted until I agreed to watch the film at home.

8. Because of the persistent anti-American, anti-conservative environment at Hudson High School, I, along with another student, James Melillo, decided to form a club that would serve as a forum for pro-American, pro-conservative dialogue and speech. The club was named the Hudson High School Conservative Club (Conservative Club).

9. James Melillo and I chose to be affiliated with a national organization, High School Conservative Clubs of America (HSCCA). The mission statement of HSCCA is as follows:

The objective of High School Conservative Clubs of America (HSCCA) is to support the United States Constitution, uphold the Bill of Rights, advocate the moral standards of our Founding Fathers, encourage traditional American values, and assist students to form chartered conservative clubs in high schools throughout the nation. We promote the pillars of the Bible, patriotism and conservative beliefs as balance to the mostly "liberal" viewpoints of teachers. Our chartered clubs invite open debate and honest, non-violent, differences of opinion by inviting guest speakers to share outside viewpoints; and we encourage a balanced classroom environment by promoting unbiased teaching.

10. The mission statement and other information relevant to current public affairs, commentary, and the activities of the HSCCA are shown at its website, the URL address of which is www.hscca.org.

11. Conservative Club members and members of affiliate clubs around the country can

2

post articles on this website. I currently have an article posted on the website.

12.    James Melillo and I obtained a teacher sponsor, and the Conservative Club was formally recognized by Principal Stapelfeld as a Hudson High School student club in the Fall of 2004.

13.    Right after we formed the Conservative Club, I overheard two teachers talking to our advisor (who did not know I was listening). The teachers told the advisor they were concerned that I would spread hate around the school, promote violence, be anti-gay, and cause an uprising.

14.    I, along with other Conservative Club members, prepared ten posters that were placed on walls and bulletin boards throughout Hudson High School on Friday, November 12, 2004, for the purpose of publicizing the existence of the club, its purpose, its message, and its meetings. The placement of posters in authorized areas at Hudson High School is a privilege that is granted to all recognized student clubs at Hudson High School. The posters included information about Conservative Club and a reference to the website address of HSCCA.

15.    The following Monday, November 15, 2004, I was called to the office of Assistant Principal Champigny. When he arrived at the office, I found that seven of the ten club posters had been taken down and were in his office.

16.    When I asked why the posters were removed, Defendant Champigny told me that the HSCCA website promotes violence and is anti-gay.

17.    When I requested a further explanation of why the posters were removed, Mr. Stapelfeld told me that because the HSCCA website contained references to visual depictions of beheadings of hostages by Iraqi insurgents and terrorists and offered "links" to such depictions, the posters promoted violence and were inappropriate and could not remain posted.

18.    Neither the references to Iraqi beheadings at the HSCCA website nor any other content accessible at that website promote or encourage violence. In fact, the

3

references to beheadings at the website convey the strongest possible condemnation of those brutal and cowardly acts.  Additionally, the HSCCA website does not contain anti-gay content, but simply contains information in opposition to same-sex marriage, a matter of national and public concern.

19.    After the club posters were posted, teachers at Hudson High School confronted and challenged me regarding the content on the HSCCA website, including the website's opinions supporting the Second Amendment, disbanding the National Education Association, and protecting traditional marriage.

20.    At the ensuing meeting of Conservative Club, the club's teacher sponsor informed me and other persons at the meeting that the club's posters may be put back up and those posters could include the HSCCA web address.

21.    I, along with others, prepared new club posters, one of which includes a reference to the HSCCA website and web address, which were again posted in authorized places throughout Hudson High School on January 7, 2005.

22.    On January 7, 2005, I was again called to Mr. Champigny's office.  When I arrived at the office, I was handed the club poster that contained the HSCCA website address.

23.    Defendant Champigny also handed me a letter, which he had signed.  In the letter, Defendant Champigny confirmed that Mr. Stapelfeld had requested that Conservative Club not post the HSCCA website address on its signs.  Mr. Champigny wrote that the club could post signs without the website address and that he was returning signs to the Plaintiff to make the required changes.

24.    The removal and censorship of the club's posters were the subject of extensive news coverage by media in Massachusetts and nationally.  In response to this publicity, Superintendent Berman requested a meeting with club members and myself.

25.    During this meeting, Dr. Berman defended the decisions and actions of Mr.

Stapelfeld and Mr. Champigny regarding inclusion of the HSCCA website address on club posters. Dr. Berman stated that the tone of some of the content on the HSCCA website was strident and problematic and that Conservative Club could not include the website address of HSCCA on its posters and signs.

26. The Hudson High School student newspaper was allowed to print the website address for HSCCA in a story regarding Conservative Club and its posters.

27. On February 7, 2005, Pacific Justice Institute, a California-based organization specializing in civil liberties advocacy, wrote a letter to Mr. Stapelfeld on behalf of Conservative Club and myself, informing Mr. Stapelfeld that his censorship of the club's posters was contrary to the constitutional rights of the club members. Mr. Stapelfeld did not respond to the letter.

28. On March 8, 2005, Charles Haynes, director of the First Amendment Schools Project of Freedom Forum in Arlington, Virginia, visited the school to interview club members concerning the controversy. Our school is one of only eleven pilot schools in the USA which participate in the "First Amendment Schools" program and receive grant money from that organization.

29. At that meeting, Mr. Haynes suggested that the school's First Amendment Coordinator should try to assure that people with opposing viewpoints feel comfortable. He seemed concerned that the school was not handling the situation correctly.

30. On March 9, 2005, the club held a meeting and sponsored a lecture by Michael Forrest on the need to preserve traditional marriage. Brian Daniels, the school's First Amendment Coordinator to the Freedom Forum, and Gail Lamere, another teacher at Hudson High School, also attended the meeting.

31. In the midst of Mr. Forrest's presentation, Mr. Daniels interrupted and challenged an assertion made by Mr. Forrest. Mr. Forrest respectfully requested that questions be held until after his presentation. At the conclusion of Mr. Forrest's

5

presentation, Mr. Daniels and Ms. Lamere aggressively challenged Mr. Forrest. They accused Mr. Forrest of being an extremist on homosexuality, of vilifying homosexuals, and otherwise attempted to intimidate and harass Mr. Forrest.

32.   To date, I have not been allowed to put up Conservative Club posters with the website address of the High School Conservative Clubs of America.  The website now contains articles describing the bias and suppression of free speech at Hudson High School   Our opinions have been censored, and posters have been removed. Teachers have treated me with disrespect because of my opinions.

33.   I have always acted in a respectful and peaceable manner to the teachers and administration, even when they improperly took away my right of free speech.  I have never caused any disruption or disorder within the school.

Signed under the penalties of perjury this __23__ day of April, 2005.


Christopher Bowler.

# COPY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

05-11007 PBS

*******************************************
CHRISTOPHER BOWLER,                         *
                                            *
HUDSON HIGH SCHOOL CONSERVATIVE CLUB,       *
an unincorporated association,              *
                                            *
JOSEPH T. BOWLER,                           *
                                            *
KIMBERLY A. BOWLER, by and through her      *
father and next friend, STEVEN BOWLER       *
                     Plaintiffs,            *
                                            *
vs.                                         *
                                            *
JOHN STAPELFELD, in his individual and      *
official capacities as Principal of         *
Hudson High School,                         *
                                            *
DAVID CHAMPIGNY, in his individual and      *
official capacities as Assistant            *
Principal of Hudson High School,            *
                                            *
DR. SHELDON BERMAN, in his individual       *
and official capacities as                  *
Superintendent of Hudson Public School      *
District,                                   *
                                            *
TOWN OF HUDSON, MASSACHUSETTS, and          *
                                            *
HUDSON HIGH SCHOOL,                         *
                     Defendants.            *
*******************************************


          Deposition of CHRISTOPHER S. BOWLER,
taken on behalf of the Defendants, pursuant to
Notice under the Federal Rules of Civil
Procedure, before Janice A. Maggioli, RPR, RMR,

CRR, and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
Pierce, Davis & Perritano, LLP, Ten Winthrop
Square, Boston, Massachusetts, on March 7, 2007,
commencing at 10:15 a.m.


MAGGIOLI REPORTING SERVICES, INC.
48 Watson Street
Braintree, Massachusetts 02184
(781) 356-2636


APPEARANCES:

Pierce, Davis & Perritano
[By John J. Davis, Esq.]
Ten Winthrop Square
Boston, Massachusetts 02110
    On behalf of the Defendants.


Law Offices of Gregory A. Hession
[By Gregory A. Hession, Esq.]
172 Thompson Street
Springfield, Massachusetts 01108
    On behalf of the Plaintiffs.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

I N D E X

| Witness | Direct Cross Redirect Recross |
|---------|-------------------------------|

Christopher S. Bowler

By Mr. Davis        5

EXHIBITS

| Id. | Description | Page |
|-----|-------------|------|
| 1 | E-mail Dec. 7, 2004 | 22 |
| 2 | E-mail Dec. 9, 2004 | 85 |
| 3 | Bulletin | 85 |
| 4 | Bulletin | 86 |
| 5 | E-mail Nov. 24, 2004 | 99 |
| 6 | E-mail Dec. 9, 2004 | 106 |
| 7 | E-mail Dec. 10, 2004 | 110 |
| 8 | E-mail Dec. 21, 2004 | 114 |
| 9 | Newspaper Article | 114 |
| 10 | E-mail Jan. 15. 2005 | 119 |
| 11 | E-mail Jan. 26, 2005 | 151 |
| 12 | Handout | 152 |
| 13 | Reading Overview | 152 |
| 14 | Reflection On Teaching | 156 |
| 15 | Listening | 156 |
| 16 | Speaking | 156 |
| 17 | Answers to Interrogatories | 170 |

Exhibit A



EXHIBIT
C. Bowler 1
3·7·07

From: Chris Bowler [csbowl99@comcast.net]
Sent: Tuesday, December 07, 2004 7:51 PM
To: bueler@hscca.org
Subject: My Letter

In response to a clear liberal bias at my high school, Hudson High School of Hudson, Massachusetts, a classmate and I recently decided to start a Conservative Club. I had taken Advanced Placement American Studies the year before which turned out to be largely anti-American studies, complete with teachers refusing to say the Pledge of Allegiance and spouting anti-war and anti-Bush propaganda every day. As a result, I became even more interested in politics and wanted my voice to be heard. I got used to attempts by my teachers and classmates to silence my point of view. While searching web sites, I came across the HSCCA and thought it would be great to start a chapter here.

The first obstacle was to find a sponsor as required by the school. We considered a half-dozen or so teachers but no one wanted any part of it. One even said he'd like to help but didn't want to risk the backlash from the other teachers. After a few weeks, we found a librarian who was willing to let us use the library for meetings and would serve as the sponsor. The Administrator in charge of clubs then gave us approval to hold meetings.

Next we set to make posters announcing the club and the first meeting. The posters announced that a Conservative Club had formed and would meet the next Thursday. We made ten of them and put them up around the school. Included on each was the website address of the HSCCA.

Within a day of putting up the posters, we began to get negative feedback from some of the teachers. We were then paged to the Assistant Principal's office where we were informed that our posters had been removed because a teacher had checked out the website and found that there were videos of beheadings there. As well, they were offended about the phrase,"take down the rainbow flag, put up the American Flag and learn the Pledge of Allegiance." This is a school that recently had a "Blue Day" to promote homosexuality. There was also some reference to the statements about illegal immigrants that bothered them.

A couple of things about our school don't square with the reaction we got. As far as the stated problem with violence, no one seemed to mind when one of my teachers handed me a copy of Fahrenheit 911 to take home. That video had scenes of dead and mutilated bodies in Iraq. And there was also a song played in the video with the F word being shouted that my parents didn't appreciate being played around my younger siblings. And even though it was an R rated movie, a 10th grade teacher offered to show it to her class, my brother's. The students declined and selected a different movie.

Another point is that my school is one of eleven school in the whole country designated as a "First Amendment School." They make it a point to encourage civic involvement and political awareness. I think they're looking for brand "L" and not brand "C." One of the offended

teachers brought an effigy doll of President Bush to school last year with simulated flames shooting out of it and asked the class to go to an anti-war rally in Boston and watch people drag a larger, life-size one through the streets. In the same class they showed us a film of Emmett Till, a black man who was beaten to death. Again, they didn't have a problem showing his mutilated body. Teachers here also have no problems with openly advocating abortion (yes, abortion, not just choice) in the classroom.

I didn't jump into this with blinders on. I was well aware of the reaction we would get if we dared upset the ideological slant that has been honed here. I did think that with the First Amendment on my side, they'd have to leave me alone. And I believed that affiliating with the HSCCA would give us credibility. But here in the People's Republic of Massachusetts, tolerance and empathy are clearly one-way streets, as hard to navigate as the old cow paths of downtown Boston.

The good news is that at least twenty people immediately expressed interest in the club in the first day.

PENGAD 800-631-6989

C Bowler 9

37-07

# Conservative club meets opposition at Hudson High

By Carolyn Kessel Stewart / News Staff Writer
Sunday, December 12, 2004

HUDSON -- As a conservative in what he calls a liberal-filled high school, senior Chris Bowler felt like a meat-eater surrounded by judgmental vegetarians during this year's contentious presidential election season.

Bowler's said his frustration grew as teachers mocked Bush or praised "Fahrenheit 9/11" and classmates loudly proclaimed their liberal opinions in class or in the school newspaper.

"We felt ashamed to express our views," Bowler said.

To challenge the paradigm at his high school, Bowler and a friend created the school's first "conservative club," which met for the first time this week.

But as soon as Bowler and friend James Mellilo hung posters for their new after school group, school officials removed the posters because they referred to a conservative Web site they said promotes violence.

"What started out as a great idea drifted from true conservative values to reactionary," said Principal John Stapelfeld.

The Web site, www.hscca.org, was built and is maintained by a 17-year-old from California and his classmates, who started the High School Conservative Clubs of America.

The home page links to videos of recent beheadings in the Middle East and advocates "taking down the rainbow flag," a reference to homosexuals, and gun ownership for all.

Bowler said he has no violent intentions.

"I do not see anything on the Web site that promotes violence, but it does expose Islamic terrorist violence," he wrote in an e-mail. "I chose www.hscca.org so the Hudson High School Conservative Club could have credibility and a resource. I have seen their club advertised on Fox News and they have many connections to talk show hosts and could get them to come to our school."

Bowler said he had a hard time finding a teacher to sponsor his club, which he found ironic given the fact that Hudson High School was named a "First Amendment School" by the First Amendment Center in Alexandria, Va.

"I believe the teachers used (the Web site) as a red herring to tear down our posters," he said. Bowler was later told he could rehang the posters without reference to the Web site, then told he could reference the Web site.

Librarian Kathy Somerville volunteered to act as adviser to the Conservative Club and said she and other faculty were truly concerned by the mix of violence and assertion of personal opinion as fact on the Web site.

"It was disturbing to everybody," she said. "I think they have to be careful of that on this Web site."

Bowler wanted to start a conservative club instead of a young Republicans' club because he thought it would be more inclusive, he said. "The conservative view to me embraces the idea that family, faith and friendship are the strongest bonds in society and that any changes to those should be thoughtfully examined."

Stephen Bowler, Chris's father, has supported his son in challenging the school.

"I can't do anything but encourage him to stand by his convictions," he said.

Social Studies Teacher Beth Ferns is a self-proclaimed liberal Democrat teacher with a poster that drew Bowler's ire. In her classroom hangs a poster of President George W. Bush quotes such as, "If this were a dictatorship, it would be a heck of a lot easier -- just so long as I'm the dictator."

Ferns has told her students she would display other political posters if they bring them in, but so far her Bush quotes have generated more interest in politics than anything else in her class.

"It's basically to spark discussion," she said. "Who is it that leads our country? What makes them a great leader?"

Ferns said she tells students her political leanings, but also listens and provides time to discuss all

sides.

"I'm not trying to tell you my way is the only way to think, your way is wrong," she said. "I think the one thing we pride ourselves in this school is teaching students to have an opinion, but have an informed opinion."

Schools have to walk a fine line, though, between allowing students expression of their beliefs and protecting the rights of a minority group.

If a club discriminates against any students, it does not have a place in the schools, she said.

"We have to be careful, speech can promote hate or ill-feelings," she said. "It's a tough line schools have to walk."

The Supreme Court limited student free speech in the Tinker v. Des Moines case in 1969 to speech that causes substantial interference with the discipline required for the operation of the school.

"Our measuring stick is whether (speech) is disruptive," Stapelfeld said. What has happened with the conservative club was confusion that quickly snowballed, he said. Ultimately, giving students more of a voice and discussion of civics, is what the school has been trying to promote.

"You can't beat the learning experience," he said.

Tim Morel said he has had a harder time finding people in his school who have what he calls "southern" values, such as being pro-war, pro-death penalty and anti-gay marriage.

"I think our school's too liberal," he said during lunch last week. "Being in Massachusetts, it's hard to find conservatives."

Lindsay Corcoran, editor of the student newspaper, "Hawk Talk," used President Bush's dictator quote in her newspaper, and then apologized for it.

She said she can understand how students like Bowler and Morel feel like minorities in the school. "The liberal students are very outspoken. It's easy (for a liberal) to voice opinions because everyone agrees with you," she said.

1-15-2005-2.txt

From: Chris Bowler [csbowl99@comcast.net]
Sent: Saturday, January 15, 2005 3:05 PM
To: catch22millard@earthlink.net; DJ4prezident@aol.com; Irishguy313@aol.com;
joshuawhite@gmail.com; ourrepublic@yahoo.com; admin@teenconservatives.com;
GMervine@aol.com; Jonwhiz@aol.com
Subject: Conservative Club

Hello High School Conservative Club Presidents,

My name is Chris Bowler and I'm a senior at Hudson High School in Massachusetts.  I
was finally able to start up a Conservative Club in December after my principal
stalled my friend and I for a few months.  Every week, a teacher or two pull me
aside and debate me or beg me to disband the club.

Recently, I had a pro-life speaker come in and the teachers were angry.  Apparently,
they felt very threatened and four teachers ended up coming to the presentation to
"spy" on what was going on.

I was wondering how many students are in each of your clubs?  My club only have
about 20 members and about 5 who come for economic issues, but skip the social
issues.

Have a great weekend and hope to hear from you guys soon.  Fight the good fight!
Don't let the teachers and others make you feel ashamed.  You're doing a great thing
for our country and your community!

Take care,
Chris

EXHIBIT
CBowler 10
3·7·07

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

DOCKET NO.: **05-11007 PBS**

| | |
|---|---|
| CHRISTOPHER BOWLER, | ) |
| | ) |
| HUDSON HIGH SCHOOL | ) |
| CONSERVATIVE CLUB, an | ) |
| unincorporated association, | ) |
| | ) |
| JOSEPH T. BOWLER, by and through | ) |
| his father and next friend, STEVEN BOWLER, | ) |
| | ) |
| KIMBERLY A. BOWLER, by and through | ) |
| her father and next friend, STEVEN BOWLER, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| JOHN STAPELFELD, in his individual | ) |
| and official capacities as Principal of | ) |
| Hudson High School, | ) |
| | ) |
| DAVID CHAMPIGNY, in his individual | ) |
| and official capacities as Assistant | ) |
| Principal of Hudson High School, | ) |
| | ) |
| Dr. SHELDON BERMAN, in his individual | ) |
| and official capacities as Superintendent of | ) |
| Hudson Public School District, | ) |
| | ) |
| TOWN OF HUDSON, MASSACHUSETTS, and | ) |
| | ) |
| HUDSON HIGH SCHOOL, | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF HUDSON HIGH SCHOOL CONSERVATIVE CLUB'S ANSWERS TO INTERROGATORIES OF TOWN OF HUDSON

Hudson High School Conservative Club answers Defendant Town of Hudson's interrogatories, under oath, as follows:

1.  Please state the name, residential address and date of birth of the person answering these Interrogatories, and the relationship of the person answering to the Hudson High School Conservative Club ("HHSCC.")

    **Answer 1**
    Christopher S. Bowler, 2 Abigail Drive, Hudson, MA 01749, dob: 08/31/86, Co-Founder and President.

2.  Please describe in full and complete detail the reasons why the HHSCC was formed, beginning with plaintiff Christopher Bowler's alleged observation during his junior year at Hudson High School ("HHS") that faculty and administrators were critical of conservative political leaders and ending with the designation of Donald Martin as the HHSCC faculty advisor.

    **Answer 2**
    See article, written for the HSCCA website, attached as Exhibit A.

3.  Please describe in full and complete detail how the HHSCC was formed and operated, including, but not limited to, the recruitment of a faculty advisor, the recruitment of members, and the involvement of the High School Conservative Clubs of America (the "HSCCA,") beginning with the designation of Donald Martin as the HHSCC faculty advisor and ending with plaintiff Christopher Bowler's graduation from HHS in 2005.

    **Answer 3**
    Due to a clear liberal bias at my high school, Hudson High School of Hudson, Massachusetts, James Mellilo and I decided to start a Conservative Club. I had taken Advanced Placement American Studies the year before which turned out to be a class filled with discrimination against people with conservative beliefs. As a result, I became even more interested in politics and wanted my voice to be heard. Since Hudson High School is considered a First Amendment School, one of eleven in the country, I decided that forming a political club would help educate myself and other students, and help others to engage in political debate. While searching web sites, I came across the High School Conservative Clubs of America (" HSCCA") and thought it would be great to start a chapter here. They would help us organize meetings, and give us information on what issues to discuss. We also found it appealing that they would send us a banner with our school's name on it.

    After communicating with HSCCA, James and I considered a few teachers as potential advisors, but they were either against conservative principles or were skeptical of such a club. One teacher even said he would like to help but didn't want to risk the backlash from the other teachers. After a few weeks, we asked the librarian, Mrs. Somerville, and she was willing to let us use the library for meetings and serve as the sponsor. The Administrator in charge of clubs then gave us approval to hold meetings.

Next we set out to make posters announcing the club and the first meeting. The posters announced that a Conservative Club had formed and would meet the next Thursday, December 9th, 2004. We made ten of them and put them up around the school. On each we included the website address of the HSCCA.

Within a day of putting up the posters, we began to get negative feedback from some of the teachers. We were then paged to come to the Assistant Principal's office, where we were informed that our posters had been removed because a teacher had checked out the website and found it offensive. They were offended about the phrase, "take down the rainbow flag, put up the American Flag and learn the Pledge of Allegiance." There was also some reference to the statements about illegal immigrants that bothered them. They were also offended by an opinion about disbanding the National Education Association (NEA), which explicitly advocates a liberal, Democratic view on society. When it became apparent that they were getting negative feedback for taking down our posters because of the conservative content, they changed their original statement about the content which had offended them. Within the website **www.hscca.org**, there was a link to other websites that showed videos of beheadings, which the Hudson High School Conservative Club never discussed in school or at their meetings.

Mrs. Somerville was being pressured by other teachers to resign as our advisor, and she respectfully quit, but allowed us to meet in the library for meetings. James and I asked the accounting teacher, Mr. Martin, who described himself as a "moderate", which was appealing to us because he was open to issues on both sides. After that, we continued to host meetings throughout the spring semester, even with teachers harassing students at meetings and in the classroom.

4.  List separately and by year all members of the HHSCC during the 2004-2005, 2005-2006, and 2006-2007 academic years, including for each member his or her residential address and telephone number.

    **Answer 4**
    There were no club members for the years 2005-2006 or 2006-2007.
    For the year 2004-2005:
    Christopher Bowler, 2 Abigail Drive, Hudson, MA 01749, 978-562-8662
    Kimberly Bowler, 2 Abigail Drive, Hudson, MA 01749, 978-562-8662
    Joseph Bowler, 2 Abigail Drive, Hudson, MA 01749, 978-562-8662
    James Melillo, 490 Main Street, Hudson, MA 01749, 978-568-1834
    Whitney Bogosian, Chestnut Street, Hudson, MA, 01749, 978-562-1351
    Christine Delaney, 38 Otsego Drive, Hudson, MA 01749, 978-562-2366
    Sean Tanny, Unlisted
    Sarah Berube, 30 Wilkins, Hudson, MA 01749, 978-562-1849
    Chris Olivo, 130 Manning, Hudson, MA 01749 978-562-0892
    Christina McEntarfer, Unlisted
    Pat Kearns, Unknown.

5.  List separately and by year all officers of the HHSCC during the 2004-2005, 2005-2006,

and 2006-2007 academic years, including how and when said officers were elected, appointed or otherwise selected.

**Answer 5**
For 2004, 2005, The Club President was Christopher Bowler, and the Vice President was James Melillo. They were elected as unopposed candidates at the first meeting. There were no club officers for the years 2005-2006 or 2006-2007.

6.  Please identify the date and location of each meeting of the HHSCC (including, but not limited, to meetings of all committees or sub-committees) held in the 2004-2005, 2005-2006, and 2006-2007 academic years.

**Answer 6**
There were no club meetings for the years 2005-2006 or 2006-2007.

For the year 2004-2005 club meetings were held on:

December 15, 2004
January 12, 2005
February 10, 2005
March 9, 2005
March 30, 2005
April 7, 2005
April 13, 2005

7.  Please identify the HHSCC faculty advisor for the 2005-2006 and 2006-2007 academic years.

**Answer 7**
There were no club meetings for the years 2005-2006 or 2006-2007 and therefore there was no advisor. For the year 2004-2005, Kathy Somerville was the acting advisor for the first meeting. Subsequent to that, Donald Martin was the advisor.

8.  If the HHSCC held no meetings in the academic years 2005-2006 and 2006-2007, please explain the reasons why.

**Answer 8**
Club members decided not to meet due to the coercive harassment by faculty members and staff, and the consequences of their extreme prejudice and intolerance against persons holding any viewpoint but their own, and pending a favorable outcome of the federal lawsuit.

9.  Please describe in full and complete detail the damages alleged in plaintiffs' First Amended Complaint and itemize in full and complete detail all losses allegedly sustained

as a result of the defendants' acts or omissions.

**Answer 9**
Defendants or their agents removed and discarded at least 7 posters valued at approximately $2 each plus two hours labor to prepare them. In addition, plaintiffs suffered emotional harm due to repeated harassment and name calling by faculty members. There is also unknown harm from viewpoint discrimination, grade bias and omission from honor related appointments such as National Honor Society, college recommendations and college scholarship opportunities.

10.    Please describe all communications concerning or relating to any of the incidents alleged in plaintiffs' First Amended Complaint, from January 1, 2004 to the present, between the HHSCC, its agents, servants, officers or representatives, and:

      a.    The defendants, their officials, agents, servants or employees;
      b.    The Hudson School Department;
      c.    The Hudson School Committee;
      d.    The HSCCA, its agents, servants, officers or representatives;
      e.    Any HHS teachers or administrators;
      f.    Any HHS students;
      g.    Any agent or official of any local, state or federal government; and
      h.    Any person who witnessed any of the incidents alleged in plaintiffs' First Amended Complaint.

**Answer 10**
a.    The defendants, their officials, agents, servants or employees:

A letter was received by Christopher Bowler from Assistant Principal Champigny advising him that he could no longer post meeting notices with the website address of the HSCCA on them. A phone conversation took place between Mr. Steve Bowler and Dr. Berman around the time that the meeting notices were removed from the wall. On multiple occasions, Steve Bowler also wrote to Mr. Stapelfeld and Dr. Berman regarding bias in the delivery of curriculum in various classrooms after complaints from Christopher Bowler.

b.    The Hudson School Department;   None.

c.    The Hudson School Committee;   None

d.    The HSCCA, its agents, servants, officers or representatives:
Numerous emails and phone calls were exchanged between Christopher Bowler and Tim Bueller, Founder of The High School Conservative Clubs of America. Subjects ranged from how to post articles on the website to acquiring a banner for the HHCC.

e.    Any HHS teachers or administrators;

Please see responses to Interrogatory 8 of Christopher Bowler.

f.    Any HHS students:

Such communications are too numerous to list separately. The answers to most of the other interrogatories and document requests are responsive to this question.

g.    Any agent or official of any local, state or federal government;

A letter was sent via Internet by Steven Bowler to the Governor of Massachusetts requesting assistance. A letter was received from the state department of education advising Mr. Bowler that the matter should be handled locally. An unsolicited letter of encouragement was received by Christopher Bowler from State Senator Scott Brown.

h.    Any person who witnessed any of the incidents alleged in plaintiff' First Amended Complaint.

Mr. Michael Forrest sent a letter detailing his observations as a guest speaker. Ms. Elizabeth Andrew likewise related her observations as a guest speaker. Mr. Chad Braswell, a guest for the pro-life meeting, also sent messages relating what he observed.

11.    Please identify by name, residential address and telephone number any third parties whose conduct caused or contributed to the occurrence of any of the incidents alleged in plaintiffs' First Amended Complaint, and describe in complete detail how each such third party so caused or contributed to said incidents.

**Answer 11**
Teachers Brian Daniels and Gail Lemere specifically disrupted a meeting of the club and harassed a guest speaker, as described in detail in Response to Interrogatory No. 8 of Christopher Bowler. The Defendants have their contact information.

12.    Please identify by name, residential address and telephone number each person with discoverable knowledge or information about any of the incidents described or alleged in plaintiffs' First Amended Complaint.

**Answer 12**
Club Members which are listed in response number 4;
The defendants;
Brian Daniels;

Gail Lemere;
Michael Forrest;
Elizabeth Andrew;
Chad Braswell

13.    Please state all facts upon which plaintiffs rely to allege, in Paragraph 4.2 of the First
       Amended Complaint, that defendants' actions in removing, converting, and censoring
       posters of the HHSCC, and in restricting the content of those posters, deprived and
       continues to deprive the plaintiffs and other members of the HHSCC of their right to free
       speech and expression under the United States Constitution.

       **Answer 13**
       The HHSCC operated under the Equal Access Act, The Massachusetts Student Free
       Expression Act, and US Constitution which guarantees free speech as well as freedom of
       association. HHSCC posters that were removed were posted in an area designated by the
       school for student clubs. No other club received instructions on what could or could not
       be placed on meeting notice posters. No other entity in the school was ordered not to
       publish and distribute the website address. The school's own newspaper published the
       website address on two occasions while Christopher Bowler was under threat of
       disciplinary action if he published the same information. The school newspaper is freely
       available to all students at the school. The school singularly restricted the free speech
       rights of Christopher Bowler and the HHSCC., while allowing other organizations
       unhampered access to operate.

14.    Please state all facts upon which plaintiffs rely to allege, in Paragraph 5.2 of the First
       Amended Complaint, that defendants' actions in removing, converting, and censoring
       posters of the HHSCC, and in restricting the content of those posters, deprived and
       continues to deprive the plaintiffs and other members of the HHSCC of their right to free
       speech and expression under Massachusetts law and the Massachusetts Declaration of
       Rights.

       **Answer 14**
       Massachusetts has enacted the Student Free Expression Act which tacitly states that
       student speech is not to be restricted unless an actual disturbance would result. The
       school cannot claim that such a disturbance would occur since the only people causing
       such a disturbance were faculty, staff, and administration of the school, who could be
       expected to show some tolerance if someone disagreed with them. No student has been
       stirred to do any wrongful acts, nor is any student known to have suffered any harm from
       the acts of the members of the HHSCC. The school did not restrict any other entity,
       including the school's own newspaper, from publishing and distributing the website
       address. Only HHSCC was prohibited from doing so. No disturbance or harm to a
       student resulted from publishing the web site address by the newspaper, therefore
       restricting the HHSCC and Christopher Bowler from publishing the same web site, which
       was incidental to the main message of the club, violated their rights under Massachusetts
       and Federal Law.

15.   Please state all facts upon which plaintiffs rely to allege, in Paragraph 5.3 of the First Amended Complaint, that the defendants acted with threats, intimidation, and coercion in removing, converting, and censoring posters of the HHSCC, and in restricting the content of those posters.

**Answer 15**
Defendants demanded that HHSCC remove posters advertising their meetings, and continually intimidated club members in many ways during the period the club was in existence. Defendants demanded that the HSCCA web address be censored. Defendants claimed that the reason for the censorship was that the website address was contained on the posters. However, defendants did not ever suggest that the posters be amended. Instead they removed and discarded the posters.

The website reason was offered as a pretext after the fact, after they had stated many other reasons why they did not want the club to operate. These reason all revolved around the opinions and viewpoint of the members of the HSCCA and the national organization, such as opposing some actions of the NEA union, advocating a pro-life position, and being against gay marriage.

Defendants or their agents disrupted club meetings, intimidated members by calling club members such names as Nazis and Terrorists, and compared club members to Timothy McVeigh and John Salvi.

16.   Please state all facts upon which plaintiffs rely to allege, in Paragraph 6.5 of the First Amended Complaint, that the defendants deprived and continue to deprive plaintiffs and other HHSCC members of rights secured by the Equal Access Act, 20 U.S.C. § 4071.

**Answer 16**
The Equal Access Act requires schools to accommodate all non curricular clubs equally if any non curricular clubs are allowed to operate. HHSCC was singled out for disruption of its meetings and intimidation of its membership. Only the HHSCC received a letter ordering them not to post meeting notices with website addresses on them. There was no school policy regarding club posters at the time, so the only governing law would have been the Equal Access Act. The HHSCC was also singled out for censorship while other school entities, such as the school newspaper, were free to publish the website address.

17.   Please state all facts upon which plaintiffs rely to allege, in Paragraph 7.4 of the First Amended Complaint, that the defendants' actions in removing and censoring posters of the HHSCC violated M.G.L. c. 71 § 82.

**Answer 17**
Please see responses to Interrogatory No. 10, 13, 14, 15, and 16.

18.     Please state all facts upon which plaintiffs rely to allege, in Paragraph 8.3 of the First
        Amended Complaint, that the defendants' actions in removing and censoring HHSCC
        posters, and in restricting the content of those posters, constitute intentional
        discrimination against the plaintiffs and other HHSCC members that is irrational,
        invidious, and without any rational basis.

**Answer 18**
The defendants claim that the HSCCC website could cause harm or a parental complaint
was proven "irrational. invidious, and without any rational basis" by subsequent events.
The website address was not only published by the Hudson High School newspaper, but
also by the Metrowest Daily News, The Boston Globe, USA Today, Christian Science
Monitor, Newsmax Magazine and David Limbaugh, a nationally syndicated columnist.
Because of the defendants heavy-handed censorship, the website they strove to censor
was almost universally published. Yet no complaint was ever reported to the club
officers. Further, the defendants' argument that the website contained graphic violence is
ironic since the school has shown Schindler's List, a graphically violent, rated R film, to
the 9th grade, for several years. In addition, during the election season, various teachers
showed the film Fahrenheit 911 to students in both academic and non-academic settings.
It shows a live beheading as well as other scenes of mutilated bodies. When the teachers
want to assert their political viewpoint, graphic violence is acceptable. When
conservative students want to link to a website which, in turn, links to another website
which contains violence which they seek to show is wrong, but is never shown at the
school, it is not acceptable. This double standard for liberals and conservatives typifies
viewpoint discrimination at the school.

19.     Please state all facts upon which plaintiffs rely to allege, in Paragraph 9.2 of the First
        Amended Complaint, that the defendants' actions deprived and continue to deprive
        plaintiff Christopher Bowler and other HHSCC members of the rights and privileges
        otherwise afforded by the defendants to other similarly situated persons and clubs. In
        your answer, please identify the other similarly situated persons and clubs who are (or
        were) afforded rights denied to the plaintiffs.

**Answer 19**
No other club in the 2004-2005 was ever issued a written notice that certain content of
club posters or handouts would be prohibited. The purposely vague school policy written
after the fact still would allow the defendants to discriminate against viewpoints they
deem "immoral, vulgar or offensive". The teachers and administration have
demonstrated that a club that claims to advocate 'Faith, Family and Freedom" is immoral,
vulgar or offensive to them, while other clubs that promote behavior which the majority
of persons would consider "immoral, vulgar or offensive" are allowed to operate without
interference. Other non-curricular clubs that operated without interference at the school
included:

Asian American Club
International Club

Big Brother Big Sister
SLSA
Friends
Gay Straight Alliance
Community Council
Environmental Club
A Capella
Barbershop Boy's Chorus
Drama Society
Dance Team
Barbershop Quartet
Show Choir
Hip Hop Club
Spirit Committee
Jazz Band
Band
Impressions
Math League
Media Club
Hawk Talk
Peer Tutors
Tomorrow's Teachers' Club
Junior National Honor Society
Skating Club
Outdoor Club
National Honor Society
Ski Club

20.    With respect to each person the plaintiffs expect to be called as an expert witness at trial, state the name and address of each such expert witness, the subject matter on which each expert is expected to testify, the substance of the facts and opinions to which each such expert is expected to testify, and a summary of the grounds for each such opinion of each such expert witness.

**Answer 20**

Plaintiffs have not designated an expert. If they do, they will update the answer to this interrogatory.

Stated under the penalties of perjury, this 25th day of November, 2006.

_Christopher Bowler_
Christopher Bowler

Gregory A. Hession, Esq.
LAW OFFICES OF GREGORY A. HESSION
172 Thompson Street.
Springfield, MA 01109
(413) 746-3333
BBO. No. 564457

Participating Attorney for
The Rutherford Institute

John W. Whitehead, Esq.
Douglas R. McKusick, Esq.
THE RUTHERFORD INSTITUTE
1440 Sachem Place
Charlottesville, Virginia 22901
(434) 978-3888
Fax: (434) 978-1789

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| **CHRISTOPHER BOWLER,** ) | |
| ) | |
| **HUDSON HIGH SCHOOL CONSERVATIVE** ) | |
| **CLUB, an unincorporated association,** ) | |
| ) | |
| **JOSEPH T. BOWLER, by and through his** ) | |
| **father and next friend, STEVEN BOWLER** ) | |
| ) | |
| **KIMBERLY A. BOWLER, by and through** ) | |
| **her father and next friend STEVEN BOWLER** ) | |
| *Plaintiffs*, ) | **Case No.  05 CV 11007 PBS** |
| **vs.** ) | |
| ) | |
| **JOHN STAPELFELD, in his** ) | |
| **individual and official capacities as** ) | |
| **principal of Hudson High School,** ) | |
| ) | |
| **DAVID CHAMPIGNY, in his individual** ) | |
| **and official capacities as assistant** ) | |
| **principal of Hudson High School, and** ) | |
| ) | |
| **DR. SHELDON BERMAN, in his individual** ) | |
| **and official capacities as Superintendent of** ) | |
| **Hudson Public School District,** ) | |
| ) | |
| **THE TOWN of HUDSON, MASSACHUSETTS** ) | |
| ) | |
| **THE SCHOOL COMMITTEE OF** ) | |
| **HUDSON, MASSACHUSETTS** ) | |
| ) | |
| **HUDSON HIGH SCHOOL,** ) | |
| *Defendants.* ) | |

**AFFIDAVIT OF GREGORY HESSION, J.D.**

I, Gregory Hession, hereby depose and state:

1.     The attached exhibits are true and accurate copies of Hudson School Committee Policies Nos. 1700 and 1701, and were attached as Exhibits B and C to the Second Amended Complaint.


Signed under the pains and penalties of perjury this 4th day of May, 2007


_/s/ Gregory A. Hession_____
Gregory A. Hession, J.D.

Hudson School Committee Policy                                              1700

## DISTRIBUTION AND POSTING OF WRITTEN MATERIALS
## FOR STUDENTS IN SCHOOLS

The Hudson Public Schools and Town of Hudson offer many programs, activities and events that benefit the children of Hudson. In an effort to provide information about upcoming opportunities to participate in programs, events, and activities, Hudson Public Schools will, from time to time, distribute and/or post information about such opportunities. This policy shall apply to programs, activities or events that are 1) sponsored by the Hudson Public Schools; 2) sponsored by Hudson Public Schools' partner organizations (as defined in section F below) and are for the benefit of Hudson students; 3) sponsored by organizations whose sole purpose is to support Hudson Public Schools; and 4) sponsored by the Town of Hudson.

Written materials that are distributed to students and posted must be appropriate for school-aged children. Written materials must not discriminate against nor disparage any group or individual based on race, gender, ethnicity, sexual orientation, color, marital or parental status, religious orientation, national ancestry or origin. Written materials may not threaten or intimidate any group or individual. These written materials may not be unlawful in any way.

All written materials that are distributed to students and posted must abide by the policies of the Hudson School Committee. These written materials must be consistent with the goals of the Hudson Public School District. The district reserves the right not to distribute and/or post written materials that do not meet the standards described herein, or materials that are inappropriate or irrelevant to the activities and events to which the policy applies.

The preferred method of providing information under this policy is by posting it in school buildings rather than distributing materials to each individual student so as to minimize the cost and administrative burden to school officials and staff. Materials will be provided to each student when the Superintendent or designee deems it appropriate to do so.

The distribution or posting of written materials outlined in this policy does not pertain to the instructional materials generated by school administrators, teachers, and other staff members.

### A. Written Materials for Students: Distribution to Students and Posting in School Buildings

Written materials of the following type or purpose may be distributed to students and posted in school buildings:

1. Information sent by the Hudson Public School District.
2. Announcements of school events, school sports events, official school club events, and school organization events, including school-sponsored or parent organization-sponsored fund raising.
3. School newsletters, officially sanctioned student newspapers and publications, parent organization newsletters and announcements, and site school council newsletters.
4. Promotions that are directly related to school and classroom activities.
5. Information about upcoming events, programs or activities that are sponsored by the Hudson Park and Recreation Commission or other departments within the Town of Hudson.
6. Information about upcoming events, programs or activities that are sponsored by Hudson Public School partner organizations (as defined in section F below) for the benefit of Hudson Public School students.

EXHIBIT
B

| Hudson School Committee Policy | 1700 |
|---|---|

### B. Prohibited Written Materials

The following written materials shall be prohibited from distribution to students and posting in school buildings:

1. Materials that promote anything illegal or immoral and/or are otherwise pervasively indecent or vulgar, or create a disruption in the school environment..
2. Materials that, in any way, violate the policies of the Hudson School Committee, including the policy prohibiting discrimination on the basis of race, gender, ethnicity, sexual orientation, color, marital or parental status, religious orientation, national ancestry or origin.

### C. Approval of Written Materials for Students

1. Each school may distribute, post, or approve for posting appropriate written announcements of school-related events, school promotions, official publications, school newsletters, and parent newsletters (items A1 through A4 above) solely upon the approval of the school principal.
2. The Superintendent or designee shall review all other materials not covered in item C1 for approval or denial. Please refer to section E below regarding submitting to the Superintendent or designee requests for the distribution and posting of written materials.

### D. Guidelines of Written Materials for Students

1. All written materials must be legible.
2. The content of all written materials must be appropriate for school-aged children.
3. Materials must clearly identify the group or groups responsible for organizing the event, activity or program. Discrete logos and symbols may be approved by way of identifying the group or organization.
4. All written materials must contain the statement "Any views or opinions expressed herein are not necessarily those of the Hudson Public Schools" in a conspicuous place in legible print.
5. The Superintendent or designee, at his/her discretion, may establish additional guidelines for written materials.

### E. Submitting Requests for Distribution and Posting of Written Materials for Students by Non-School Sponsored Groups

1. Any person, group, or organization wishing to distribute or post written materials in a specific Hudson public school must first submit for approval a copy of the written materials to the Superintendent's office **at least seven days in advance of the desired distribution or posting time**, together with the following information:
   a. Name, address, and telephone number of the person/group/organization submitting the request. Email address is optional.
   b. Date of requested distribution or posting.
   c. The grade(s) of students to whom the distribution or posting is intended.
2. The Superintendent or designee will review the request and render a decision. The person, group, or organization submitting the request shall be informed of the decision via written letter, telephone call, or email message.
3. Approved written materials must not be overly burdensome for distribution and must be bundled in packages of quantities as designated by each Hudson public school.

## Hudson School Committee Policy

1700

4. In the event that permission to distribute or post written materials is denied, the person, group, or organization may request reconsideration of the decision by the Superintendent or designee. The request for reconsideration must be in writing and must set forth the reasons why distribution is desirable and in the interest of the school community. The Hudson School Committee may reconsider denials of the Superintendent or designee.

### F. Definitions

Partner organizations of the Hudson Public Schools are private organizations that work in cooperation with Hudson Public Schools to deliver programming to Hudson students. The Superintendent or designee shall have the authority to determine the criteria for new partnerships and evaluate possible partnership opportunities. The purpose of partnering with private organizations is to provide students enrichment programming in the fine arts, athletics, as well as other curriculum areas. Partnerships and partnership programs shall be consistent with the mission of Hudson Public Schools.

Adopted by Hudson School Committee:  February 8, 2005
Amended by Hudson School Committee:  July 12, 2005

Marianne Vergano-Laughton
Secretary, Hudson School Committee

| Hudson School Committee Policy | 1701 |
|---|---|

## POSTERS ANNOUNCING MEETINGS OR EVENTS SPONSORED BY STUDENT GROUPS

Posters announcing meetings or events sponsored by student groups may be placed only in areas designated by the school administration. Prior to displaying any poster, the student group must have it initialed by an administrator indicating that it complies with this policy. The purpose of the posters is to identify the sponsoring student group and the dates, times and places of its meeting or events and, therefore, may not contain other material including website information. Posters must be appropriate for school-aged children and may not promote anything illegal or immoral, be pervasively indecent or vulgar, create a disruption in the school environment, or violate in any way the policies of the Hudson School Committee, including its policy prohibiting discrimination on the basis of race, gender, ethnicity, sexual orientation, color, marital or parental status, religious orientation, national ancestry or origin.

Adopted by Hudson School Committee:        July 12, 2005

Marianne Vergano-Laughton
Secretary, Hudson School Committee

Posters                                                                                        Page 1 of 1

**EXHIBIT**
C