UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
─────────────────────────────────
                                  )
CHRISTOPHER BOWLER, et. al.       )
          Plaintiffs,             )
                                  )
     v.                           )  CIVIL ACTION NO. 05-11007-PBS
                                  )
TOWN OF HUDSON, et. al.           )
                                  )
          Defendants.             )
─────────────────────────────────)
```

**MEMORANDUM AND ORDER**

October 4, 2007

Saris, U.S.D.J.

## I.  Introduction

Plaintiffs,[1] who are present or former students of Hudson High School ("HHS"), allege that defendants unlawfully censored their speech by taking down posters advertising the HHS Conservative Club in violation of their First Amendment rights.[2]

---

[1] Plaintiffs are Christopher, Joseph and Kimberly Bowler, by and through their father, Steven Bowler. Plaintiff Christopher Bowler has since graduated. Plaintiffs also include the Hudson High School Conservative Club, an unincorporated association.

[2] Plaintiffs allege five counts in their Second Amended Complaint: (I) a violation of their First Amendment right of free expression; (III) a violation of the Equal Access Act, 20 U.S.C. § 4071; (IV) violations of their right to free expression under the Massachusetts Education Reform Act, M.G.L. c.71 § 82; (V) violation of the right to equal protection under the Equal Protection Clause of the Fourteenth Amendment; and (VI) a violation of the plaintiffs' right to equal protection under Amendment CVI of the Massachusetts Constitution.  The parties filed a Stipulation of Dismissal as to Count II only, plaintiffs' claim under the Massachusetts Civil Rights Act, M.G.L. c.12, § 11I.  Plaintiffs seek nominal damages, damages resulting from conversion of the posters, and equitable relief.

The posters listed the website address for a national organization of high school conservative clubs, which in turn contained a link to another website hosting graphic video footage of hostage beheadings in Iraq and Afghanistan.  The link to the videos was accompanied by a warning.  Defendants assert that the posters were taken down because of the graphic content of the videos, while plaintiffs contend that the true reason was to censor the expression of their political views.

Defendants are John Stapelfeld, the principal; David Champigny, the assistant principal; and Dr. Sheldon Berman, superintendent of the Hudson Public School District; all are sued in their individual and official capacities.  The Town of Hudson and HHS have also been sued.

Defendants move for summary judgment, arguing that plaintiffs' rights were not violated because the beheading videos were offensive, capable of causing substantial disruption, and had the potential to cause psychological harm to young students. Therefore, they argue, the school's censorship was within the bounds permitted by the Supreme Court's student speech jurisprudence.  The individual defendants also contend that they are entitled to qualified immunity, and the Town argues that municipal liability should not attach to either the Town or HHS. After careful consideration of the difficult issues involved, the Court **DENIES**-**IN**-**PART** and **ALLOWS**-**IN**-**PART** defendants' motion for

2

summary judgment.

## II. Factual Background

With all reasonable inferences drawn in favor of the plaintiffs, the record supports the following facts, some of which are hotly disputed.

Defendant HHS enrolls students between the ages of twelve and eighteen.  HHS prides itself in being one of only eleven pilot schools selected to participate in the "First Amendment Schools" program, a national initiative designed to transform the way in which schools teach the rights and responsibilities of democratic citizenship.

In the fall of the 2004, plaintiff Christopher Bowler and his friend, James Milello, formed the HHS Conservative Club ("Club").  They believed that faculty, administration, and fellow students at HHS were prejudiced against conservative political views, and that the school lacked a forum for the expression of their beliefs.  They hoped that starting the Club would provide students with a venue for "pro-American, pro-conservative dialogue and speech."  (Aff. of Christopher Bowler ("Christopher Aff.") ¶8).

Christopher chose to affiliate his Club with a national organization called the High School Conservative Clubs of America ("HSCCA").[3]  He had learned of the HSCCA while searching website,

---

[3] The mission statement of the HSCCA reads:
The objective of the High School Conservative Clubs of

and joined HSCCA to gain assistance and resources for his own
Club.  When Christopher found a teacher sponsor, defendant
Principal Stapelfeld formally recognized the Club as a Hudson
High School student club in November 2004.  (Christopher Aff.
¶12).  Principal Stapelfeld told Christopher and Milello that he
was glad they were "getting involved politically," and helped the
Club find an advisor.  (Aff. of John Stapelfeld ("Stapelfeld
Aff.") ¶¶11-12; see also Christopher Dep. Tr. 89-91).  The Club
was also provided with space to hold meetings and permitted to
have speakers.

    Right after Christopher formed the Club, he overheard two
unnamed teachers telling the club advisor that they were
concerned that he would "spread hate around the school, promote
violence, be anti-gay and cause an uprising."  (Christopher Aff.
¶13).

    Matters came to a head on or about Friday, December 3,

---

    America (HSCCA) is to support the United States
    Constitution, uphold the Bill of Rights, advocate the moral
    standards of our Founding Fathers, encourage traditional
    American values, and assist students to form chartered
    conservative clubs in high schools throughout the nation.
    We promote the pillars of the Bible, patriotism and
    conservative beliefs as balance to the mostly 'liberal'
    viewpoint of teachers.  Our chartered clubs invite open
    debate and honest, non-violent, differences of opinion by
    inviting guest speakers to share outside viewpoints; and we
    encourage a balanced classroom environment by promoting
    unbiased teaching.
High School Conservative Clubs of America, Mission Statement,
http://www.hscca.org/mission.php (last visited Oct. 3, 2007).

2004,[4] when the plaintiffs and other members of the Club prepared ten posters advertising the existence of the Club and their first meeting.  Included on these posters was a link to the HSCCA's website, www.hscca.org (the "URL").  The ten posters were placed on walls and bulletin boards throughout the high school.  The placement of posters in authorized areas at HHS is a privilege granted to all recognized student clubs.

On Monday, December 6, 2004, HHS Technology Director Ellen Schuck received an email from a member of the HHS faculty advising her that the poster included the address of a website, the HSCCA website, that contained "several links to violent and brutal beheadings."  (Aff. of Ellen Schuck ("Schuck Aff.") ¶¶6-7).  Ms. Schuck visited the HSCCA website to determine whether HHS should block access to it.

The HSCCA website contained a prominent banner entitled "Islam: A Religion of Peace?"  Underneath the banner was a picture of a blindfolded hostage kneeling in front of three masked and armed terrorists.  The picture was a still shot from one of five realtime videos of beheadings linked underneath the banner.  The links were accompanied with a warning that the "following videos are extreme [sic] graphic."  (See Melillo Dep.

---

[4] Christopher's affidavit in support of the plaintiffs' Opposition states that the posters were put up "on Friday, November 12, 2004."  (Christopher Aff. ¶14).  Plaintiffs acknowledge, however, that the November 12th date is incorrect. (See Pl. Opp. at 3, ¶¶8, 10).

Tr. at 40 & Ex. 2 (copy of HCSSA website)).

Ms. Schuck found the five beheading videos within moments of
visiting the HCSSA website.  She described her experience viewing
the videos:

> Most alarming to me were the manner in which the victim
> was killed; the anonymity and cold-bloodedness of the
> hooded executioners; the sounds of the victim as he was
> killed; the amount of blood shown; the close-up images of
> the fatal wound, the severed head and the lifeless body;
> and the length of the video.  It seemed to go on and on.
> When the video was finally over, I felt angry, helpless
> and sad.  I was still crying and trembling.

(Schuck Aff. ¶11; see also Melillo Dep. Tr. at 43-44 (finding
videos gruesome, disturbing, and upsetting)).  After she viewed
the video, Ms. Schuck immediately blocked access to the HSCCA URL
(although not to the actual website hosting the videos) from all
computers on the HHS network.  She then met with Assistant
Principal Champigny and told him of the videos accessible through
the HSSCA website, the URL of which was printed on the bottom of
the ten posters that had been put up by the Club members.  After
consulting with HHS Principal Staplefeld, the posters were
removed on December 7, 2006.

That same day, Champigny confronted Christopher with the
posters.  When Christopher arrived at Champigny's office, he
asked why the posters had been removed.  Mr. Champigny responded
that the "HSCCA website promotes violence and is anti-gay."
(Christopher Aff. ¶16).  Mr. Champigny elaborated to Christopher
that the HSCCA website contained links to "visual depictions of

beheadings of hostages" that "were inappropriate and could not remain posted." (Id. ¶17; see also Champigny Aff. ¶10 (informing Christopher that "HHS considered it inappropriate and potentially harmful to expose other students to the type of violence shown in the videos.")). Mr. Champigny also told him that though he "supported the Conservative Club," many of the teachers were offended by the content of the HSCCA website such as (1) calls to take down the rainbow (gay rights) flag and put up the American flag, (2) the website's support for the Second Amendment,(3) the inclusion of a "12-Step Liberal Recovery Program," and (4) its position in favor of abolishing the national education association ("NEA"). (Christopher Dep. Tr. at 62-63). Mr. Champigny informed Christopher that "the Club could not continue to list the HCSSA website on its posters." (Champigny Aff. ¶9).

On or about January 7, 2005, the Club posted new posters on the walls of HHS, at least some of which again listed the HSCAA website address. Christopher was informed by the Club's teacher sponsor that the Club could put the posters back up with the URL listed. (Christopher Aff. ¶20). At this point, Stapelfeld himself viewed the beheading videos and found the videos "shocking and disturbing." (Stapelfeld Aff. ¶26). Christopher was again called to Mr. Champigny's office and Champigny again advised him that the HSCCA website could not be posted on the Club's posters, going so far as to hand him a letter, signed by Champigny, confirming that Principal Stapelfeld had requested

7

that the Club not put the URL on its posters.  (Christopher Aff.
¶23).  Stapelfeld and Champigny allowed the Club to black out the
HSCCA website address on the Club's posters and write the word
"censored" over the HSCCA website address, which the Club did on
several of its posters.  (Champigny Aff. ¶15; see also
Christopher Aff. ¶23).

Over the course of the following month, the debate between
Club members and the HHS administration became the subject of
some notoriety, both locally and nationally.  The Club continued
to host meetings, and invited at least one guest speaker to the
school.[5]  The administration allowed the Club to display a banner
provided to the Club by the HSSCA featuring the URL during Club
meetings, although Christopher was told by Champigny that he was
concerned that teachers would give him "flack" for the decision.
(Christopher Dep. Tr. at 95-97).  On February 3, 2005, the URL
itself was printed in at least one article in the student
newspaper, though without the permission of the school
administration.  (Stapelfeld Aff. ¶¶30-31; Complaint & Answer
¶3.23).  There is no evidence of any disruption in the school
resulting from the widespread publication of the website.  The
URL also appeared in a December 12, 2004 MetroWest Daily feature

_____

[5] Plaintiffs state that on March 9, 2005 the Club sponsored
a lecture by Michael Forrest on "the need to preserve traditional
marriage."  (Christopher Aff. ¶30).  Christopher claims that two
members of the HHS faculty attended this lecture and
"aggressively challenged" the views of their speaker. (Id. ¶31).

covering the dispute, in which HHS Principal Stapelfeld was
quoted as saying, "[w]hat started out as a great idea drifted
from true conservative values to reactionary."  (Christopher Dep.
Tr. Ex. 9).

Plaintiffs claim that during this time they were subject to
harassment from members of the HHS faculty, staff and
administration, who took exception to the content of the HSCCA
website as well as the political views expressed by the students
themselves in class.  Plaintiff Christopher Bowler claims that
during this period he was called "ignorant" and an "idiot" as a
result of his conservative viewpoint. (Christopher Aff. ¶6.)  He
further claims that he overheard teachers talking to his Club's
faculty advisor, expressing concern that the Club would promote
intolerance and hatred. (Id. ¶13.)

In response to the publicity, Superintendent Berman
requested a meeting with Club members, including Bowler.  During
this meeting, Dr. Berman defended the decisions and actions of
Mr. Stapelfeld and Mr. Champigny regarding the HSCCA website
address.  Dr. Berman stated that "the tone of some of the content
of the HSCCA website was strident and problematic and that [the]
Conservative Club could not include the website address of HSCCA
on its posters and signs."  (Christopher Aff. ¶25).

Prior to the formation of the Club, HHS students were shown
the films *Fahrenheit 9/11* and *Schindler's List*, both of which

show graphic violence.[6]  (Christopher Aff. ¶7; Christopher Answers to Interrogs. No. 18; Complaint & Answer ¶3.7).

The Club held seven meetings during the 2004-2005 academic year, the last one on April 13, 2005.  (Christopher Answers to Interrogs. No. 6).  It held no further meetings because of the "coercive harassment" and "intolerance" to the Club's views. (Id. No. 8).  The Club has been inactive since then.  (Id. Nos. 7-8).

Subsequent to the dispute, the Hudson School Committee adopted Policies 1700 and 1701 on February 8, 2005 and July 12, 2005, respectively, which required students to secure prior approval for any posted material, and forbidding any web addresses from being listed on posters.

_____

[6] Plaintiffs also allege that a film depicting Emmett Till's disfigured body at his open-casket funeral was also shown at to students at HHS.  (Pl. Opp. at 2, ¶3 (citing Christopher's Answers to Interrogs., No. 10)).  Emmet Till was an African-American teenager who was brutally murdered in Money, Mississippi in 1955.  His mother insisted on an open-casket funeral, and encouraged journalists to take pictures of his disfigured corpse and pulverized face.  Plaintiffs' citation to the Christopher's Answers to Interrogatories, however, does not support their allegation, and the only support for this allegation is an e-mail attached as an exhibit to Christopher's deposition.  (See Christopher Dep. Tr. Ex. 1).

### III.  Discussion

**A. Summary Judgment Standard**

"Summary judgment is appropriate when 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" <u>Barbour v. Dynamics Research Corp.</u>, 63 F.3d 32, 36-37 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)), <u>cert. denied</u>, 516 U.S. 1113 (1996). "To succeed [on a motion for summary judgment], the moving party must show that there is an absence of evidence to support the non-moving party's position." <u>Rogers v. Fair</u>, 902 F.2d 140, 143 (1st Cir. 1990); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" <u>Barbour</u>, 63 F.3d at 37 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" <u>Rogers</u>, 902 F.2d at 143 (quoting <u>Anderson</u>, 477 U.S. at 249-50) (citations in <u>Anderson</u> omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." <u>Barbour</u>, 63 F.3d at 36.

**B.  First Amendment**

**1.  Free Speech Behind the Schoolhouse Gate**

Students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate."  <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u>, 393 U.S. 503, 506 (1967). However, "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," <u>Bethel Sch. Dist. No. 403 v. Fraser</u>, 478 U.S. 675, 682 (1986), and the rights of students "must be 'applied in light of the special characteristics of the school environment.'" <u>Hazelwood Sch. Dist. v. Kuhlmeier</u>, 484 U.S. 260, 266 (1988) (quoting <u>Tinker</u>, 393 U.S. at 506).  The "nature of those rights is what is appropriate for children in school."  <u>Morse v. Fredrick</u>, 551 U.S. __, 127 S. Ct. 2618, 2627 (2007) (quoting <u>Vernonia Sch. Dist. 47J v. Acton</u>, 515 U.S. 646, 655-56 (1995)).

The Supreme Court has delineated the extent to which school officials may regulate student speech.  First, in <u>Tinker</u>, the Court has held that a school may censor student speech that reasonably threatens to materially and "substantially interfere with the work of the school or impinge upon the rights of other students."  393 U.S. at 509.  However, to do so, the school "must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint."  <u>Id.</u> (students had

First Amendment right to wear black armbands in protest of
Vietnam war despite school administration's "undifferentiated
fear" of classroom disturbance).

The precise scope of <u>Tinker</u>'s 'interference with the rights
of others' language is unclear.  The Supreme Court has deferred
the question whether <u>Tinker</u>'s "invasion of the rights of others"
language extends only to speech capable of triggering tort
liability.  "In any case, it is certainly not enough that the
speech is merely offensive to some listener."  <u>Saxe v. State</u>
<u>Coll. Area Sch. Dist.</u>, 240 F.3d 200, 217 (3d Cir. 2001) (Alito,
J.); <u>Hazelwood</u>, 484 U.S. at 273 n.5.

Second, a school may regulate "plainly offensive" speech --
that is, "sexually explicit, indecent, or lewd speech" -- as part
of its mission to instill those "fundamental values of 'habits
and manners of civility' essential to a democratic society."
<u>Fraser</u>, 478 U.S. at 681, 683-84 (school empowered to ban
sexually-suggestive student speech delivered to "captive
audience" of six hundred students in connection with student
government campaign).  A school may prohibit words that offend
for the same reasons that obscenity offends."  <u>Id</u>. at 685.  The
Court explained that "[t]he undoubted freedom to advocate
unpopular and controversial views in schools and classrooms must
be balanced against the society's countervailing interest in
teaching students the boundaries of socially-appropriate

behavior." <u>Id.</u> at 681. "The determination of what manner of speech in the classroom or in the school assembly is inappropriate properly rests with the school board." <u>Id.</u> at 683.

Third, a school may censor "school-sponsored" speech that is inconsistent with the school's "basic educational mission." <u>Hazelwood</u>, 484 U.S. at 266 (upholding authority of school to prevent publication in school newspaper of student articles on divorce and teen pregnancy produced as part of a journalism class). The <u>Hazelwood</u> Court explained that "[t]he question whether the First Amendment requires a school <u>to tolerate</u> particular student speech -- the question . . . addressed in <u>Tinker</u> -- is different from the question whether the First Amendment requires a school <u>affirmatively to promote</u> particular speech." <u>Id.</u> at 270-71 (emphasis added). Thus while <u>Tinker</u> tightly controls a school's authority to punish or censor non-school-sponsored speech, <u>Hazelwood</u> governs a school's ability to regulate what "is in essence the school's own speech, that is, articles that appear in a publication that is an official school organ." <u>Morse</u>, 127 S. Ct. at 2637 (Alito, J., concurring).

Finally, "schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use." <u>Id.</u> at 2622 (upholding authority of school officials to punish student for displaying a banner reading "BONG HiTS FOR JESUS" at a school-

approved event because message could reasonably be interpreted as promoting illegal drug use).  Justices Alito and Kennedy joined the Court's opinion expressly

> on the understanding that (a) it goes no further than to hold that a public school may restrict speech that a reasonable observer would interpret as advocating illegal drug use and (b) it provides no support for any restriction of speech that can plausibly be interpreted as commenting on any political or social issue, including speech on issues such as "the wisdom of the war on drugs or of legalizing marijuana for medicinal use."

Id. at 2636 (Alito, J., with Kennedy, J., concurring).

The Court has "repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools."  Tinker, 393 U.S. at 507 (citations omitted).  Nonetheless, "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor."  Fed. Election Comm'n v. Wisconsin Right to Life, 551 U.S. __, 127 S. Ct. 2652, 2669 (2007) (addressing non-student speech).

## 2.  Censorship of the Posters

Defendants have moved for summary judgment on plaintiffs' First Amendment claims on numerous grounds.  They argue, first, that the school was permitted to censor the posters under Tinker because it was reasonable to conclude that the graphic content of the videos available on the URL would impinge on the rights of other students, some as young as twelve, and that it threatened

16

to materially and substantially disrupt school operations.

To access the videos, a student would need (1) to view the posters and then, later, (2) access the website (and he could not do so at school because the website was blocked by the time the posters were removed), (3) discover the beheading videos among the other content, (4) navigate past an express warning,[7] and (5) affirmatively click on a link to the videos.  There is no allegation that plaintiffs were publicizing the graphic content of the website.  Thus, students at HHS were not a "captive audience" for the videos; rather, the videos were only available to the students, outside of school, as a matter of conscious choice.  <u>Cf.</u> <u>Fraser</u>, 478 U.S. at 684 (acknowledging "the obvious concern" of parents and teachers "to protect children -- <u>especially in a captive audience</u> -- from exposure to sexually explicit, indecent, or lewd speech") (emphasis added).  When students are exposed to speech only as a consequence of voluntary choice, the speaker has not invaded the rights of others.

Moreover, the administration's fear of disruption cannot support censorship of the posters.  To support the regulation of student speech under <u>Tinker</u>, school officials must produce some <u>evidence</u> that a restriction "is necessary to avoid material or substantial interference with schoolwork or discipline."  393

---

[7] The warning reads: "The following videos are extreme [sic] graphic.  However, we feel it is necessary to provide them so you can see the true doctrines of Islam put to into action.  These are terrorists, and this is what they are capable of."

U.S. at 511.  Accordingly, courts have allowed schools to regulate student expression only in narrow circumstances, for example, where the expression is likely to spark confrontation between students based on a specific history of violent antagonism between racial groups.  Compare West v. Derby Unified Sch. Dist., 206 F.3d 1358, 1366 (10th Cir. 2000) (upholding ban on wearing of confederate flags because "[t]he history of racial tension in the district made administrators' and parents' concerns about future substantial disruptions from possession of Confederate flag symbols at school reasonable.  The fact that a full-fledged brawl had not yet broken out over the Confederate flag does not mean that the district was required to sit and wait for one"), with Bragg v. Swanson, 371 F. Supp. 2d 814, 826-27 (S.D. W. Va. 2005) (school violated student's First Amendment rights when it disciplined him for wearing clothing displaying the confederate flag because the school had no history of racial tension or violence).

Essentially, the defendants' theory is that students would likely become alerted to the videos available on the HSCCA website through the posters, seek them out and view them, suffer a negative psychological reaction, and then "require counseling to cope with their subsequent feelings of helplessness and despair."  (Defs. Mem. at 11.)  They also posit that students might become so disturbed that teachers would be required to take time away from lessons to discuss the videos.

18

Defendants have produced undisputed evidence that the videos were graphic and disturbing. (<u>See</u> Schuck Aff. ¶¶10-11; Millelo Dep. Tr. at 43-44). However, they have not produced evidence that the videos were reasonably likely to result in a substantial interference with the operation of the school. The risk that student counseling may be required, or the likelihood of unplanned classroom discussions, does not rise to the level of a substantial and material disruption comprehended by <u>Tinker</u>. Indeed, these videos were widely available in the internet and the HSCCA URL was published in the school paper, all without incident. While the courts should not Monday-morning quarterback a school's reasonable assessment of risk, still the school persisted in is position even after it was clear there would be no disruption. Accordingly, <u>Tinker</u> does not support censorship of the posters based upon the undisputed evidence before the court.

Next, defendants argue that the graphic videos were "plainly offensive" and therefore subject to regulation under <u>Fraser</u>. Under the Supreme Court's student speech jurisprudence, a school may, in its discretion, limit student speech that is "inappropriate" for school children. See <u>Fraser</u>, 478 U.S. at 682 ("[T]he First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket.") (citation omitted); <u>cf</u>. <u>Acton</u>, 515 U.S. at 656 (explaining that a student's "Fourth Amendment rights, no less than First and

19

Fourteenth Amendment rights, are different in public schools than elsewhere" because of a school's "custodial and tutelary responsibility for children"). True, this jurisprudence has focused on a school's authority to ban lewd, vulgar or obscene speech because "it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse." Fraser, 478 U.S. at 683. Several courts have read Fraser to support censorship of student speech that was not "lewd, vulgar, or obscene" but that could reasonably be interpreted to promote illegal or "immoral" activities, including suicide, murder and drugs. See, e.g., Boroff v. Van Wert City Bd. of Educ., 220 F.3d 465, 470 (6th Cir. 2000)(school may ban wearing of "Marilyn Manson" band t-shirt); Broussard v. Sch. Bd. of Norfolk, 801 F. Supp. 1526, 1534-36 (D. Va. 1992) (school may prohibit wearing of t-shirt reading "Drugs Suck!"). Here, however, because the graphic and arguably "offensive" speech was not actually displayed at school, Fraser does not support the school's censorship. See Coy v. Bd. of Educ. of N. Canton City Schs., 205 F. Supp. 2d 791, 799-800 (N.D. Ohio 2002) (school may not discipline student for vulgar and offensive content posted on student website and accessed at school).

Defendants rely on the Ninth Circuit's decision in Harper v. Poway Unified Sch. Dist., 445 F.3d 1166 (9th Cir. 2006), vacated as moot, 127 S. Ct. 1484 (2007), for the proposition that Tinker's "right to be left alone" encompasses the right to be

20

free from psychological injury.  Harper held that, under Tinker,

"[p]ublic school students who may be injured by verbal assaults

on the basis of a core identifying characteristic such as race,

religion, or sexual orientation, have a right to be free from

such attacks while on school campuses."  Id. at 1178.  However,

Harper lacks precedential value.  See Los Angeles County v.

Davis, 440 U.S. 625, 634 n.6 (1979) (explaining that "vacating

the judgment of the Court of Appeals deprives that court's

opinion of precedential effect").  Even if Harper were good law,

the Ninth Circuit expressly limited its holding "to instances of

derogatory or injurious remarks directed at students' minority

status such as race, religion, and sexual orientation."  445 F.3d

at 1183.  There has been no allegation in this case that the

objectionable content found on the HSCCA website in any way

touched upon the minority status of other students.  There is a

persuasive argument that "the right to be left alone" may extend

to the involuntary exposure of students to upsetting images of

violence in the school setting.  Here, however, there was no such

exposure.

     Although neither side cited Pico v. Board of Education, 457

U.S. 853 (1982), it is worth discussing because it involved the

removal of books from school libraries by the school board

because of their potentially upsetting and possibly anti-American

values.  Id. at 856-58.  The Court, in seven highly fractured

opinions, none of which garnered majority support, held that the

21

"constitutionality of the censorship of materials available in the school library depends upon the motivation behind [the school's] actions." Id. at 871; see also Case v. Unified Sch. Dist. No. 233, 895 F. Supp. 1463, 1468-70 (D. Kan. 1995) (applying Pico, and denying summary judgment where an issue of fact remained as to the motivation for the removal of a school library book). Here, the removal of a poster is not akin to the removal of books from a library although in other situations the blocking of a URL may be analogous. Cf. Reno v. ACLU, 521 U.S. 844, 853 (1997) (describing the internet as "comparable, from the readers' viewpoint, to . . . a vast library.") (emphasis added). For example, Ms. Schuck's decision as Technology Director to block access to the images from all Hudson Public School computers by means of filters on the computer servers seems much more analogous to taking a book out of a library than a decision to remove a poster. There is no challenge to Ms. Shuck's decision to block the URL from the school computers.

Because the students had a First Amendment right to put the website URL on their posters, defendants' motion for summary judgment on Count I is **DENIED**.

## C. The Equal Access Act

Defendants also move for summary judgment on plaintiffs' claims under the Equal Access Act ("EAA" or "Act"), 20 U.S.C. § 4071. The EAA forbids federally-funded public schools that

22

qualify as limited open (i.e., public) forums to "deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings." 20 U.S.C. § 4071(a). That is, "schools that allow student groups whose purpose is not directly related to the curriculum to meet on school grounds during lunch or after school cannot deny other student groups access to the school due to the content of the students' proposed discussions." <u>Colin v. Orange Unified Sch. Dist.</u>, 83 F. Supp. 2d 1135, 1142 (C.D. Cal. 2000). "A 'limited open forum' exists whenever a public secondary school 'grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time." <u>Bd. of Educ. of Westside Cmty. Schs. v. Mergens</u>, 496 U.S. 226, 235 (1990) (citing 20 U.S.C. § 4071(b)). The parties agree that HHS is a limited open forum for purposes of the EAA.

Plaintiffs argue that defendants denied them a "fair opportunity" to conduct a meeting of their Club in violation of the Act because the Club was the only student organization to have its message censored by school officials. It is undisputed that the school allowed the Club to form, hold meetings (at which the HSSCA banner with the URL was displayed), advertise the Club through posters with the URL redacted, and host speakers. "Equal access" has been interpreted to include equal access to school

facilities and resources.  See Straights and Gays for Equal. v. Osseo Area Schs.-Dist. No. 279, 471 F.3d 908, 913 (8th Cir. 2006) (under EAA, student gay rights group "entitled to the same avenues of communication" as other noncurriculum student groups, including access to the public address system and yearbook).  Cf. Clark v. Dallas Indep. Sch. Dist., 806 F. Supp. 116, 120 (N.D. Tex. 1992) ("Plaintiffs' attempts to distribute religious tracts do not fall within the scope of conduct protected by the [EAA]. Plaintiffs were not attempting to hold a 'meeting' within the scope of [the Act].").

Here, the question is whether the school's initial decision to pull down the posters violated the EAA.  From defendant's point of view, the Club was afforded a fair opportunity to advertise, place posters on the walls (without the URLs) and hold meetings, and was not denied access to other avenues of communication or other "miscellaneous rights" available to other student groups.  From plaintiffs' perspective, the posters were pulled down because of the conservative message of the Club and its website, and the purported concern over the grisly beheading was merely a pretext.  The motivation for the removal of the posters is a contested fact question.  Defendants' motion for summary judgment on Count III is **DENIED**.

**D.  The Massachusetts Education Reform Act**

Plaintiffs also bring a claim under M.G.L. c.71 § 82, which provides that

> The right of students to freedom of expression in the public schools of the commonwealth shall not be abridged, provided that such right shall not cause any disruption or disorder within the school.  Freedom of expression shall include without limitation, the rights and responsibilities of students, collectively and individually, (a) to express their views through speech and symbols, (b) to write, publish, and disseminate their views, (c) to assemble peaceably during regularly scheduled school hours for the purpose of expressing their opinions.

The Massachusetts Supreme Judicial Court has held that

> The clear and unambiguous language protects the rights of the students limited only by the requirement that any expression be non-disruptive within the school.  The language is mandatory.  The students' rights include expression of views through speech and symbols, "without limitation." There is no room in the statute to construe an exception for arguably vulgar, lewd, or offensive language absent a showing of disruption within the school.

Pyle v. Sch. Comm., 423 Mass. 283, 286, 667 N.E.2d 869, 872 (1996) (involving t-shirts that violated dress code).  As discussed, the school has not produced evidence that the censorship was justified on the basis of a reasonable forecast of disruption or disorder.  Accordingly, under the plain terms of the statute, summary judgment is unavailable.  Defendants' motion as to Count IV is **DENIED**.

**E.  Equal Protection**

Plaintiffs also bring claims under both the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and the right of equal protection under the Massachusetts Constitution.  These claims are coterminous.  See Dickerson v. Atty. Gen., 396 Mass. 740, 743, 488 N.E.2d 757, 759 (1986) ("For the purpose of equal protection analysis, our standard of review under the cognate provisions of the Massachusetts Declaration of Rights is the same as under the Fourteenth Amendment to the Federal Constitution.").

In order to prevail on an Equal Protection claim, plaintiffs must "allege facts indicating that, compared with others similarly situated, [it] was selectively treated . . . based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  Barrington Cove Ltd. v. R.I Hous. and Mortgage Fin. Corp., 246 F.3d 1, 7 (1st Cir. 2001) (emphasis added) (quoting Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir.1995).

A material issue of fact remains as to whether or not school officials used the graphic videos available on the HSCCA website as a pretext to censor the plaintiffs' political speech in violation of the First Amendment.  The defendants contend that the videos were not used as a pretext and point out, among other

26

things, that the school allowed the Club to form, advertise
meetings through posters with the link redacted, hold meetings at
which the HSCCA website was prominently displayed, and invite
speakers to the school.

Plaintiffs' have countered by arguing that the graphic
nature of the videos were used pretextually to censor the Club's
controversial political views.  Principal Stapelfeld was quoted
in a newspaper article about the poster controversy describing
the website as "reactionary," a criticism that applies to its
political content, not the graphic nature of the videos.  While a
newspaper article is inadmissible hearsay, there is admissible
(disputed) evidence that school administrators Champigny and
Berman were concerned about the content of the website apart from
the gruesomeness of the beheading photos.  Further, the
plaintiffs argue that graphic images used to make more liberal or
mainstream political points -- for example, in *Fahrenheit 911* or
*Schindler's List* -- were not similarly censored.  Finally,
plaintiffs have submitted affidavits alleging a pervasive
atmosphere of hostility by teachers at the school towards the
Club's conservative views.

Taken together, this evidence raises a material issue of
fact as to the school's intent in ordering the URL removed.
While the plaintiffs' evidence does not support the proposition
that the defendants were attempting to silence the Club, a

27

triable issue of fact remains regarding whether the school used the videos as a pretext to censor the HSCCA website for political reasons.  Accordingly, defendants' motion for summary judgment on Count IV is **DENIED**.

**E.  Qualified Immunity**

Under the doctrine of qualified immunity, public officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is intended to shield "all but the plainly incompetent or those who knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986), and provides wide latitude for errors and mistakes.  See, e.g., Wood v. Clemons, 89 F.3d 922, 931 n.9 (1st Cir. 1996) ("Of course, to say . . . a belief would have been reasonable is not to imply that it would have been legally correct."); Lowinger v. Broderick, 50 F.3d 61, 65 (1st Cir. 1995) ("[E]ven erroneous decisions by officials may be entitled to qualified immunity.").

The First Circuit has established a three-part test for determining whether or not a state actor, such as a school official, is entitled to the defense of qualified immunity.

> An official is entitled to qualified immunity unless (1) "the plaintiffs' allegations, if true, establish a constitutional violation," (2) "the right was clearly established at the time of the alleged violation," and (3)

28

> "a reasonable [official], similarly situated, would
> understand that the challenged conduct violated that
> established right."

Rodriguez-Marin v. Rivera-Gonzalez, 438 F.3d 72, 83 (1st Cir.

2006) (quoting Suboh v. Dist. Atty's Office, 298 F.3d 81, 90 (1st

Cir. 2002)).  To be sure, "[t]eachers are neither lawyers nor

police officers; and the law should not demand that they fully

understand the intricacies of our First Amendment jurisprudence."

Morse, 127 S. Ct. at 2639 (Breyer, J., concurring in part and

dissenting in part).  Accordingly, if a jury finds that the

defendants' censored the posters because they reasonably believed

that the videos were inappropriate for high school students,

qualified immunity will attach.

     Plaintiffs argue that the First Amendment right of the high

school students to engage in non-disruptive speech was clearly

established, and that the individual defendants should have known

that censorship of HSCCA posters was unconstitutional under

Tinker and Frasier.  The First Amendment jurisprudence governing

a school's regulation of student access to violent speech on the

internet with the benign intent to protect students from images

which may be upsetting and psychologically damaging is not

settled, as is indicated by the fractured decisions in Pico

regarding the role of the subjective intent for the censorship

and the uncertain status of the "right to be left alone" under

Harper.  Given the Court's own difficulty in determining whether

a First Amendment violation occurred in this case, the Court

cannot find that the First Amendment rights in this case were
"clearly established" in order to defeat the individual
defendants' claim of qualified immunity.

The Court also finds no evidence that a similarly situated
official would have acted differently.  The plaintiffs do not
dispute that the videos linked by the HCSSA website were
upsetting, (See Schuck Aff. ¶¶10-11; Millelo Dep. Tr. at 43-44),
and plaintiffs do not otherwise challenge the blocking of access
to the URL on HHS computers by Technology Director Ms. Schuck.
It is understandable that, after limiting access to the URL on
HHS computers, a reasonable school administrator would proceed to
remove the URL from the Club's posters.  Qualified immunity
contemplates such errors and mistakes.  See Wood, 89 F.3d at 931
n.9.

Finally, and curiously, plaintiffs have not argued against
qualified immunity for the individual school administrators on
the ground that they were impermissibly motivated to punish the
Club's speech because of its content.  See, e.g., Torres v.
Gonzalez, 71 F. Supp. 2d 14, 23 (D.P.R. 1999) ("What is in
controversy and precludes this Court's shielding of defendants'
actions with qualified immunity is whether her dismissal based on
the nullity of her appointment was a mere pretext for defendants'
real motive for dismissing plaintiff, her political affiliation
with the former administration.").  Under First Circuit law, "[a]
party who aspires to oppose a summary judgment motion must spell

out his arguments <u>squarely and distinctly</u>, or else forever hold
his peace." <u>Higgins v. New Balance Athletic Shoe, Inc.</u>, 194 F.3d
252, 260 (1st Cir. 1999) (ruling an alternative "stereotyping"
sexual harassment theory waived when pressed for first time on
appeal) (emphasis added).  As a result, the Court similarly
considers abandoned any claim that the individual defendants are
not entitled to qualified immunity because of their impermissible
motivation.  The Court thus **ALLOWS** summary judgment as to the
qualified immunity of the individual defendants.

The Court concludes by noting that it is unclear whether the
plaintiffs seek damages under their state law claims.  The
plaintiffs only seek injunctive relief for its claim under the
Massachusetts Education Reform Act, but seeks unspecified relief
for its claim under Amendment CVI of the Massachusetts
Constitution.  Plaintiffs shall inform the Court within fourteen
days whether they are pressing claims for damages against the
individual school administrators under state law.

## F.  Vicarious Liability

"[A] municipality cannot be held liable <u>solely</u> because it
employs a tortfeasor -- or, in other words, a municipality cannot
be held liable under § 1983 on a respondeat superior theory."
<u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 691 (1978).
Rather, "it is when execution of a government's policy or custom,
whether made by its lawmakers or by those whose edicts or acts

may fairly be said to represent official policy, inflicts the
injury that the government as an entity is responsible under §
1983." Id. at 694.  In order for municipal liability to attach
in the First Circuit, there must be a finding that "1) that the
municipal policy or custom actually . . . caused the plaintiff's
injury, and 2) that the municipality possessed the requisite
level of fault, which is generally labeled . . . 'deliberate
indifference.'"  Young v. City of Providence ex rel. Napolitano,
404 F.3d 4, 26 (1st Cir. 2005) (emphasis added).

     Plaintiffs contend that their § 1983 claims trigger Monell
liability because the Hudson School Committee adopted policy 1701
(club posters may not include URL's) in July of 2005 in response
to the poster controversy.  Plaintiffs contend that these policy
adoptions constitute ratification of the school's censorship and
that municipal liability should therefore attach.  See City of
St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (commenting
that "when a subordinate's decision is subject to review by the
municipality's authorized policymakers, they have retained the
authority to measure the official's conduct for conformance with
their policies.  If the authorized policymakers approve a
subordinate's decision and the basis for it, their ratification
would be chargeable to the municipality because their decision is
final").

     As explained by the Eleventh Circuit,
     [Municipal] liability on the basis of ratification exists

32

> when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority. <u>The final policymaker, however, must ratify not only the decision itself, but also the unconstitutional basis for it</u>.

<u>Matthews v. Columbia County</u>, 294 F.3d 1294, 1297-1298 (11th Cir. 2002) (citations omitted and emphasis added). "The policymaker must have knowledge of <u>the constitutional violation</u> and actually approve of it." <u>Lytle v. Carl</u>, 382 F.3d 978, 987 (9th Cir. 2004) (emphasis added) (school superintendent was "final policymaker"; municipality could be held liable for ratification of retaliatory acts by principal against teacher where jury found that superintendent also participated directly in retaliation).

Here, the adoption of policies forbidding any web addresses from being listed on posters is, without more, insufficient evidence that the School Committee was ratifying the unconstitutional decision of the principal to censor the posters in violation of the students' First Amendment rights. However, there is also evidence that Superintendent Berman had knowledge of the unconstitutional censorship and ratified it on arguably unconstitutional grounds. Accordingly, summary judgment with respect to the municipality must be **<u>DENIED</u>**.

## G.    Standing to Challenge Policies

Defendants finally contend that the plaintiffs lack standing to challenge the validity of Hudson School Committee Policies 1700 and 1701, because the Policies were enacted *after* the

33

defendants' censorship of the plaintiffs' posters, and because the Club has not met for over two years.  (Def. Mem. at 24-26). Thus, plaintiffs cannot show that they have "sustained or [are] immediately in danger of sustaining some direct injury" from the Policies, as required to show standing.  City of Los Angeles v. Lyons, 461 U.S. 95, 101-02 (1983).  The plaintiffs respond by pointing out that plaintiffs Kimberly and Joseph Bowler are still students of HHS and continue to be subject to the Policies, and that the Club has not yet "re-started" due to the ongoing intolerance of their views at HHS, as evidenced by HHS's prior censorship of the posters.  (Def. Opp. at 23-24).

The First Circuit has held in the First Amendment context that "an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences."  New Hampshire Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996) (finding plaintiff committee had standing to challenge state statute on First Amendment grounds). To establish this injury, the plaintiff must show that the fear of enforcement is "objectively reasonable."  Id. at 14 (citing Laird v. Tatum, 408 U.S. 1, 13-14 (1972)).  Given that the Club and its members, including Kimberly and Joseph Bowler, have been subject to censorship of their posters on at least two occasions, the Court cannot conclude based on the undisputed evidence that their fear of future enforcement of the Policies is objectively

34

unreasonable.  And, in any event, plaintiffs have standing to challenge the Policies under the Massachusetts Education Reform Act, M.G.L. c.71 § 82.  It follows that summary judgment with respect to the plaintiffs' standing to challenge the validity of the Policies must be **DENIED**.

**ORDER**

For the reasons stated, the defendants' motion for summary
is **DENIED-IN-PART** and **ALLOWED-IN-PART**.


**S/PATTI B. SARIS**
United States District Judge